**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                                          :          MEMORANDUM DECISION
                                                :              AND ORDER
TERRORIST ATTACKS ON                            :
SEPTEMBER 11, 2001                              :          03 MDL 1570 (GBD) (SN)
                                                :
                                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

> *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-06977
> *Fed. Ins. Co., et al. v. Al Qaida, et al.*, No. 03-cv-06978
> *Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-09849
> *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-01922
> *Cont'l Cas. Co., et al. v. Al Qaeda Islamic Army, et al.*, No. 04-cv-05970
> *O'Neill, et al. v. Republic of Sudan, et al.*, No. 18-cv-12114
> *Aronow, et al. v. Republic of Sudan*, No. 20-cv-07733
> *Betru, et al. v. The Republic of the Sudan*, No. 20-cv-10615
> *Parker, et al. v. The Republic of the Sudan*, No. 20-cv-10657
> *Nolan, et al. v. The Republic of the Sudan*, No. 20-cv-10720

GEORGE B. DANIELS, United States District Judge:

Plaintiffs in this multidistrict litigation seek to hold Defendant Republic of the Sudan liable for allegedly financing, sponsoring, conspiring to sponsor, aiding and abetting, or otherwise providing material support to Osama bin Laden and the terrorist organization known as al Qaeda, which resulted in mass death, destruction, and injury during the terrorist attacks on September 11, 2001 (the "9/11 Attacks"). In the Consolidated Amended Complaint ("CAC") and *Ashton* Amended Complaint ("*Ashton* Compl."), Plaintiffs allege that Sudan bears responsibility for the 9/11 Attacks because Sudanese government officials, employees, and agents directly and knowingly provided critical support to al Qaeda in the years leading up to the Attacks.[1] (*See*

---

[1] O'Neill, on behalf of a class, also alleged injury. *See Estate of John P. O'Neill, Sr., et al. v. Republic of the Sudan, et al.*, No. 18-cv-12114 (GDB) (SN) (S.D.N.Y. Dec. 21, 2018). This Court denied the *O'Neill* Plaintiffs' motion for class certification. (July 31, 2023 Mem. Decision and Order, ECF No. 9243.)

*generally* CAC, ECF No. 6539; *Ashton* Compl., ECF No. 6537.)[2]  Sudan moves to dismiss these complaints under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  (Def.'s Mot. to Dismiss, ECF No. 6574.)

Before this Court is Magistrate Judge Sarah Netburn's May 2, 2022 Report and Recommendation (the "Report"), recommending the dismissal of certain federal, state, and international law claims but otherwise denying Sudan's motion.  (Report, ECF No. 7942, at 1.) Upon Plaintiffs' motion for partial reconsideration, (ECF No. 8090), Magistrate Judge Netburn amended her Report on September 23, 2022, (Am. Report, ECF No. 8549).[3]  Magistrate Judge Netburn advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections on appeal.  (Report at 71; Am. Report at 6.)

Because the parties filed timely objections to the Report, (*see* CAC Pls.' Objs., ECF No. 8707; Def.'s Objs., ECF No. 8717), this Court undertakes a *de novo* review of the Report.  After doing so, this Court ADOPTS Magistrate Judge Netburn's Report in finding that: (1) this Court has subject-matter jurisdiction over the claims and personal jurisdiction over Sudan, (Report at 5–36), (2) Plaintiffs have stated plausible claims to survive Sudan's motion to dismiss, (*id.* at 36–63; Am. Report at 2–3),[4] and (3) multiple grounds exist to vacate prior entries of default against Sudan, (Report at 63–70).  For the reasons stated herein, Sudan's motion to dismiss, except in regard to specific claims noted, is DENIED.

---

[2] Unless otherwise indicated, all docket numbers refer to the main docket sheet for this multidistrict litigation.  *See In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570.*

[3] For ease of reference, citations in this Decision to the "Report" refer to Magistrate Judge Netburn's May 2, 2022 Report and Recommendation as revised through her September 23, 2022 Amended Report.

[4] This Court declines to adopt the Report's recommendations that Plaintiffs state viable Alien Tort Statute ("ATS") claims and that the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d), authorizes secondary liability claims against foreign sovereigns.  *See* discussion *infra* Part IV.

## I.    BACKGROUND[5]

Plaintiffs allege that Sudan knowingly provided extensive support to al Qaeda and its operatives beginning in the early 1990s. (Report at 2 (citing *Ashton* Compl. ¶ 10; also citing CAC ¶ 16).)  They allege that this support transformed al Qaeda into the global terrorist organization capable of conducting the 9/11 Attacks. (*Id.* (citing *Ashton* Compl. ¶ 10; also citing CAC ¶¶ 15–17).)  Plaintiffs seek to hold Sudan liable for their 9/11-related harms under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*; Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*; Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016); Alien Tort Statute ("ATS"), 28 U.S.C. § 1350; Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961 *et seq.*; international law; and state law.

As detailed in the Report, separate groups of Plaintiffs first filed suit against Sudan between August 2002 and September 2004. (*See* Report at 2–4 (summarizing procedural history).)  Sudan did not participate in the proceedings, resulting in the Clerk of Court issuing at least three certificates of default. (*Id.* at 2–3.)  Then, in 2020, Sudan began appearing in this multidistrict litigation, and the Court approved the filing of two new consolidated complaints: (1) the *Ashton* Amended Complaint, filed November 19, 2020; and (2) the CAC, filed the next day on November 20, 2020.  Sudan filed the instant motion to dismiss on January 8, 2021.

On May 2, 2022, Magistrate Judge Netburn issued her Report on Sudan's motion, recommending dismissing certain federal, state, and international law claims but otherwise denying the motion. (Report at 1.)  Magistrate Judge Netburn amended her Report on September 23, 2022, following Plaintiffs' motion for reconsideration. (Am. Report.)  In its timely objections

---

[5] This Court assumes familiarity with the general background of this case and will only restate relevant background as necessary to address the pending motion.  Because this Court adopts the Report unless otherwise noted, this Court refers to facts detailed in the Report throughout this Decision.

filed with this Court, Sudan argues that the Report incorrectly concludes that this Court has subject-matter jurisdiction under the FSIA, that this Court has personal jurisdiction over Sudan, and that Plaintiffs state any viable claims.  (*See generally* Def.'s Objs.)  CAC Plaintiffs also filed timely and limited objections, arguing that this Court should not adopt the Report's recommendations regarding the FSIA's noncommercial tort exception to sovereign immunity, 28 U.S.C. § 1605(a)(5), and that the Report mistakenly narrowed the scope of the FSIA's terrorism exception to sovereign immunity, 28 U.S.C. § 1605A.  (*See generally* CAC Pls.' Objs.)  On April 19, 2023, this Court held oral argument on the parties' objections.

## II.    LEGAL STANDARDS

### A.  Reports and Recommendations

A court "may accept, reject, or modify, in whole or in part, the findings or recommendations" set forth in a magistrate judge's report.  28 U.S.C. § 636(b)(1)(C).  The court must review *de novo* the portions of a magistrate judge's report to which a party properly objects. *Id.*  The court, however, need not conduct a *de novo* hearing on the matter.  *See United States v. Raddatz*, 447 U.S. 667, 674–75 (1980).  Rather, it is sufficient that the court "arrive at its own, independent conclusion" regarding those portions of the report to which objections are made. *Nelson v. Smith*, 618 F. Supp. 1186, 1189–90 (S.D.N.Y. 1985) (citation omitted).

Portions of a magistrate judge's report to which no or "merely perfunctory" objections are made are reviewed for clear error.  *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (citations omitted).  The clear error standard also applies if a party's "objections are improper—because they are 'conclusory,' 'general,' or 'simply rehash or reiterate the original briefs to the magistrate judge.'"  *Stone v. Comm'r of Soc. Sec.*, No. 17-cv-569 (RJS) (KNF), 2018 WL 1581993, at *3 (S.D.N.Y. Mar. 27, 2018) (citation omitted), *aff'd sub nom. Stone v. Comm'r*

*of Soc. Sec. Admin.*, 767 F. App'x 207 (2d Cir. 2019).   Clear error is present when "upon review of the entire record, [the court is] 'left with the definite and firm conviction that a mistake has been committed.'"   *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (citation omitted).

### B.   Motions to Dismiss

To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A claim is facially plausible when the factual content pled allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."   *Id.* (cleaned up).

In considering a motion to dismiss, a district court "accept[s] all factual claims in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."   *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (citation omitted).   However, this tenet is "inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).   Instead, the pleading's "factual allegations must be enough to raise a right to relief above the speculative level, . . . *i.e.*, enough to make the claim plausible."   *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (cleaned up).

### C.   The Foreign Sovereign Immunities Act

"The FSIA 'provides the sole basis for obtaining jurisdiction over a foreign state in federal court.'"   *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)).   The FSIA renders foreign states, as well as their agencies and instrumentalities, 28 U.S.C. § 1603(a), "presumptively immune from

the jurisdiction of United States courts," unless a specific exception applies, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda— Permanent Mission*, 877 F.2d 189, 195 (2d Cir. 1989) ("The FSIA begins with a presumption of immunity which the plaintiff must overcome by showing that the defendant sovereign's activity falls under one of the statutory exceptions."). Accordingly, "[o]nce the defendant presents a prima facie case that it is a foreign sovereign [or an instrumentality of a foreign sovereign], the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013) ("*Terrorist Attacks III*") (citation omitted).

"Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of fact." *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (cleaned up), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *see also MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 497 (S.D.N.Y. 2017) ("When resolving issues of subject matter jurisdiction, a district court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits and exhibits." (citations omitted)). In doing so, the court "generally must accept the material factual allegations in the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor." *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016); *see also In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 641 (S.D.N.Y. 2018) ("*Terrorist Attacks IV*") (quoting same).

"[B]y permitting the district court to go beyond the bare allegations of the complaint, it preserves the effectiveness of the immunity doctrine by avoiding putting the foreign government defendant to the expense of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amenability to suit at the earliest possible opportunity." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 142 (2d. Cir. 2001) (cleaned up); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017) ("[C]onsistent with foreign sovereign immunity's basic objective, namely, to free a foreign sovereign from *suit*, the court should normally resolve . . . factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible." (citation omitted)).

## III.   THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE CLAIMS AGAINST SUDAN UNDER FSIA § 1605(a)(7) (REPEALED), § 1605A, AND § 1605B, AS WELL AS PERSONAL JURISDICTION OVER SUDAN

This Court has subject-matter jurisdiction over the claims against Sudan under 28 U.S.C. § 1605(a)(7), its successor provision of § 1605A, and § 1605B.[6]  This Court also has personal jurisdiction over Sudan.

### A. The FSIA Terrorism Exceptions of § 1605(a)(7) (repealed), § 1605A, and § 1605B

FSIA § 1605(a)(7) offers an exception to foreign sovereign immunity that confers subject-matter jurisdiction over the claims against Sudan.  This exception waives sovereign immunity for cases against designated state sponsors of terrorism

---

[6] Because Plaintiffs do not allege that the entire tort took place in the United States, this Court holds that the noncommercial tort exception of FSIA § 1605(a)(5) does not confer subject-matter jurisdiction over Plaintiffs' claims. (*See* Report at 35–36.)  "[A] court should decide the foreign sovereign's immunity defense '[a]t the threshold' of the action."  *Helmerich & Payne Int'l*, 581 U.S. at 187 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983)).  Contrary to CAC Plaintiffs' arguments, (*see* CAC Pls.' Objs. at 3–10), Magistrate Judge Netburn properly reached the issue of subject-matter jurisdiction under § 1605(a)(5), which Plaintiffs themselves had asserted was an applicable FSIA exception, (*see, e.g.*, Pls.' Opp'n to Def.'s Mot. to Dismiss, ECF No. 6649, at 8), and correctly determined this exception is not available.

in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . .

28 U.S.C. § 1605(a)(7) (version effective Oct. 6, 2006 to Jan. 27, 2008); *see also Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020) (The "exception permits certain plaintiffs to bring suits against countries who have committed or supported specified acts of terrorism and who are designated by the State Department as state sponsors of terror."). The United States designated Sudan a state sponsor of terrorism in 1993. (Report at 12); *see also* discussion *infra* Section III.B.2.

FSIA § 1605A offers another exception to foreign sovereign immunity for subject-matter jurisdiction over the claims against Sudan.[7] The National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181 ("2008 NDAA"), repealed 28 U.S.C. § 1605(a)(7) and replaced it with 28 U.S.C. § 1605A, "Terrorism Exception to the Jurisdictional Immunity of a Foreign State." This "new exception withdrew immunity, granted jurisdiction, and authorized suits against state sponsors of terrorism for 'personal injury or death' arising from the same predicate acts" as § 1605(a)(7). *Owens v. Republic of Sudan*, 864 F.3d 751, 765 (D.C. Cir. 2017) (quoting 28 U.S.C. § 1605A(a)(1)), *certified question answered*, 194 A.3d 38 (D.C. 2018), *and vacated and remanded on other grounds sub nom. Opati*, 140 S. Ct. 1601; (*see also* Report at 6 (quoting same)). Section 1605A provides a private right of action against state sponsors of terrorism, *see* 28 U.S.C. §

---

[7] In 2020, Congress enacted the Sudan Claims Resolution Act ("SCRA"), Pub. L. No. 116-260, 134 Stat. 3291 (2020) (codified at 28 U.S.C. § 1605A (note)), "which effectively restored Sudan's sovereign immunity with respect to terrorism claims" but "preserved only one class of suits—the ongoing proceedings brought by 'victims and family members of the September 11, 2001, terrorist attacks.'" *Mark v. Republic of the Sudan*, No. 21-5250, 2023 WL 4672260, at *2 (D.C. Cir. July 21, 2023) (quoting SCRA § 1706(a)(2)(A)).

1605A(c), and a party may also seek to recover reasonably foreseeable property loss based on the same acts, *see id.* § 1605A(d).

Lastly, FSIA § 1605B offers another means to find subject-matter jurisdiction for the claims against Sudan for "physical injury to person or property or death" caused by a combination of international terrorism and the tortious acts of foreign states or their officials. 28 U.S.C. § 1605B(b); (*see also* Report at 6 (same)). Unlike the above provisions, this FSIA exception does not require the designation of the foreign sovereign as a "state sponsor of terrorism." *Terrorist Attacks IV*, 298 F. Supp. 3d at 639 (citing 28 U.S.C. § 1605B(b)).

### B. Plaintiffs Have Adequately Pled Proximate Causation, the Appropriate Standard for Jurisdictional Causation Under the FSIA Terrorism Exceptions

The law of the case in this multidistrict litigation provides that jurisdictional causation under § 1605(a)(7), § 1605A, and § 1605B requires only proximate causation, not but-for causation. (Report at 7 (citing *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (SN), 2011 WL 13244047, at *41 (S.D.N.Y. Dec. 22, 2011); also citing *Terrorist Attacks IV*, 298 F. Supp. 3d at 645).) Other courts have similarly found that proximate causation is the appropriate standard for jurisdictional causation under the FSIA terrorism exceptions. (*See id.* at 7–8 (citing cases from the D.C. Circuit and Fourth Circuit).) In turn, proximate causation requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Terrorist Attacks IV*, 298 F. Supp. 3d at 645 (quoting *Owens*, 864 F.3d at 794). Such proximate causation exists when (1) a defendant's acts were a "substantial factor" leading to the injury and (2) the injury was a "reasonably foreseeable" or "natural consequence" of those actions. *Id.* at 645–46.

Plaintiffs have met their burden in showing jurisdictional causation under this proximate causation standard. This analysis requires a court to "accept the material factual allegations in the

complaint as true, but [a court] does not draw all reasonable inferences in the plaintiff's favor." *Figueroa*, 222 F. Supp. 3d at 307; *see also Terrorist Attacks IV*, 298 F. Supp. 3d at 641. As the Report details, Plaintiffs have adequately pled that: (1) Sudan's provision of support to al Qaeda was a "substantial factor" in the 9/11 Attacks; and (2) mass death, injury, and destruction on 9/11 were "reasonably foreseeable" consequences of Sudan's support. (Report at 8–20.)

> 1. *Sudan's Support Was a "Substantial Factor" in al Qaeda's Ability to Launch the 9/11 Attacks*

In assessing the factual allegations, the first inquiry is whether the professed aid from Sudan was a "substantial factor" in building al Qaeda into an organization that could launch the 9/11 Attacks—not if any *individual* form of alleged aid was itself a substantial factor in the *specific* attacks on 9/11. (*See* Report at 8–9 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004).) After Sudanese Army Colonel Omar al-Bashir took over the country with support from Hassan al-Turabi's National Islamic Front ("NIF") in a coup d'état in 1989, Sudan's new government "reached out to al Qaeda and invited Osama bin Laden's nascent terror[ist] group to relocate to Sudan." (*Id.* at 10 (citing CAC ¶¶ 30–34; also citing *Ashton* Compl. ¶¶ 13–15).) Bin Laden had not been welcome in Afghanistan after the Soviet Union's withdrawal in 1989 and had been "expelled [from his home country of Saudi Arabia] in 1990 for his continued support of terrorism." *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549 (E.D. Va. 2007) ("*Rux II*"). By 1992, bin Laden, al Qaeda, and its leadership operated from the Sudanese capital of Khartoum. (Report at 10 (citing CAC ¶ 58).) "Sudan's invitation . . . allowed al Qaeda to extricate itself from a war-torn Afghanistan and organize its terrorist enterprise in a stable safe haven." *Owens*, 864 F.3d at 797.

Plaintiffs adequately plead that Sudan then "mobilized its sovereign might" to protect and bolster the fledgling terrorist group of al Qaeda. (Report at 10.) Sudanese intelligence and security

10

services worked with al Qaeda to vet potential recruits and protected al Qaeda's six militant training camps in Sudan. (*Id.* (citing CAC ¶¶ 69, 137–39).) Sudan also "assigned 15 to 20 uniformed soldiers to act as personal bodyguards for bin Laden and other al Qaeda members," even "foil[ing] an assassination attempt against bin Laden in Khartoum." *Owens*, 864 F.3d at 783. President al-Bashir provided al Qaeda operatives with official documents to bypass Sudanese security screenings and gave operatives Sudanese citizenship, passports, and diplomatic papers for international travel. (Report at 11 (citing CAC ¶¶ 70, 72; also citing *Ashton* Compl. ¶¶ 57, 65).) Al Qaeda then sent multiple operatives from Sudan to receive flight training abroad, including in the United States. (*Id.* at 14 (citing CAC ¶¶ 157–58).) Beyond personnel, the Sudanese government transported weapons and equipment from Afghanistan to Sudan via its state-run airline, planned to manufacture chemical weapons with al Qaeda, and discussed securing uranium for nuclear weapons with the terrorist group. (*Id.* at 11 (citing CAC ¶¶ 73, 154; also citing *Ashton* Compl. ¶ 67).)

The Sudanese government and al Qaeda also maintained an economic relationship. "Bin Laden completed civil infrastructure projects [in Sudan] and started numerous enterprises with wealthy NIF members," to include banks that enabled "al Qaeda to access the international monetary system." (Report at 11 (citing CAC ¶¶ 123–24; also citing *Ashton* Compl. ¶¶ 32–36).) "Sudan allowed its banking institutions to be used by Al Qaeda to launder money," *Rux II*, 495 F. Supp. 2d at 549, to include a scheme that moved $26 to 28 million from Sudan for bin Laden, (Report at 14 (citing *Ashton* Compl. ¶¶ 106–111)). As the Report details, "Sudan and al Qaeda set up agricultural enterprises that maintained a near-monopoly over key exports, front charities to generate revenue and cover operatives' movements, and a host of other enterprises that gave al Qaeda and its operatives access to cash and jobs." (*Id.* at 11–12 (internal citations omitted).)

From 1990 to 1996, the Sudanese government's purported sponsorship transformed and empowered al Qaeda to use its newfound resources as global terrorists. Al Qaeda's early membership of approximately 60 individuals—when it operated near the Afghanistan-Pakistan border—grew to around 2,000 by the early 1990s. (Report at 12 (citing CAC ¶¶ 45, 57).) In 1991, al-Turabi arranged meetings between the NIF, al Qaeda, and Iran, leading Sudan to broker "an agreement with Iran and Hezbollah to transfer their vast terrorist expertise to al Qaeda." (*Id.* (citing CAC ¶¶ 75–82).) Al Qaeda then sent operatives to Lebanon and Iran for training in explosives, security, and intelligence tactics. (*Id.* (citing CAC ¶¶ 84–85).) The CIA concluded that "[w]hile based in Sudan from 1992-1996, [al Qaeda] was transformed from an only partially realized idea to an international organization ready to operate on its own." (*Id.* (quoting CAC ¶ 44).)

Amid mounting international pressure on Sudan in the mid-1990s, bin Laden left the country in 1996, but Sudanese support allegedly persisted. The U.S. State Department assessed that "an amicable separation" occurred to allow bin Laden to continue running his Sudanese enterprises through intermediaries. (Report at 12–13 (citing *Ashton* Compl. ¶ 80).) Despite Sudan's assertion that bin Laden left the country "with practically nothing" because "the Sudanese government expropriated all his assets," (*see* Def.'s Objs. at 8 (quoting NAT'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., THE 9/11 COMMISSION REPORT 63, 170 (2004))), U.S. State Department reports indicate that several of bin Laden's businesses were still operating in Sudan by June 2000, with possible concealment by the Sudanese government, (*see* Report at 13–14 (citing CAC ¶ 135).) In 1998, a State Department terrorism report concluded that "Sudan continued to serve as a meeting place, safehaven, and training hub for a number of international terrorist groups, particularly Usama Bin Ladin's al-Qaida organization." (*Id.* at 13 (quoting CAC

¶ 41).)  This annual terrorism report "continued to describe Sudan as an al Qaeda sanctuary" through 2001.  (*Id.* (citing CAC ¶ 41; also citing *Ashton* Compl. ¶ 118).)

For the proximate causation analysis, Plaintiffs' allegations demonstrate that Sudan's support for al Qaeda was a substantial factor in the 9/11 Attacks.  Because "funds—and, in certain instances, arms and other support—are fungible," Sudan's support needed to have only increased al Qaeda's "operating capacity" as a global terrorist organization capable of striking the United States.  *See Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 368 (D.D.C. 2020).  As other courts have found, "Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network." *Rux II*, 495 F. Supp. 2d at 553.  "Although the expulsion of bin Laden may have marked a temporary setback for Al Qaeda, on balance, the organization benefited greatly from Sudan's aid during the 1990s." *Owens*, 864 F.3d at 797.  The Sudanese government's support thus constituted a substantial factor in al Qaeda's ability to launch the 9/11 Attacks.

     2.   *The 9/11 Attacks Were a "Reasonably Foreseeable" Consequence of Sudan's Support of al Qaeda*

The second factor in the proximate causation analysis is whether an attack on the United States, such as the 9/11 Attacks, was a "reasonably foreseeable" result of Sudan's purported support for al Qaeda.  As this Court has found in the personal jurisdiction context, the harm is foreseeable if a defendant acts to "support some future attack to be planned by al Qaeda against the United States, reasonably anticipating that the brunt of the injuries will be felt there," rather than that the defendant "know[s] . . . the support provided is *specifically for the 9/11 attacks*." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 481 (S.D.N.Y. 2010) (emphasis added).

The allegations indicate Sudan not only foresaw but desired that its support for al Qaeda would lead to an attack on the United States. (*See* Report at 15.) NIF leader al-Turabi sought to unify Sunni and Shia terrorist organizations against the United States, and he and al-Bashir considered the United States an enemy of Sudan. (*Id.* (citing CAC ¶¶ 30, 35).) CIA reports provide that the NIF, al Qaeda, and Iran agreed to "form a tripartite front against their common enemies [the United States and Israel]. . . ." (*Id.* at 16 (quoting CAC ¶ 82).) Specifically, al Qaeda issued fatwas calling for attacks on U.S. forces and other Americans in the region in 1991, 1992, and 1993, which Sudan's intelligence services and the NIF allegedly supported during the 1993 attacks on U.S. troops in Somalia. (*Id.* at 16 (citing *Ashton* Compl. ¶¶ 70–75).) Plaintiffs allege that al Qaeda operatives lived in Sudan and used Sudanese passports to travel to Somalia, in conjunction with NIF support, for these attacks. (*Id.* (citing CAC ¶ 104).) Bin Laden issued additional statements in 1996 and 1998 declaring his intentions to expel American influence from the Middle East and kill Americans. (*Id.* (citing *Rux II*, 495 F. Supp. 2d at 552; also citing *Ashton* Compl. ¶ 81).) Sudan then harbored and aided al Qaeda operatives in mass murder through the 1998 bombings of U.S. Embassies in Kenya and Tanzania, as well as the 2000 suicide attack on the USS *Cole* (DDG 67) in Yemen. (*Id.* at 16–17 (citing *Ashton* Compl. ¶¶ 82–83, 90).)

Attacks on American soil akin to the 9/11 Attacks were a reasonably foreseeable result of Sudan's support for al Qaeda and associated terrorist groups. Following the 1993 bombing of the World Trade Center by al Qaeda-linked operatives, Sudan is alleged to have aided radical Islamic terrorists in planned attacks on six New York City landmarks. (*Id.* at 17 (citing CAC ¶ 115; also citing *Ashton* Compl. ¶¶ 77–78).) The FBI foiled the plot, and U.S. Secretary of State Warren Christopher consequently designated Sudan a state sponsor of terrorism, announcing that "Sudan

is a country which has repeatedly provided support for acts of international terrorism."[8] (*Id.* at 12 (quoting Pls.' Opp'n to Def.'s Mot. to Dismiss, ECF No. 6649, at 10 n.6).)  As previous courts and the Report found, Plaintiffs' allegations, and the "reasonable inferences drawn therefrom, demonstrate a reasonable connection between Sudan's actions" and the 9/11 Attacks for purposes of jurisdictional causation.  (*Id.* at 18 (quoting *Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006) ("*Rux I*")).)

Sudan's direct support of al Qaeda and its terrorist agenda make the allegations "different in kind" from the allegations against charities and non-governmental groups, such as the Saudi High Commission for Relief in Bosnia and Herzegovina ("SHC"), which this Court found to be indirectly linked to al Qaeda and causally disconnected from the 9/11 Attacks.  (*See* Report at 19 (citing *Terrorist Attacks IV*, 298 F. Supp. 3d at 647).  *Contra* Def.'s Objs. at 4–13.)  The factual allegations here indicate that the Sudanese government harbored al Qaeda because it wanted the organization to attack the United States, facilitated meetings about attacking the United States, sponsored the travel and training of operatives to develop terrorist tactics, helped finance al Qaeda's operations, and aided al Qaeda operatives in multiple terrorist attacks on U.S. targets. This claimed Sudanese government support for al Qaeda was therefore a substantial factor in the reasonably foreseeable outcome of al Qaeda injuring and killing innocent people when it again attacked America on September 11, 2001.

### C.  Sudan's Alleged Actions Waive Sovereign Immunity and Provide This Court with Subject-Matter Jurisdiction Under the FSIA's Terrorism Exceptions

Applying these factual allegations to the FSIA terrorism exceptions, this Court has jurisdiction over the claims against Sudan.  FSIA §§ 1605(a)(7) and 1605A(a)(1) are exceptions to foreign sovereign immunity for a designated state sponsor of terrorism that provides "material

---

[8] This designation remained until 2020.  (Report at 12.)

support or resources," as defined by 18 U.S.C. § 2339A(b)(1), for terrorist acts. "Material support

or resources" means

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel (1 or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). This definition clearly includes the Plaintiffs' allegations of Sudanese

support for al Qaeda, such as the Sudanese government providing banking and financial services

for bin Laden's companies, facilitating terrorist training of al Qaeda operatives by Iranian and

Hezbollah agents, issuing Sudanese passports and travel documents to known al Qaeda operatives,

providing terrorist recruitment assistance, and transporting al Qaeda's goods and personnel within

and beyond Sudanese borders in furtherance of terrorist plots. *See* factual allegations *supra*

Section III.B. President al-Bashir, NIF leader al-Turabi, and other Sudanese state officials

provided this material support "within the scope of [their] office[s], employment, or agency." *See*

28 U.S.C. §§ 1605(a)(7), 1605A(a)(1), 1605B(b)(2). Indeed, aid such as the issuance of Sudanese

identity documents and the deployment of military personnel to protect bin Laden and al Qaeda

training camps within Sudanese borders constituted powers vested only in the sovereign of Sudan.

Plaintiffs also meet separate statutory requirements under the FSIA § 1605B exception. A

foreign state need not be designated a state sponsor of terrorism under this exception, whereby the

state lacks immunity for "an act of international terrorism in the United States" in which the foreign

state or its personnel committed "a tortious act or acts." 28 U.S.C. § 1605B(b). The basis of a

foreign state's tortious act or omission must be more than mere negligence, *id.* § 1605B(d), and

this Court has found that the liability for the underlying ATA cause of action requires knowing or

deliberate indifference, *In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 517

(S.D.N.Y. 2010) ("*Terrorist Attacks II*").   Here, Plaintiffs sufficiently plead knowing and deliberate conduct by President al-Bashir, al-Turabi, and multiple levels of Sudanese government officials and employees in supporting al Qaeda and furthering its terrorist agenda.   *See* factual allegations *supra* Section III.B; (*see also* Report at 21–23).

> 1.  *This Court Has Subject-Matter Jurisdiction over Family-Member Claims Under FSIA §§ 1605A(a) and 1605B*

Plaintiff family members of 9/11 victims thus rightly bring their solatium claims against Sudan under 28 U.S.C. §§ 1605A(a) and 1605B.   As the Report found, section 1605A(a)(2)(A)(ii) extends jurisdiction and waives sovereign immunity for cases where either "the claimant or the victim" was a national of the United States, member of the armed forces, or government employee. (*See* Report at 29–30.)   Claims by legal representatives and family members of 9/11 victims are thus permissible where the claimant or victim was within one of the three groups identified in the statute.   (*Id.* (citing § 1605A(a)(2)(A)(ii), (c))); *see also Hoglan v. Rafsanjani*, 759 F. App'x 99, 105 (2d Cir. 2019); *Owens*, 864 F.3d at 807.   (*Contra* Def.'s Objs. at 13–14.)   Similarly, section 1605B permits family members' solatium claims for money damages "against a foreign state for . . . death occurring in the United States" that was caused by international terrorism.  28 U.S.C. § 1605B(b); (Report at 31).

> 2.  *This Court Has Subject-Matter Jurisdiction over Corporate Claims Under FSIA §§ 1605A and 1605B*

Plaintiff corporations also rightly bring claims against Sudan under §§ 1605A and 1605B. This Court has jurisdiction over the § 1605A claims by corporate Plaintiffs, namely *Federal Insurance Company* and *Continental Casualty Company* Plaintiffs, because their claims stem from insurance payments to U.S. national policyholders.   (Report at 32–33.)  This FSIA exception reads that once an action is brought under § 1605A(c), "actions may also be brought for reasonably

17

foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies." 28 U.S.C. § 1605A(d); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (FM), 2015 WL 9468813, at *2 (S.D.N.Y. Dec. 28, 2015) (insurance companies may bring claims), *report and recommendation adopted as modified sub nom. In re Terrorist Attacks*, No. 03-md-1570 (GBD) (FM), 2016 WL 1029552 (S.D.N.Y. Mar. 9, 2016); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (SN), 2018 WL 3323159, at *2–3 (S.D.N.Y. June 25, 2018) (same).   As to corporate Plaintiffs' § 1605B claims, section 1605B(c) allows for U.S. nationals to bring previously barred ATA claims for treble damages, while section 1605B(b) provides a broader grant of jurisdiction for entities such as corporations to sue for acts of international terrorism in the United States caused by the tortious acts of foreign states, their agents, or employees.  (*See* Report at 33–35.)

### 3.   This Court Also Has Personal Jurisdiction over Sudan

Sudan therefore lacks immunity under the FSIA terrorism exceptions of §§ 1605(a)(7), 1605A,[9] and 1605B, providing this Court with subject-matter jurisdiction over Plaintiffs' claims. For this Court to have personal jurisdiction over Sudan, service of process is also necessary.  *See* 28 U.S.C. §§ 1330(b) (personal jurisdiction requiring applicable exception to sovereign immunity and service of process), 1608.  Because "Sudan concedes that it has been properly served," (*see* Pls.' Opp'n to Def.'s Mot. to Dismiss at 32), this Court has personal jurisdiction over Sudan.  (*See* Report at 36); *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d

---

[9] For the reasons stated in the Report, Plaintiffs' 28 U.S.C. § 1605A actions are timely as related actions under § 1605A(b), as provided by § 1083(c)(3) of the 2008 NDAA. (*See* Report at 23–29.)  The plain text of § 1083(c)(3) allows Plaintiffs to commence related actions under § 1605A if there are still pending claims, as here, "arising out of an act or incident [that] has been timely commenced under section 1605(a)(7) of title 28." (*Contra* Def.'s Objs. at 16–18.)

393, 399 (2d Cir. 2009) (no minimum contacts analysis under the Due Process Clause for personal jurisdiction over foreign sovereigns).

## IV.   PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS TO SURVIVE SUDAN'S MOTION TO DISMISS

Plaintiffs allege federal claims under 28 U.S.C. § 1605A(c) and (d), the ATA, the ATS, and RICO. They also allege claims under international and state law. This Court adopts the Report as to the survival of Plaintiffs' federal § 1605A(c) and (d), civil RICO, and primary ATA claims, as well as certain state tort claims. (*See* Report at 36.) This Court declines to adopt the Report's recommendation as to the ATS claims and secondary liability ATA claims, hereby dismissing those claims for failure to state a claim. This Court also dismisses Plaintiffs' international law claims for failure to state a claim. This Court dismisses certain state law claims for assault and battery on statute of limitations grounds and all state law claims for conspiracy, aiding and abetting, and punitive damages because New York law does not recognize these causes of action. Finally, this Court dismisses all state law claims for intentional infliction of emotional distress and negligence because alternative causes of action exist for the intentional conduct alleged. (*See id.* at 36–37.)

### A.   Some of Plaintiffs' Federal Claims Under the FSIA Exceptions Survive

#### 1.   *Plaintiffs Have Adequately Stated Claims Under 28 U.S.C. § 1605A(c) and (d)*

The Report appropriately found that Plaintiffs' claims under 28 U.S.C. § 1605A(c) and (d) survive Defendant's motion to dismiss. (*See* Report at 37–38.) Section 1605A(c) creates a private right of action against designated state sponsors of terrorism for U.S. nationals, members of the armed forces, government employees, or their legal representatives, while § 1605A(d) permits additional actions for "reasonably foreseeable property loss." 28 U.S.C. §§ 1605A(c)–(d). As the Report found, Plaintiffs have established the *prima facie* elements of their § 1605A claims by

19

pleading U.S. nationality or insurance payouts to U.S. national policyholders and the requisite jurisdictional causation standard against Sudan. (*See* Report at 37–38.)

### 2. *Plaintiffs Have Adequately Stated Primary Liability Claims Under the ATA*

The separate FSIA exception of § 1605B allows for Plaintiffs' primary liability ATA claims stemming from direct Sudanese support for al Qaeda. The ATA provides a cause of action, to include against a foreign state, *see* 28 U.S.C. § 1605B(c), for U.S. nationals injured in their "person, property, or business" by an act of international terrorism, 18 U.S.C. § 2333(a). These claims require (1) a predicate unlawful action, (2) the proper mental state, and (3) at least proximate causation. (Report at 38 (citing *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016)).)

Plaintiffs' primary liability ATA allegations satisfy these three factors. Sudan's alleged predicate acts of "international terrorism," as defined by 18 U.S.C. § 2331(1), include providing material support to terrorists, *id.* § 2339A, and providing material support or resources to designated foreign terrorist organizations, *id.* § 2339B. (Report at 38–40 (citing CAC ¶ 248; also citing *Ashton* Compl. ¶ 139)); *see also* factual allegations *supra* Sections III.B–C (detailing extensive Sudanese direct material support to al Qaeda). Second, the scienter requirement for the underlying actions requires a showing that the defendant "both knew that it was providing material support to [a terrorist group] and knew that [the group] engaged in terrorist activity." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 (2d Cir. 2014) (citing 18 U.S.C. § 2339B(a)(1)). Magistrate Judge Netburn correctly determined that Sudan's purported provision of aid to al Qaeda and its awareness of al Qaeda's terrorist activities was knowing and—even further—deliberate. (Report at 41–42.) Plaintiffs have also satisfied the third prong of causation for an ATA claim under § 1605B. *See* discussion *supra* Section III.B (proximate causation sufficiently pled). Plaintiffs' primary liability ATA claims therefore survive, as do the ATA claims of *Federal*

20

Insurance Company and Continental Casualty Company corporate Plaintiffs under the law of the case's subrogation principles.  (See Report at 52–53); In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570 (GBD) (FM), 2011 WL 6318975, at *2 (S.D.N.Y. Dec. 16, 2011) (Insurance "Plaintiffs suffered injury to their 'property or business' entitling them to treble damages pursuant to the ATA on their subrogation claims.")

### 3.   Plaintiffs Have Failed to State Secondary Liability Claims Under the ATA

As discussed in previous decisions in this multidistrict litigation, however, the ATA as amended by JASTA does not permit secondary liability claims against foreign sovereigns.  (See Feb. 7, 2023 Mem. Decision and Order, ECF No. 8862, at 14–19; Apr. 17, 2023 Mem. Decision and Order, ECF No. 9020, at 4–8.)  The operative text of JASTA does not subject foreign sovereigns to secondary liability under the ATA because Congress restricted liability to any "person" as defined in 1 U.S.C § 1 (the "Dictionary Act"), rather than the broader definition of "person" in the ATA's "Definitions" section provided in 18 U.S.C. § 2331.  Compare 18 U.S.C. § 2333(d)(1) ("In this subsection, the term 'person' has the meaning given the term in section 1 of title 1."), with id. § 2331(3) ("the term 'person' means any individual or entity capable of holding a legal or beneficial interest in property").  That narrowed definition of "person" from the Dictionary Act excludes foreign sovereigns from the aiding-and-abetting and conspiracy liability subsection of § 2333(d)(2).  (See Feb. 7, 2023 Mem. Decision and Order at 15–16.)

Cases on which Plaintiffs and the Report rely, such as Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 318 (1978) (finding foreign sovereigns are "persons" entitled to sue under the Sherman Act), do not rest on the Dictionary Act's definition of "person" that § 2333(d)(1) mandates.  Nor do they address the international comity concerns of haling foreign states into U.S. courts on expansive secondary liability theories.  Sudan has raised similar arguments in its briefing on their Objections to the Report, (see Def.'s Opp'n to CAC Pls.' Objs., ECF No. 8793, at 11–13; Def.'s

Reply in Supp. of Objs., ECF No. 8808, at 15), as well as in its motion to dismiss before Magistrate Judge Netburn, (*see* Def.'s Mem. of Law on Mot. to Dismiss, ECF No. 6575, at 33–35).

The Report is correct that "JASTA's text explicitly contemplates suit against foreign states" through the added FSIA exception of § 1605B. (Report at 43.)  But the Report goes beyond the operative text of JASTA in seeking to apply the entire statute to foreign states.[10]  JASTA is *not* "exclusively concerned with foreign states," (*see id.*), because the added FSIA exception of § 1605B constitutes only one section of the Act, while JASTA's modifications to the ATA regarding secondary liability in § 2333(d) inarguably apply to non-sovereign defendants.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 882 F.3d 314, 318–20 (2d Cir. 2018); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854–56 (2d Cir. 2021); *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495–97 (2d Cir. 2021); *Terrorist Attacks IV*, 298 F. Supp. 3d at 642 n.6 (describing JASTA's separate changes to both the FSIA and ATA).  Accordingly, this Court dismisses Plaintiffs' secondary liability claims under the ATA against Sudan for failure to state a claim.[11]

### 4.   *Plaintiffs Have Failed to State Claims Under the Alien Tort Statute*

The ATS provides a federal court "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350; *see also Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995).  The Report found that Plaintiffs had adequately stated claims under the ATS.  (Report at 60–61.)[12]  However, the FSIA

---

[10] The Report erroneously inserts "State" into the title of JASTA by referring to the statute as the "Justice Against *State* Sponsors of Terrorism Act."  (Report at 2 (emphasis added).)  The correct title is the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016).

[11] Because the ATA does not now allow for secondary liability claims against Sudan, this Court declines to adopt the related findings in the Report, (*see* Report at 42–44), or address either the timeliness or sufficiency of the Plaintiffs' aiding-and-abetting and conspiracy claims, (*see id.* at 44–52).

[12] The Report also found that the ATS claims stemming from 9/11 "air piracy" would "firmly" survive Justice Clarence Thomas's more restrictive approach of recognizing only "the three historical torts" under the ATS.  (*See* Report at 60 n.16); *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1938–40 (2021) (Thomas, J.,

provides "the sole basis for obtaining jurisdiction over a foreign state in federal court." *Amerada Hess*, 488 U.S. at 439; *see also United States v. Assa Co. Ltd.*, 934 F.3d 185, 189 (2d Cir. 2019) ("If the defendant is a foreign state, the lawsuit *must* go through the FSIA gateway."). The FSIA is so comprehensive that it was not necessary for Congress to "enact an express *pro tanto* repealer of the Alien Tort Statute" in order to establish that only the FSIA, and not the ATS, allows for the exercise of jurisdiction over foreign states. *Amerada Hess*, 488 U.S. at 437–39; *see also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 115 (2d Cir. 2017) ("To the extent the ATS ever provided a source of subject matter jurisdiction over foreign sovereigns, the *Amerada Hess* Court found it could no longer confer that authority after the passage of the FSIA . . . ."); *Enahoro v. Abubakar*, 408 F.3d 877, 883 (7th Cir. 2005) ("[T]he Alien Tort Statute cannot provide jurisdiction over foreign sovereigns . . . .").

Given that the FSIA provides the exclusive means of obtaining jurisdiction over foreign sovereign defendants, Plaintiffs' ATS claims cannot proceed. The ATS is a purely jurisdictional statute and "does not expressly provide any causes of action." *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 212 (2d Cir. 2016) (quoting *Kiboel v. Royal Dutch Petroleum Co.*, 569

---

plurality) (restricting ATS causes of action to violation of safe conducts, infringement of the rights of ambassadors, and piracy). Courts have differed as to whether "piracy" must be understood as limited to maritime conduct beyond any nation's territorial sea. *Compare Taveras v. Taveraz*, 477 F.3d 767, 772 n.2 (6th Cir. 2006) ("A fundamental element of the offense of piracy is that the acts of robbery or depredation must have been committed *upon the high seas.*"), *with United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) ("international law permits prosecuting acts of aiding and abetting piracy committed while not on the high seas"), *and United States v. Shibin* 722 F.3d 233, 241 (4th Cir. 2013) (finding that piracy can merely "incite or intentionally facilitate acts committed against ships, persons, and property on the high seas"). In contrast here, the 9/11 terrorists hijacked commercial planes in U.S. national airspace, not upon or above the high seas beyond the jurisdiction of any coastal state. *See* 9/11 COMMISSION REPORT 32–33. Aircraft hijacking has also been understood as distinct from piracy. *See, e.g.,* Michael C. McClintock, *Skyjacking: Its Domestic Civil and Criminal Ramifications*, 39 J. AIR L. & COM. 29, 32 (1973) ("[P]iracy in the air is technically hijacking and not piracy."). It is therefore unclear whether aircraft hijacking would in fact fall "firmly within the bounds" of the narrower vision of the ATS articulated in Justice Thomas's *Nestle* plurality opinion. (*Contra* Report at 60 n.16.) Because the ATS does not provide an independent cause of action, Plaintiffs' ATS claims fail under the weight of the FSIA's jurisdictional monopoly over claims against foreign states, and this Court need not rule on the Report's alternative "air piracy" reasoning.

U.S. 108, 115 (2013)). Plaintiffs' asserted "violations of the law of nations" that would otherwise proceed through the ATS's jurisdictional grant are not embodied in any of the relevant exceptions to the FSIA. Moreover, only the expropriation exception, 28 U.S.C. § 1605(a)(3), (h)(2), refers to conduct that constitutes a "violation of international law." *See Amerada Hess*, 488 U.S. at 435–36 (citing the FSIA expropriation exception for "the plain implication that *immunity is granted* in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions" (emphasis added)). Because claims against Sudan must proceed through a FSIA exception and the ATS does not provide an independent cause of action to proceed through any of the applicable FSIA terrorism exceptions here, this Court dismisses Plaintiffs' ATS claims for failure to state a claim.

### 5. *Plaintiffs Have Adequately Stated Claims Under RICO*

Plaintiffs allege facts that support a plausible inference of a potential "conscious agreement" between Sudanese officials and al Qaeda "to commit two predicate acts in furtherance of the common purpose" of a RICO enterprise against U.S. targets. *Cf. Terrorist Attacks II*, 740 F. Supp. 2d at 515 (citing 18 U.S.C. § 1962(d)). Whether Sudan took part "in directing the affairs of the al Qaeda enterprise," *Terrorist Attacks II*, 740 F. Supp. 2d at 515, is a fact-bound determination and plausible at this stage based on allegations that al-Bashir, al-Turabi, and other Sudanese officials maintained regular, direct communications with senior al Qaeda operatives and bolstered the organization's development. *See* factual allegations *supra* Sections III.B–C. As the Magistrate Judge properly found, Sudan does not present a fact-driven argument foreclosing Plaintiffs' RICO claims, unlike previous insufficient RICO claims against other defendants in *Terrorist Attacks II*. (*See* Report at 61.) In conjunction with the FSIA terrorism exceptions to Sudan's sovereign immunity, Plaintiffs have sufficiently pled RICO claims against Sudan.

**B. Some of Plaintiffs' State Law Claims Survive**

    *1. FSIA Exceptions of §§ 1605A and 1605B Do Not Preempt State Law*

Sudan unpersuasively argues that 28 U.S.C. §§ 1605A and 1605B preempt Plaintiffs' state law claims because the federal statutes are the exclusive source of relief against state sponsors of terrorism. (*See* Def.'s Objs. at 22–23.)  In particular, Sudan asserts that 28 U.S.C. § 1606 served originally as a "gateway" for state law claims by subjecting foreign sovereigns to liability through cases brought under § 1605, and Congress "closed" the gateway in the subsequent passage of 28 U.S.C. §§ 1605A and 1605B.  (*See* Report at 53.)  However, nothing in the text of § 1605A "displace[d] a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012) (citation omitted).  This Court joins other courts in rejecting Sudan's "strained 'gateway' argument." *Owens*, 864 F.3d at 809.

    The preemption doctrine counsels further in favor of finding that neither §§ 1605A nor 1605B preempted state tort law.  Courts expect to see a "clear and manifest purpose of Congress" to find preemption. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Where Congress has not explicitly preempted state law, a court may find that preemption is implied if (1) a pervasive regulatory scheme leaves "no room for the States to supplement," (2) regulation is in an area where federal law predominates, or (3) a state scheme would frustrate the federal scheme. *Id.*  Sections 1605A and 1605B do not pervasively regulate the field of terrorism-related suits, in part because §§ 1605A(c) and 1605B (through an ATA cause of action) do not provide a remedy for family members of foreign nationals killed in U.S. terrorist attacks.  In effect, Sudan urges this Court to hold that a foreigner's family lacks any legal relief in America if a state-sponsored terrorist flies a plane into a New York City skyscraper, murdering that foreigner.  (*Cf.* Def.'s Objs. at 22–23.)  "State tort law fills this gap in the federal terrorism-liability scheme." (Report at 54.)  As to the

other *Rice* factors, tort law is an area in which state, and not federal, law historically predominates, *see, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996), and increasing the potential liability of state sponsors of terrorism in no way "frustrates the federal scheme," *see Leibovitch*, 697 F.3d at 571 (goal of the FSIA terrorism exceptions is to "permit[] massive judgments of civil liability against nations that sponsor terrorism"). Plaintiffs' state law claims are neither explicitly nor implicitly preempted.

### 2. *Only Plaintiffs' Assault, Battery, and Trespass Claims Are Viable State Law Claims*

Plaintiffs plead a variety of state law claims, to include assault, battery, trespass, conspiracy, aiding and abetting, punitive damages, intentional infliction of emotional distress, and claims sounding in negligence. (*See* Report at 53.) The parties' briefing and the Report assume New York law applies for the state law claims, in line with previous cases in this multidistrict litigation. (*See* Report at 55 n.14.) This Court thus addresses the common law claims under New York law. As Magistrate Judge Netburn found, "Sudan's arguments on causation have been denied in the context of the ATA and subject matter jurisdiction and are denied here [in the context of the state law claims] for the same reasons." (Report at 56.)

Plaintiffs have alleged the necessary intent for their intentional tort claims of assault, battery, and trespass. The Report rightly finds that assault requires that the tortfeasor intend to put "another person in fear of imminent harmful or offensive contact." *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (citing *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)). Civil battery entails an intention to make "wrongful physical contact with another person without consent." *Charkhy*, 678 N.Y.S.2d at 41. Lastly, trespass requires intentionally invading another's property. *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996); (*see also* Report at 56–57 (same)). For Sudan, its alleged "[c]oncerted action liability rests upon the principle that '[a]ll those who, in

pursuance of a common plan or design to commit a tortious act, actively take part in it . . . are equally liable . . . .'" *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 580 (1982) (quoting PROSSER, TORTS § 46, at 292 (4th ed.)). Plaintiffs have adequately alleged knowing support of al Qaeda, sufficient for the intentional concerted action required for their trespass, assault, and battery claims. *See, e.g., Scollo v. Nunez*, 874 N.Y.S.2d 380, 380 (2d Dep't 2009) ("[T]here are triable issues of fact as to whether the appellants acted tortiously pursuant to a tacit agreement to assault or batter the plaintiffs . . . ."); *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 566 (S.D.N.Y. 2005) ("[If] Plaintiffs plead that Defendants here acted in concert with the September 11 hijackers, they will have stated a claim for relief for trespass."); (Report at 57 (same)).

Some of these intentional tort claims, however, must be dismissed on statute of limitations grounds. The statute of limitations is one year for assault and battery and three years for trespass. (Report at 57 (citing New York statutes and cases).) The Report thus appropriately dismissed the assault and battery claims for all Plaintiffs who brought claims after September 11, 2002. (*Id.* at 57–58 (finding *Ashton* and *Burnett* Plaintiffs' assault and battery claims as timely filed).) As noted in the Amended Report and uncontested by Sudan, all Plaintiffs' trespass claims are timely because they were filed before September 11, 2004. (*See* Am. Report at 2–3.)

Turning to the other state claims, this Court dismisses the common law claims for conspiracy, aiding and abetting, and punitive damages because New York law does not recognize these causes of action. *Terrorist Attacks II*, 740 F. Supp. 2d at 514 n.6 (S.D.N.Y. 2010) ("Since no independent cause of action exists for punitive damages, conspiracy, or aiding and abetting, those purported causes of action are dismissed.").

Plaintiffs' claims for intentional infliction of emotional distress and those sounding in negligence must also be dismissed. Claims for intentional infliction of emotional distress are not

available because such claims are a last resort, and federal and state law provide alternative causes of action. *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) ("[A]n intentional infliction tort may 'be invoked only as a last resort,'. . . 'to provide relief in those circumstances where traditional theories of recovery do not . . . .'" (internal citations omitted)). For Plaintiffs' negligence claims, section 1605B(d) provides that "a foreign state shall not be subject to the jurisdiction of the courts of the United States . . . on the basis of an omission or a tortious act or acts [of international terrorism] that constitute mere negligence." Moreover, Plaintiffs' negligent hiring and supervision claims fail because "Plaintiffs have plausibly alleged that it was Sudanese officials [deliberately] carrying out government policy"—not their negligent acts—"that caused the" 9/11 Attacks. (*See* Report at 59.) Moreover, Plaintiffs "do not plausibly allege that Sudanese employees acted outside the scope of their employment when they executed that policy." (*Id.* (citing *Terrorist Attacks II*, 740 F. Supp. 2d at 514 n.6 ("Dismissal is also warranted with regard to the negligence claim" because "[t]he moving defendants are alleged to have acted knowingly and intentionally in providing material support to al Qaeda.")).)

Therefore, this Court dismisses Plaintiffs' claims for conspiracy, aiding and abetting, punitive damages, intentional infliction of emotional distress, and claims sounding in negligence. All of Plaintiffs' trespass claims and *Ashton* and *Burnett* Plaintiffs' assault and battery claims survive as sufficiently pled and timely filed. (*See* Report at 59; Am. Report at 2–3.)

### C. Plaintiffs' International Law Claims Are Dismissed

Finally, the Report correctly determined that Plaintiffs fail to assert viable claims for "violations of international law." (Report at 61–63 (quoting CAC ¶ 333).) In *Sosa v. Alvarez-Machain*, Justice Antonin Scalia wrote that "creating a federal command (federal common law) out of 'international norms,' and then constructing a cause of action to enforce that command through the purely jurisdictional grant of the ATS, is nonsense upon stilts." 542 U.S. 692, 743

(Scalia, J. concurring). Unlike in the context of the ATS, Plaintiffs' claims of "violations of international law" are untethered from even any alleged jurisdictional grant. "[A] decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Sosa*, 542 U.S. at 727. Indeed, Congress has already created private rights of action to address international terrorism supported by foreign states, namely through 28 U.S.C. § 1605A(c) and § 1605B(c) with the ATA. "It would be inappropriate for courts to displace this considered statutory and regulatory structure" by holding a foreign sovereign liable through a common law-based approach of assessing "international law violations." *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018). This Court thus dismisses Plaintiffs' international law claims for failure to state a claim.

## V. PLAINTIFFS' AMENDED COMPLAINTS MOOTED PRIOR ENTRIES OF DEFAULT AGAINST SUDAN, AND GOOD CAUSE EXISTS TO VACATE THOSE CERTIFICATES

### A. Prior Entries of Default Against Sudan Are Now Moot

Magistrate Judge Netburn correctly determined that the Plaintiffs' amended complaints are the operative "master complaints" against Sudan. (Report at 63.) In a multidistrict litigation, a consolidated complaint may be either a "master complaint . . . which supersede[s] prior individual pleadings," or "a pleading with[out] legal effect [that is] only an administrative summary of the claims brought by all the plaintiffs." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015) (internal citations omitted). To determine the status of a pleading, courts look to

> (1) how the plaintiffs labeled the new complaint, (2) whether the plaintiffs served the defendants with the new complaint instead of the original pleadings, (3) whether key deadlines were set in relation to the new complaint, (4) whether the court entertained motions to dismiss the consolidated complaint, and (5) whether the parties and the court looked solely to the allegations in the consolidated complaint when arguing and deciding such motions.

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 490 (7th Cir. 2020). Here, "the Court said that the *Ashton* [C]omplaint and CAC were to be the operative pleadings," setting deadlines for both the "amended complaints" and Sudan's instant consolidated motion to dismiss. (Report at 64.) Sudan also consented to service of these amended complaints by electronic filing. (*Id.* at 65 n.17.) Moreover, many of the causes of action and jurisdictional waivers at issue, such as 28 U.S.C. § 1605A, § 1605B, and JASTA, did not exist when Plaintiffs filed their prior complaints. (*See id.* at 64.) Although Plaintiffs stated that the complaints were "not intended to replace prior operative pleadings," (Report at 65 (citing CAC ¶ 2; also citing *Ashton* Compl. at 2)), all other *Bell* factors weigh in favor of the amended complaints operating as "master complaints" against Sudan.

Because Plaintiffs' amended complaints are the operative complaints, they mooted the Court's prior entries of default against Sudan. (Report at 63.) "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). Thus, any entries of default predicated on original complaints against Sudan have become moot. (Report at 65–66 (citing cases).) Moreover, Plaintiffs did not object to the Report's conclusion that the amended complaints have become the operative complaints mooting these prior defaults. (*See generally* CAC Pls.' Objs.) Reviewing Magistrate Judge Netburn's determination for clear error, this Court lacks any "firm conviction that a mistake has been committed." *See Snow*, 462 F.3d at 72 (citation omitted). The amended complaints in the form of the CAC and *Ashton* Complaint therefore mooted the prior defaults against Sudan.

### B.  Alternatively, Good Cause Exists to Vacate Default Certificates

Even if the amended complaints did not moot the entries of defaults, a "court may set aside an entry of default for good cause . . . ." Fed. R. Civ. P. 55(c). This determination warrants a "lenient standard" based on whether (1) the default was willful, (2) setting it aside would prejudice

the adversary, and (3) a meritorious defense is presented. *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981). A defendant's failure to meet one factor is not dispositive, and "when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). Further, "default judgments are disfavored, especially . . . against foreign sovereigns." *First Fid. Bank*, 877 F.2d at 196.

Under this lenient standard, Magistrate Judge Netburn rightly found good cause to set aside the defaults. (Report at 67–70.) The first factor on willfulness weighs against Sudan, which was grossly negligent if not willful in its defaults, because it was served with multiple complaints from Plaintiffs between 2003 and 2013 but did not enter an appearance until February 2020. (*Id.* at 68.) The other two factors, however, support vacating the defaults. Setting aside the defaults would not prejudice Plaintiffs because Plaintiffs have not shown that such action would "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (quoting 10 C. WRIGHT, A. MILLER, & M. KANE, FED. PRAC. & PROC. CIV. § 2699, at 536–37 (4th ed. 1983)). Sudan also presents meritorious defenses that exceed the low standard of "giv[ing] the factfinder some determination to make." *Am. All. Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996) (citation omitted). Indeed, some of Sudan's defenses based on lack of subject-matter jurisdiction, the statute of limitations, and failure to state a claim have prevailed. Magistrate Judge Netburn therefore rightly determined that good cause exists to set aside the entries of default against Sudan for the *Ashton*, *Burnett*, and *Federal Insurance Company* cases, even if those defaults had not been mooted by the amended complaints. (Report at 70.)

## VI.   CONCLUSION

This Court ADOPTS Magistrate Judge Netburn's Report in part by denying Sudan's motion to dismiss, (ECF No. 6574), for lack of subject-matter jurisdiction and finding that this Court has jurisdiction over the claims against Sudan. Plaintiffs have sufficiently pled their 28 U.S.C. § 1605A(c) and (d), ATA primary liability, and civil RICO claims. Plaintiffs have also sufficiently pled state law trespass claims, and *Ashton* and *Burnett* Plaintiffs have sufficiently pled state law assault and battery claims.

This Court also ADOPTS the Report by granting Sudan's motion to dismiss for failure to state a claim as to the (1) Plaintiffs' state law claims for punitive damages, conspiracy, aiding and abetting, intentional infliction of emotional distress, negligence, and assault and battery brought after September 11, 2002; and (2) Plaintiffs' international law claims. This Court declines to adopt the Report regarding the Plaintiffs' ATS claims and secondary liability ATA claims, hereby granting Sudan's motion to dismiss for failure to state a claim as to Plaintiffs' ATS claims and ATA aiding-and-abetting and conspiracy claims.

This Court directs the Clerk of Court to vacate the Certificates of Default at ECF Nos. 2511 and 2575 and the associated Certificate dated September 9, 2005 for *Federal Insurance Company*. The Clerk of Court is directed to close the open motion at ECF No. 6574 accordingly.


Dated: August 10, 2023
       New York, New York

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge

32