**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |

**This Document relates to:**
*Burnett, et al. v. Al Baraka Inv. & Dev. Corp*., et al., No. 03-cv-9849 (GBD)(SN)

<u>***BURNETT* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR ENTRY OF DEFAULT JUDGMENTS**
**AGAINST THE TALIBAN UNDER 18 U.S.C. § 2333 FOR PERSONAL INJURY**
**PLAINTIFFS WHO DO NOT HAVE PRIOR IRAN DAMAGES JUDGMENTS**</u>

For the reasons stated herein and as set forth in the accompanying Declaration of John C. Duane (hereinafter "Duane Decl."), the *Burnett* Moving Plaintiffs included on Exhibit A who are individuals who sustained physical injury as a direct result of the terrorist attacks on September 11, 2001, respectfully request final default judgments against The Taliban for pecuniary and non-pecuniary loss (including, but not limited to pain-and-suffering damages, pre-judgment interest, and trebled damages under 18 U.S.C. § 2333(a)) in favor of the *Burnett* Moving Plaintiffs. The *Burnett* Moving Plaintiffs included in Exhibit A seek damages against The Taliban in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001, and in accordance with this Court's prior orders addressing damages for those who sustained physical injuries on September 11, 2001, pursuant to the framework established by Magistrate Judge Netburn (*see* ECF No. 5879) and adopted by Judge Daniels (*see* ECF No. 5946).

The *Burnett* Moving Plaintiffs on Exhibit A further move that such damages be trebled under the ATA and include prejudgment interest at the rate of 4.96 percent, compounded annually, from the period from September 11, 2001, until the date of the judgment for damages entered against The Taliban and for leave to file for such other and further relief that may be appropriate at a later date including, but not limited to, punitive damages.

On April 7, 2006, this Court entered default judgment as to liability against The Taliban (and 132 other defaulting defendants) in the case captioned *Burnett, et al. v. Al Baraka Inv. & Dev. Corp.*, et al., No. 03-cv-9849 (GBD)(SN). ECF No. 1756. That April 7, 2006 default judgment was entered in favor of 5,612 real parties in interest in the *Burnett* action at the time. On September 1, 2022, the Court granted Plaintiffs' motion to make explicit those plaintiffs whose claims were encompassed within the ambit of these real parties in interest and determined that these claims "relate[] back to when each of the individuals originally named in the pleading were added to this action." *See* ECF No. 8487.  On November 1, 2022, the Court granted Plaintiffs' Motion to Add Parties Against the Taliban that added 529 claims within the *Burnett* action and stated "[p]rior rulings, orders, and judgments entered in this case remain in effect as to all parties."  *See* ECF No. 8696 at 2.  On January 12, 2024, the Court granted Plaintiffs' Motion to Add Parties Against the Taliban that added four claims within the *Burnett* action again providing that these plaintiffs were subject to all prior rulings, orders, and judgments in the case. *See* ECF No. 9532.

Since that time, the Court has granted several additional motions filed by Plaintiffs to add parties against The Taliban to add claims within the *Burnett* action in which Plaintiffs sought the same application of prior rulings. *See, e.g.,* ECF Nos. 9559, 9629, and more recently, ECF No. 10959. All plaintiffs in this case added since the entry of the default judgment have been subject to all prior orders of the Court including this default judgment as to liability against The Taliban. It is on behalf of the plaintiffs listed in Exhibit A along with the distinct claims clarified or added as set forth above that this motion pertains.

This motion seeks to (1) award final default damages judgments against The Taliban on behalf of certain American citizens/U.S. nationals identified in Exhibit A who do not have a prior damages judgment in this litigation in amounts commensurate with the injuries that these

individuals sustained during the Terrorist Attacks on September 11, 2001, and in accordance with this Court's prior orders addressing damages for those who sustained physical injuries on September 11, 2001, pursuant to the framework established by Magistrate Judge Netburn (see ECF No. 5879) and adopted by Judge Daniels (see ECF No. 5946) within the context of claims against the Islamic Republic of Iran. The *Burnett* Moving Plaintiffs in Exhibit A seek this relief pursuant to the civil damages provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a).

## ARGUMENT

I.    **The Court should apply the same mechanism for the personal injury plaintiffs included on Exhibit A as the Court previously established vis-à-vis damages judgments against Iran.**

The *Burnett* Moving Plaintiffs included on Exhibit A who sustained personal injuries as a direct result of the terrorist attacks on September 11, 2001 have not previously obtained damages judgments within this MDL against the Islamic Republic of Iran and certain of its agencies and instrumentalities for Iran's role in providing support to Al Qaeda in the years leading up to the terrorist attacks on September 11, 2001. Whereas the damages judgments obtained against Iran arose pursuant to 28 U.S.C. § 1605A(c), which provides a private right of action against a designated state sponsor of terrorism, Plaintiffs' claims against The Taliban arise under a number of different statutory schemes including under the ATA and the common law. The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

The breadth of damages available under the ATA is similar to those available—and applied by this Court in judgments against Iran—under 28 U.S.C. § 1605A(c). "[T]he ATA incorporates 'general principles of tort law.' … The basic presumption is that Congress creates federal torts

against the background of general tort law...." *See Linde v. Arab Bank, PLC*, 97 F. Supp.3d 287, 336 (E.D.N.Y. 2015). The ATA provides "private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations." *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007). In fact, when the ATA was initially enacted in 1991, Senator Grassley stated that the ATA "removes the jurisdictional hurdles in the courts confronting *victims* and it empowers *victims* with all the weapons available in civil litigation .... The [ATA] accords *victims* of terrorism the remedies of American tort law." *Litle v. Arab Bank, PLC*, 611 F. Supp.2d 233, 245 (E.D.N.Y. 2009), *quoting* 137 Cong. Rec. S4511 (Apr. 16, 1991). This language "suggests that Congress intended that the full range of damages should be available to persons entitled to bring actions pursuant to §2333(a)." *Estates of Ungar v. Palestinian Authority*, 304 F. Supp.2d 232, 265 (D.R.I. 2004).

The plaintiffs pursuing damages under the ATA for personal injuries sustained as a direct result of the terrorist attacks on September 11, 2001 are listed in Exhibit A, appended to the Duane Declaration. The *Burnett* Moving Plaintiffs included in Exhibit A sustained personal injuries on September 11, 2001, but they have not obtained prior damages judgments for pain-and-suffering against the Islamic Republic of Iran under 28 U.S.C. § 1605A. Exhibit A sets forth damages for individuals who sustained personal injuries that were proximately caused by the terrorist attacks on September 11, 2001 but who did not succumb to those injuries.

The April 7, 2006, liability default judgment in *Burnett* was not reduced previously to a final judgment because individual damages assessments of the Plaintiffs' claims had not been conducted, and other appearing (non-defaulting) defendants in the active MDL thereafter opposed the process. In 2007, certain other plaintiffs in this MDL with similar Taliban judgments sought monetary awards in relation to their judgments against The Taliban, but procedural objections by

appearing (non-defaulting) defendants at that time frustrated the process of reducing the default judgments as to liability to final damage judgments. *See, e.g.*, ECF No. 688 (Federal Insurance Docket) and undocketed March 2, 2007 letter from the Defendants' Executive Committee to Judge Casey. As a result, the 2007 motion was not addressed with regard to The Taliban until April 6, 2022. *See* ECF No. 7833.

This Court ruled, in 2011 and 2012, that default judgments against one defendant in favor of 9/11 plaintiffs are properly extended to other defendants as to whom the plaintiffs have liability judgments also for the September 11, 2001 attacks. *See, e.g.*, ECF No. 2582 (extending Federal Insurance's damage assessment against Al Qaeda at ECF No. 2502 to Hezbollah); ECF No. 2623 (extending *Havlish* damage assessment against Iran to defaulting Non-Sovereign Defendants). The Court has now also entered a default judgment on similar grounds on behalf of the *Federal Insurance* plaintiffs against The Taliban. *See* ECF No. 7833.

On July 11, 2022, the Court issued an Order related to motions for default judgment that had been filed against The Taliban.  In that Order, the Court noted the following:

> The Court has a framework for motions seeking damages for personal injuries . . . *See, e.g.*, ECF No. 7323 (personal injury defaults) . . . .  This is the proper mechanism for adjudicating these claims and the Court does not find that a special master will aid in this adjudication at this time.

ECF No. 8198 at 8. Following the Court's direction, the *Burnett* Moving Plaintiffs included on Exhibit A whose personal injury claims have not yet been adjudicated against another defendant within this MDL herein submit their requests for adjudication of their claims under the ATA in accordance with the Court's established mechanism.

The Plaintiffs identified in Exhibit A include individuals who were on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); or who were among those who entered the premises in the vicinity of the World Trade Center

and were injured on September 11, 2001. The injuries of individuals who were injured on September 11, 2001 range from smoke inhalation and broken bones to devastating burns and loss of limbs. One injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the horror of the attacks on September 11, 2001. Under the ATA, these injuries are all compensable and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of attempting to assist or render aid to the injured or endangered or to flee from the scene, the proximate causation of these injuries is not in question. Further, there can be no question The Taliban sponsored Osama bin Laden and was behind the September 11, 2001 attacks that caused the Burnett Moving Plaintiffs' various injuries.[1]

This Court has previously examined personal-injury damages in the context of the terrorist attacks on September 11, 2001. In the first Report and Recommendation issued by Magistrate Judge Netburn addressing personal-injury damages in this context (which was affirmed by Judge Daniels without objection), the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where "personal injury plaintiffs cannot escape the memory of 9/11." *See* ECF No. 5879 at 5. This accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS

---

[1] U.S. National Commission on Terrorist Attacks upon the United States. *9/11 Commission Report: The Official Report of the 9/11 Commission and Related Publications.* by Thomas H. Kean and Lee Hamilton,  pp. 66-67, 125-126, 157, 170-171, and 176.

110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." *Id.* at 6. The Court divided the categories of injuries into three classifications:

1. "Significant" injuries (presumptively $5 million for pain and suffering): "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." *Id.* at 6-7.

2. "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries (presumptively $10 million for pain and suffering): "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

The Court issued upward or downward departures based upon the facts of each case presented. For example, in the case of Plaintiff Lauren Manning, this Court granted an upward

departure and found that Manning was entitled to a $25,000,000 judgment, noting that Manning's

injuries were "beyond devastating." *See* ECF No. 5955 at 3-4.

### A. Individualized Case Assessments

While Plaintiffs' motion addresses several personal injury claims in Exhibit A that cross

multiple categories, all of these Plaintiffs were injured at or within close proximity to the World

Trade Center. What follows is a summary of the attached proofs.[2]

### 1. Vanessa Benjamin
   ### Injury Category[3]: Building Collapse/Pulmonary Trauma Injuries
   ### Severity: Significant

On September 11, 2001, Vanessa Benjamin worked as a legal assistant with Pillsbury

Winthrop LLP, a law firm located in lower Manhattan at One Battery Park Plaza. *See* Duane

Dec., Ex. B, Declaration of Vanessa Benjamin at ¶ 3. On the morning of September 11, 2001, she

traveled on the New York City subway system to her law firm office. As Mrs. Benjamin's

subway car passed underneath the World Trade Center (WTC) area, the first passenger jet,

---

[2] These are arranged alphabetically.

[3] The categories cited are those categories set forth in the January 10, 2020 letter submitted by the Plaintiffs' Executive Committee for Personal Injury and Death Claims. *See* ECF No. 5484 at 13-14. Those categories include the following:

1)    IMPACT INJURY

Persons physically injured by the impact of the aircraft hitting the WTC I, WTC II, Pentagon, and WTC Marriot (jet fuel burns or blast injuries, jet fuel exposure and damage, broken backs/necks/limbs, paraplegics, orthopedic trauma);

2)    ESCAPE INJURY

Persons physically injured during the escape from the buildings (those injured descending the long dark staircases, those injured in elevators (i.e. during free falls), those who were trampled while escaping, those who fell and were injured while the Pentagon or WTC were under attack, resulting in broken bones, crushed limbs, trauma lacerations, bruising, etc.);

3)    BUILDING COLLAPSE INJURY

Persons physically injured in either the WTC I or II buildings or Marriot WTC collapse at and around Ground Zero (explosion-like injuries, being buried in rubble, eye or ear damage, head injuries, crushed limbs, multi-system acute traumas, shrapnel like injuries from glass or metal, etc.);

4)    FALLING DEBRIS INJURY

Persons injured at Ground Zero or Pentagon by falling debris (TBIs, concussions, crushed limbs, variety of physical injuries and traumas);

5)    PULMONARY TRAUMA INJURY

Persons who breathed in large quantities of smoke, debris, chemicals, WTC Dust, jet fuel or related toxins at Ground Zero, Pentagon, or Shanksville, PA and whose lungs were burned, damaged and injured on 9/11; and

6)    LATENT INJURIES (CANCERS)

These cases are not contemplated at this time.

American Airlines Flight 11, struck the North Tower. Mrs. Benjamin then heard a loud explosion that shook the subway and dimmed the lights in the subway car. Her subway car eventually reached the South Ferry station at about 8:50 am. *Id.* at ¶¶ 4-5.

When she exited the station to the street level, Mrs. Benjamin encountered what looked like a war zone. She saw that the North Tower was on fire with a huge gaping hole in the side of the building. She ran to her office building where her coworkers were observing the horrific scenes unfold at the WTC. As she then stood outside, Mrs. Benjamin saw the second passenger jet, United Airlines Flight 175, strike the upper section of the South Tower. Everyone around her began to scream and cry, and she became fearful for her safety. *Id.* at ¶¶ 6-8.

Mrs. Benjamin left the area near the WTC, and she then heard another loud explosion and the sky grew dark. She heard people screaming that one of the WTC Towers was collapsing. Mrs. Benjamin walked through an alley with a group of people, but when she reached the corner, a huge white cloud of toxic dust and debris engulfed her and knocked her to the ground. She suffered injuries to her arms, legs, and feet during the fall, and in the pitch dark, Mrs. Benjamin inhaled massive quantities of toxic dust. She also sustained significant exposure to the dust and debris in her eyes. *Id.* at ¶¶ 9-10.

Someone helped Mrs. Benjamin to her to feet, but as she fled the area and while still covered in debris, the North Tower collapsed. The police officers near her location told Mrs. Benjamin to run, so she fled the area by bus and then taxi. She then walked home for several additional miles, and she did not reach her apartment until 6:00 pm that evening. When she woke up the next day, Mrs. Benjamin's eyes were in extreme pain due to her dust exposure, and she struggled to breathe normally due the toxic dust that she had inhaled from the debris cloud. She

also had bruises on her arms and legs and her feet were swollen from her fall during the terrorist attacks. *Id*. at ¶¶ 11-12.

Mrs. Benjamin immediately sought treatment for her injuries, which included eye injuries and corneal abrasions, asthma, breathing problems and lung spasms, and severe hyperkeratosis and pain in her feet. She was also later diagnosed with post-traumatic stress disorder due to the horrific events she experienced during the 9/11 Attacks. *Id*. at ¶¶ 13-15.

### 2. Eric Berntsen
### Injury Category: Building Collapse/Pulmonary Trauma Injuries
### Severity: Significant

On September 11, 2001, Eric Berntsen worked as a firefighter with the Fire Department of New York (FDNY) serving with Engine Company 21. *See* Duane Dec., Ex. C, Declaration of Eric Berntsen at ¶ 4. On the morning of September 11, 2001, Mr. Berntsen's Company received dispatch orders to report to the command post at the Marriot Hotel on the corner of Liberty and West Street after the passenger jets had slammed into the North and South Towers of the WTC. At the time that the South Tower collapsed, Mr. Berntsen had been assisting with the evacuation of the buildings in the concourse area between the North and South Towers. Following the collapse of the South Tower, he assisted with rescuing several civilians from underneath the rubble and debris. *Id*. at ¶ 4.

As Mr. Berntsen removed an injured gentleman from under concrete debris and carried him out from underneath the WTC area, the North Tower collapsed. The force of the collapse of the building slammed Mr. Berntsen to the ground and he became completely buried by dust and debris. Despite his injuries, Mr. Berntsen worked to regain the ability to move, and he then dug himself out from under the debris. After Mr. Berntsen stumbled to his feet, a police officer escorted him to a safe location. Mr. Berntsen then reported to Engine Company Seven on Duane Street and an ambulance transported him to Jamaica North Shore Hospital in Queens. *Id*.

As a result of these terrorist attacks, Mr. Berntsen suffered multiple bulging and herniated discs in his back, a sprained right shoulder, corneal abrasions, cuts to his head, and chronic sinusitis, GERD, and sleep apnea due to the vast amounts of building dust and debris that he inhaled. Lastly, Mr. Berntsen has been diagnosed with PTSD due to his experiences during the 9/11 Attacks. *Id*. at ¶ 6.

### 3.     Louie Chacchioli
###        Injury Category: Building Collapse/Pulmonary Trauma Injuries
###        Severity: Significant

On September 11, 2001, Louie Chacchioli worked as a firefighter with the FDNY serving with Ladder 47. *See* Duane Dec., Ex. D, Declaration of Louie Chacchioli at ¶ 3. On the morning of September 11, 2001, Mr. Chacchioli arrived at his fire station for the start of his shift when he heard on the news that a passenger jet had crashed into the North Tower of the WTC. He then watched in horror as the television news showed United Airlines Flight 175 crashing into the South Tower. Mr. Chacchioli's fire team then went directly to the South Tower as quickly as possible. As his team approached the WTC Towers, Mr. Chacchioli saw the horror of people jumping from the upper sections of the buildings. *Id*. at ¶ 4.

Mr. Chacchioli's team went to the Marriot Hotel as it had caught fire, and he watched as a building jumper landed on his fellow firefighter, Danny Sur, killing him instantly. As he then entered the Marriot Hotel, Mr. Chacchioli saw debris flying everywhere, and he escorted people out of the hotel to safety as quickly as possible. *Id*. at ¶¶ 5-6.

 Mr. Chacchioli's team then focused on assisting other firefighters at the North Tower. He went up an operational elevator along with other firefighters to the 24th floor, where he saw a cloud of dust, debris, and smoke. While assisting with civilians in the building, he heard several loud explosions. Mr. Chacchioli encountered a large group of people, and he quickly escorted them down the stairs as he feared that the North Tower would collapse. Shortly after his group of victims

made it to the lobby level and out of the building onto West Street, the North Tower began to collapse. *Id*. at ¶¶ 7-12.

As the North Tower collapsed, Mr. Chacchioli became engulfed by a black cloud of smoke and dust. He dove under a firetruck and passed out from the large quantities of debris that he inhaled into his lungs and airways. He eventually awoke as another firefighter pulled him from under the firetruck and away to safety. As a result of his experience during the 9/11 Attacks, Mr. Chacchioli suffered significant injuries, including eye damage and multiple respiratory injuries from his exposure to toxic dust and debris. He also suffers from post-traumatic stress disorder due to the horrific events that he witnessed on September 11th. *Id*. at ¶¶ 13-16.

> ### 4.  Beverly Diane De Witt
> ### Injury Category: Escape Injuries
> ### Severity: Significant

On September 11, 2001, Beverly Diane De Witt worked for Legend Legal Staffing, Inc., and she had been assigned to the New York City Law Department - Office of Corporation Counsel ("OCC"), located at 100 Church Street, New York, New York 10007, and which was located within a few blocks of the World Trade Center (WTC). *See* Duane Dec., Ex. E, Declaration of Beverly Diane De Witt at ¶ 3. On the morning of September 11, 2001, her express bus abruptly stopped at Trinity Place en route to New York City as the North Tower had been struck by a passenger jet. As she exited from the bus, Mrs. De Witt saw that the North Tower of the WTC was on fire. She then saw a second passenger jet, United Airlines Flight 175, slam into the upper section of the South Tower at full speed. Debris, including shoes, papers, and glass, began to rain down from the sky. The scene around Mrs. De Witt began to look like a war zone. *Id*. at ¶¶ 4-5.

As she stood there frozen, a police officer approached Mrs. De Witt and instructed her to leave the area. A short time later, another police officer rushed over to Mrs. De Witt's location and moved her into a building yelling, "Brace the wall; put your arms up on the wall!" Then she felt

the ground reverberating beneath her feet. When the rumbling stopped, Mrs. De Witt turned and looked at the glass doors of the building she was in – it was black outside. The emergency services personnel were telling people to cover their mouths and nose and run; to stay away from police and firefighters. While running for her life in the thick cloud of dust and debris, Mrs. De Witt fell off of a curb and injured her right knee, left foot, and right foot. Both of Mrs. De Witt's lower limbs twisted, and her body toppled against the pavement. Despite her injuries, Mrs. De Witt rose to her feet and continued to run. As she ran, Mrs. De Witt inhaled quantities of building dust and debris into her lungs and airways. *Id*. at ¶¶ 6-7.

As she reached the intersection of Church Street and White Street, Mrs. De Witt watched in horror as the North Tower collapsed. Determined to escape from the chaos and horror, she walked for hours until she reached the intersection of West 48th Street and 6th Avenue. Her feet were bleeding and swollen, but Mrs. De Witt was able to board a bus to continue home to Staten Island.

Mrs. De Witt sought initial treatment for her injuries after the 9/11 Attacks, and she continued to receive medical and emotional treatment for her injuries in the ensuing weeks, months, and years. As a result of these terrorist attacks, Mrs. De Witt suffered impact injuries to her feet and her right leg and knee. Her fall during the escape from the WTC area resulted in deformities to both of her feet, and Mrs. De Witt now suffers from lower extremity neuropathy and bilateral Morton's neuroma. Further, due to her exposure to the WTC building dust and debris, she also suffers from asthma and other breathing problems. Mrs. De Witt now suffers from chronic pain in her feet, which is exacerbated by prolonged activity, standing, or walking. These injuries to her feet have also caused Mrs. De Witt to suffer from a gait alteration that negatively affects both of her lower limbs. *Id*. at ¶¶ 8-9.

**5.**     **Lisa F. Gong**
          **Injury Category: Escape Injuries**
          **Severity: Severe**

On September 11, 2001, Lisa F. Gong worked as a Sergeant with the City of New York Police Department (NYPD) and had been stationed at One Police Plaza (NYPD Police Headquarters), which was located within blocks of the World Trade Center. *See* Duane Dec., Ex. F, Declaration of Lisa F. Gong at ¶ 3. At approximately 8:45 AM, Ms. Gong was drinking coffee in the break room on the 13th floor of NYPD Police Headquarters when she saw a passenger jet crash into the WTC's North Tower. She ran to Church Street at the entrance of the North Tower and began evacuating people from the first floor. Soon after, Ms. Gong heard a roaring sound and saw the second passenger jet, United Airlines Flight 175, colliding into the upper section of the South Tower. Debris, including huge pieces of metal, glass, and concrete, began to fall from the upper floors, and she heard radio transmissions that people were leaping and jumping out of the windows. *Id.* at ¶¶ 4-6.

As she ran west on Vesey Street towards West Street, Ms. Gong dodged metal, glass, and other debris falling from the North Tower. She reached the garage entrance of WTC Building #7, where EMS had set up a triage station. As Ms. Gong evacuated several civilians to an ambulance parked in the intersection, she heard twisting metal and an explosion above her and watched in horror as the South Tower collapsed. A huge black cloud of dust and debris hit Ms. Gong in her back with force, and she fell on her hands and knees and slammed into a concrete curb. Multiple people fell on top of Ms. Gong, including a firefighter with his equipment. Ms. Gong swallowed large quantities of cinder, ash, and building debris into her lungs and air passages. When she heard the North Tower collapsing, she turned to run but only made it to the northwest corner of West

14

Street when the second dust cloud struck her. Ms. Gong felt pieces of debris hit her back and she again fell to the ground, covering her head as she heard a car explode. *Id.* at ¶¶ 7-9.

Despite her own injuries, Ms. Gong helped carry an injured firefighter to an ambulance and transported him to Beth Israel Hospital. Upon arrival, she had great difficulty breathing and went inside the hospital to get oxygen and flush her eyes and throat, going through a decontamination shower and into the Emergency Room for initial care and treatment. *Id.* at ¶¶ 10-11. Ms. Gong sought continuing medical treatment for her injuries after the 9/11 Attacks, and she continued to receive medical and emotional treatment in the ensuing weeks, months, and years.

As a result of these terrorist attacks, Ms. Gong suffered a back injury, including cervical and lumbar disc herniations and bulging discs as well as a pinched nerve in her left scapula, a neck injury, and a severe injury to her left foot that later required multiple surgeries. She also suffered from bacterial infections that caused additional nerve damage. Further, due to her exposure to large quantities of WTC building dust and debris, she also suffers from eye injuries, asthma, chronic laryngopharyngitis, chronic rhinitis, GERD, obstructive sleep apnea, interstitial lung disease, and sinusitis. *Id.* at ¶¶ 12-14.

>        **6.    Llewellyn Malcolm**
>              **Injury Category: Escape Injuries**
>              **Severity: Significant**

On September 11, 2001, Llewellyn Malcolm worked as a bellman/bell attendant with the New York Marriott World Trade Center hotel. *See* Duane Dec., Ex. G, Declaration of Llewellyn Malcolm at ¶ 3. On the morning of September 11, 2001, he had been working in the lobby of the hotel attending to guests when the first passenger jet, American Airlines Flight 11, crashed into the upper section of the North Tower. Mr. Malcolm heard a tremendous explosion directly overhead. He immediately ran around to the lower and subterranean floors of the hotel (to the engineering, housekeeping, accounting department, and cafeteria area) to alert employees that

15

there was an emergency and they must evacuate (as he was afraid that these employees may not have heard the noise and were not aware of the potential emergency). *Id*. at ¶¶ 4-5.

After warning his coworkers, Mr. Malcolm attempted to leave the hotel building. As he ran from the hotel, he tripped and stumbled and people fleeing from the building trampled over him. Some of these people fleeing in panic actually fell on top of Mr. Malcolm, and he suffered injuries to his left knee and ankle. Determined to leave the area, he stumbled out to the courtyard area of the hotel. Mr. Malcolm saw people jumping from the WTC Towers and exploding on the concrete in front of him, and he saw body parts strewn around the courtyard. These images from 9/11 still haunt Mr. Malcolm. *Id*. at ¶¶ 6-7.

As he stumbled towards an area where policemen were standing, the South Tower collapsed. Mr. Malcolm saw the approaching plume of dust, debris, soot, and ash from the collapsing South Tower, which looked like a river coming towards him. The building dust and debris covered Mr. Malcolm's body, and he inhaled large quantities of these toxic substances into his lungs and airways. Mr. Malcolm fled by way of a Metropolitan Transportation Authority bus after a police officer pushed him onboard. The bus took a roundabout route up the West Side and eventually brought Mr. Malcolm to 125th Street and St. Nicholas. He made his way home to the Bronx via public transportation from that point, and Mr. Malcolm finally arrived at his house later that evening. *Id*. at ¶¶ 8-9.

Shortly after the events of 9/11, Mr. Malcolm sought medical treatment for his injuries, which included a significant injury to his left knee that later required arthroscopic knee surgery, as well as a left ankle injury and a lower back injury (lumbosacral sprain). He also suffers from reactive airway disease syndrome (RADS) , gastroesophageal reflux disease (GERD) , and asthma

16

due to the larger quantities of dust and debris that he inhaled following the collapse of the South Tower. *Id.* at ¶¶ 10-11.

> **7.    Clarence Singleton**
> **Injury Category: Escape Injuries**
> **Severity: Significant**

On September 11, 2001, Clarence Singleton worked as a field mortgage inspector for Big Apple Inspections and First American Real Estate Solutions, LLC. He had retired the previous year with the New York Fire Department after twenty-two years of service with the rank of Lieutenant. *See* Duane Dec., Ex. H, Declaration of Clarence Singleton at ¶ 3. On the morning of September 11, 2001, Mr. Singleton had been in the field providing inspection services in the New York City area when the first passenger jet, United Airlines Flight 11, struck the North Tower. When he heard the news, he immediately went to his apartment and put on his NYFD tee-shirt and traveled over to the WTC area to see if he could aid the firefighters who responded to the scene. *Id.* at ¶ 4.

When Mr. Singleton arrived at the WTC, both Towers had been struck, and the South Tower had already collapsed. As a retired firefighter, he recalled his professional training and began extinguishing fires at the WTC. Soon after, Mr. Singleton heard a loud bang and realized that the North Tower had started to collapse. Upon the collapse of the North Tower, he turned and ran about thirty feet before he fell and severely injured his right shoulder. Due to the severity of his right shoulder fracture, Mr. Singleton was not able to pull himself up despite knowing that he was still in the collapse zone. *Id.* at ¶¶ 5-6.

A huge cloud of dust and debris surrounded Mr. Singleton, and he thought that he might die. He crawled on his hands and knees and used his firefighter training to scale a small wall to escape from the collapse zone. Emergency Medical Services arrived and took Mr. Singleton to St.

Vincent's Hospital. The doctors reset Mr. Singleton's right shoulder, and he returned to the scene at the WTC to provide more assistance. *Id*. at ¶ 7.

Due to the severity of his right shoulder injury caused by the 9/11 Attacks, Mr. Singleton later underwent arthroscopic shoulder surgery on October 29, 2001, at Victory Memorial Hospital in Brooklyn. During his recovery, he was immobilized and incapacitated for six weeks after the surgery and he further endured nine months of physical therapy to regain his shoulder strength. This injury caused permanent damage and lingering pain, and Mr. Singleton continues to take medication in order to cope with his shoulder pain. *Id*. at ¶ 8.

## III. The *Burnett* Moving Plaintiffs' ATA claims against The Taliban mandate treble damages.

The *Burnett* Moving Plaintiffs assert their claims against The Taliban under the ATA that provides they "*shall* recover threefold the damages" awarded. *See* 18 U.S.C. § 2333(a) (emphasis added). The trebling of the damages award in these circumstances is mandated by the use of the world "shall". *See United States v. Kahn,* 5 F.4th 167, 174 (2d Cir. 2021) (holding "[t]he word 'shall,' in a statute, indicates a command; what follows the word 'shall' is 'mandatory, not precatory'"). Therefore, the *Burnett* Moving Plaintiffs submit that each of the values awarded for compensatory damages should be trebled to accord with the mandatory trebling language in the ATA. A separate column is included on Exhibit A indicating the trebling of the damages values.

## IV. The Court should also award prejudgment interest for claims under the ATA.

On the issue of prejudgment interest, this Court previously ruled that the rate of prejudgment interest of 4.96 percent interest per annum compounded annually was appropriate. ECF No. 3383 at 2, *adopting* ECF No. 3358 at 16-20 (discussing the availability of prejudgment interest under federal and New York common law and determining, in the Court's discretion a prejudgment interest rate of 4.96%). Accordingly, the *Burnett* Moving Plaintiffs appearing on

Exhibit A ask that this Court direct that prejudgment interest of 4.96 percent, compounded annually, be awarded on their awards running from September 11, 2001 to the date of judgment against The Taliban.

**V.      Plaintiffs seek to reserve their rights to seek punitive damages or other damages at a later time to the extent appropriate**

As has been the practice in the Court in addressing many of the motions for default judgments, the *Burnett* Moving Plaintiffs herein seek the Court's permission to apply for punitive damages or other damages later, consistent with any applicable future rulings and to supplement the record as part of applications for those damages. While the *Burnett* Moving Plaintiffs assert their entitlement to punitive damages, in light of prior differing decisions on the proper punitive multiplier (compare, e.g., ECF 3175 at 3 with ECF 3384 at 6), Plaintiffs request permission to reserve the issue of punitive damages until a later date, as this Court has previously authorized. *See* ECF No. 3666.

**VI.      Proposed Order**

For the Court's convenience and consideration, a proposed form of Order is being filed contemporaneously with this motion. The proposed Order tracks the language of the Court's 2006 Order, including judgment against The Taliban, and the Court's July 31, 2017 Order directing entry of final judgment against the Iran Defendants.

**CONCLUSION**

For the foregoing reasons, the *Burnett* Moving Plaintiffs submit that a judgment awarding default damages judgments under the ATA for the Plaintiffs identified on Exhibit A be awarded against Defendant The Taliban in the values set forth in those exhibits. Plaintiffs further submit that these judgments under the ATA be trebled under 18 U.S.C. § 2333(a) and that prejudgment

interest be applied to each judgment in the amount of 4.96%, compounded annually, from September 11, 2001 through the date of the entry of this judgment.

Plaintiffs further ask that the Court permit future motions that may address punitive damages and such other and further relief as is permissible under the ATA.

Finally, as set forth in the Court's July 11, 2022 Order, any default judgment granted in this case against The Taliban is binding solely on the determination of damages against The Taliban and not against any of the other Defendants in this action.

Dated:  September 24, 2025

Respectfully submitted,

MOTLEY RICE LLC

*/s/ John C. Duane*
John C. Duane, Esq.
Donald A. Migliori, Esq.
Jodi Westbrook Flowers, Esq.
John M. Eubanks, Esq.
Robert T. Haefele, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450
Email: jduane@motleyrice.com

Attorneys for the *Burnett* Plaintiffs