**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001** | 03-MD-01570 (GBD)(SN)<br>ECF Case<br>**ORAL ARGUMENT REQUESTED** |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.,* 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.,* 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.,* 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.,* 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.,* 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.,* 23-cv-02845

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, AND WORLD ASSEMBLY OF MUSLIM YOUTH

# TABLE OF CONTENTS

**Page**


GLOSSARY OF ABBREVIATIONS ........ xiv

INTRODUCTION ........ 1

SUMMARY OF ARGUMENT ........ 4

I. LEGAL STANDARDS ........ 5

A. Summary Judgment Generally ........ 5

B. The Governing ATA and JASTA Standards ........ 8

C. Governing JASTA Aiding and Abetting Principles Relevant to Summary Judgment ........ 12

D. Defendants' Formulation of the Standard Is Incomplete ........ 16

E. Plaintiffs' Aiding and Abetting Claims Are Especially Strong Because Defendants Shared Common Cause with Al Qaeda ........ 17

F. Causation, Foreseeability, and Global Strike Capability ........ 19

Causation ........ 19

Foreseeability ........ 24

Global Strike Capability ........ 26

2018 *KSA* Decision ........ 28

G. JASTA Conspiracy Liability ........ 29

II. EVIDENTIARY ISSUES ........ 32

A. Al Fadl ........ 32

B. Expert Reports and *Daubert* Challenges ........ 37

C. Government Investigative Reports ........ 40

D. OFAC Designations ........ 44

III. MWL AND IIRO FACTS ........ 49

A. MWL and IIRO Operated as a Single Institution Under Centralized Control ........ 51

**TABLE OF CONTENTS**
***(continued)***


**Page**

(1) MWL Created IIRO and Governs IIRO Through MWL's Own Officers ..... 51

(2) MWL and IIRO Held Themselves Out as One Organization, and the United States Treated Them as One ..... 53

(3) IIRO's Headquarters Controlled Its Branch Offices ..... 54

B. MWL and IIRO Were Embedded in the Network From Which Al Qaeda Was Formed ..... 55

(1) MWL, IIRO, and the Services Bureau in Peshawar ..... 55

(2) Al Qaeda Figures Ran IIRO's Peshawar Office ..... 58

(3) Julaidan Sat on Al Qaeda's Founding Advisory Council While Directing MWL's Pakistan Office ..... 60

(4) Since Its Founding, Al Qaeda Has Used MWL and IIRO ..... 60

(5) The Golden Chain ..... 61

C. Mohammed Jamal Khalifa and IIRO's Philippine Operation ..... 62

D. Defendants' Support Continued After Al Qaeda Declared War on the United States ..... 66

(1) Al Qaeda's Declarations of War on Americans, and Its Dependence on the Defendant Charities ..... 66

(2) Contemporaneous U.S. Intelligence Placed IIRO and MWL Inside Bin Laden's Funding Network ..... 67

(3) IIRO Was Principal Funder of Al Qaeda's Training Camps in Afghanistan (Where 9/11 Hijackers Trained) Through 2001 ..... 70

(4) Julaidan's Continuing Positions at IIRO, MWL, and the Rabita Trust ..... 72

(5) Al-Mujil and IIRO's Eastern Province Office ..... 73

(6) Financial Improprieties Pervaded IIRO's Branch Offices ..... 74

(7) Raids, Arrests, and Account Seizures During Basha's Tenure ..... 76

**TABLE OF CONTENTS**
***(continued)***

**Page**


(8) IIRO and MWL Supported Al Qaeda on Its Other Jihad Fronts, Including Bosnia, Chechnya, Sudan, Somalia, Yemen, and Malaysia ... 76

E. The Rabita Trust ... 81

F. Al Haramain Al Masjed Al Aqsa Charity Foundation ... 83

G. Findings and Designations by the United States, the United Nations, and the Department of Defense ... 84

H. Independent Evidence Corroborating Al Fadl ... 86

I. Plaintiffs' Experts ... 88

IV. WAMY FACTS ... 91

A. WAMY is a Single, Centrally Directed Organization Whose Senior Leadership Knew that it Funded and Otherwise Supported Al Qaeda. ... 91

B. WAMY's "Welfare Arm" LBI, and its Successor BIF, Joined Al Qaeda. ... 93

C. WAMY Sent Funds, Personnel, and Other Support ao Al Qaeda Affiliated Jihadist Fighters in Conflict Zones, Using Al Qaeda-Linked Conduits. ... 94

D. WAMY Funded Recruitment and Paramilitary Training and Propagated Violent Jihad. ... 96

E. WAMY Was on Notice of its Role and Did Not Stop. ... 97

F. WAMY's Support Reached the 9/11 Enterprise and the Hijackers. ... 98

G. Opinion Testimony of Plaintiffs' Experts Concerning WAMY and al Qaeda ... 99

V. A REASONABLE JURY COULD RETURN A VERDICT AGAINST MWL AND IIRO; SUMMARY JUDGMENT MUST BE DENIED ... 102

Plaintiffs' Factual Case Summarized ... 103

A. Aiding and Abetting ... 105

Wrongful Act ... 105

General Awareness ... 105

**TABLE OF CONTENTS**
***(continued)***

**Page**


Knowing Substantial Assistance ........ 106

MWL's and IIRO's Knowledge of Al Qaeda's Acts and Objectives ........ 107

The *Halberstam* Factors ........ 110

Defendants' Weak Rebuttal ........ 113

(1) Retroactivity ........ 116

(2) Absence of Internal Financial Records Showing Monies Flowing from Defendants to Al Qaeda ........ 120

(3) Defendants' Audits/Controls ........ 121

(4) Agency/Alter Ego ........ 123

B. Conspiracy ........ 126

VI. A REASONABLE JURY COULD RETURN A VERDICT AGAINST WAMY; SUMMARY JUDGMENT MUST BE DENIED ........ 130

A. A Reasonable Jury Could Find WAMY Liable for Aiding And Abetting Al Qaeda Under § 2333(D)(2). ........ 130

B. A Reasonable Jury Could Find JASTA Conspiracy Liability. ........ 143

C. The New York State-Law Claims Survive With The Federal Claims. ........ 145

D. Conclusion. ........ 148

CONCLUSION ........ 149

CERTIFICATE OF SERVICE ........ 152

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. City of Miami, Fl*,
637 F.3d 1178 (11th Cir. 2011) ....................30, 127

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004)....................34

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242 (1986).................... *passim*

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) .................... *passim*

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026)....................3, 18, 22

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988)....................41

*Belkin v. Islamic Republic of Iran*,
667 F. Supp. 2d 8 (D.D.C. 2009)....................128, 129

*Bennett v. Goord*,
343 F.3d 133 (2d Cir. 2003)....................6

*Bensky v. Indyke*,
743 F. Supp. 3d 586 (S.D.N.Y. 2024)....................147

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022)....................30

*Bodoff v. Islamic Republic of Iran*,
424 F. Supp. 2d 74 (D.D.C. 2006)....................128, 129

*Bonacasa v. Std. Chartered PLC*,
22 CV 3320, 2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023)....................20

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000)....................42

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
274 F. Supp. 2d 86 (D.D.C. 2003)....................25, 149

**TABLE OF AUTHORITIES**
***(continued)***

**Page**

*Carte Blanche PTE Ltd. v. Diners Club Int'l Inc.*,
758 F. Supp. 908 (S.D.N.Y. 1991)....124

*City of New York v. Golden Feather Smoke Shop Inc.*,
No. 08-cv-03966 (CBA)(JMA) 2013 WL 3187049 (E.D.N.Y. June 20, 2013) ....34

*Cofacredit S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999)....124, 127

*Cozen O'Connor v. U.S. Dep't of Treasury*,
570 F. Supp. 2d 749 (E.D. Pa. 2008) ....134

*Cresser v. American Tobacco*,
174 Misc. 2d 1 (S. Ct., Kings Co. 1997)....31, 35

*Dennis v. Napoli*,
148 A.D.3d 446, 49 N.Y.S.3d 652 (1st Dep't 2017) ....148

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
671 F. Supp. 3d 387 (S.D.N.Y. 2023)....113

*Elmaliach v. Bank of China Ltd.*,
971 N.Y.S.2d 504 (1st Dep't 2013)....113

*Emanuel v. Gap, Inc.*,
No. 19-cv-03617 (PMH), 2022 WL 3084317 (S.D.N.Y. Aug. 3, 2022) ....36

*Finan v. Lafarge S.A.*,
No. 22-cv-7831, 2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025) ....25, 106

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023) .... *passim*

*Garanti Financial Kiralama A.S. v. Aqua Marine & Trading Inc.*,
697 F.3d 59 (2d Cir. 2012)....115

*Gayle v. Gonyea*,
313 F.3d 677 (2d Cir. 2002)....6

*Gelb v. Bd. of Elections of City of New York*,
224 F.3d 149 (2d Cir. 2000)....7

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016)....30, 127

**TABLE OF AUTHORITIES**
***(continued)***

**Page**


*Gill v. Arab Bank PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) ....................47

*Gonzalez v. Google, Inc.*,
282 F. Supp. 3d 1150 (N.D. Cal. 2017) ....................9

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .................... *passim*

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) .................... *passim*

*Innovative Biodefense, Inc. v. VSP Techs., Inc.*,
176 F. Supp. 3d 305 (S.D.N.Y. 2016)....................124

*In re Japanese Elec. Prods. Antitrust Litig.*,
723 F.2d 238 (3d Cir. 1983), rev'd on other grounds, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................6

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005)....................6

*Johnson & Johnson v. S. Pointe Wholesale Inc.*,
No. 08-cv-1297 (SLT)(SMG), 2014 WL 12558573 (E.D.N.Y. Apr. 4, 2014)....................34

*Kalshi v. Gratsos*,
790 F.2d 1050 (2d Cir. 1986)....................127

*Kaplan v. Lebanese Canadian Bank SAL*,
999 F.3d 842 (2d Cir. 2021).................... *passim*

*Kaytor v. Elec. Boat Corp.*,
609 F.3d 537 (2d Cir. 2010)....................8

*Kindhearts for Charitable Humanitarian Dev. Inc. v. Geithner*,
647 F. Supp. 2d 857 (N.D. Ohio 2009)....................46

*King v. Habib Bank Ltd*
No. 20-cv-4322 (LGS), 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ....................31

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998)....................6

**TABLE OF AUTHORITIES**
***(continued)***

**Page**


*Lelchook v. Societe Generale de Banque au Liban S.A.L.*,
147 F.4th 226 (2d Cir. 2025), *cert. denied*, 1465 S.Ct. 2602 (2026) ....................118

*Levin v. Bank of New York Mellon*,
No. 09-cv-5900 (RPP), 2013 WL 5312502 (S.D.N.Y. Sept. 23, 2013)....................48

*Levy v. Young Adult Inst. Inc.*,
103 F. Supp. 3d 426 (S.D.N.Y. 2015)....................113

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018).................... *passim*

*Linde v. Arab Bank PLC*,
922 F. Supp. 2d 316 (E.D.N.Y. 2013) ....................36

*Lindsay v. Lockwood*,
163 Misc. 2d 228 (Sup. Ct., Monroe Co. 1994)....................31

*Lindsay v. Lockwood*,
625 N.Y.S.2d 393 (Sup. Ct., Monroe Co. 1994)....................146

*Louis Vuitton Malletier S.A. v. Ly USA Inc.*,
472 F. App'x 19 (2d Cir. 2012) ....................34

*Manning* v. *Budget Rent A Car.*
241 N.Y.S.3d 295 (2d Dep't 2025)....................126

*Maurizi v. Callaghan*,
No. 20-CV-922JLS(F), 2022 WL 1446500 (W.D.N.Y. Feb. 25, 2022) ....................147

*McCarthy v. New York City Tech. Coll. of City Univ. of New York*,
202 F.3d 161 (2d Cir. 2000)....................6

*Moses v. BNP Paribas, S.A.*,
802 F. Supp. 3d 567 (S.D.N.Y. 2025)....................118

*Nat'l Union Fire Ins. Co. v. Turtur*,
892 F.2d 199 (2d Cir. 1989)....................7

*In re Nigeria Charter Flights Contract Litig.*,
520 F. Supp. 3d 447 (E.D.N.Y. 2007) ....................115

*Opati v. Republic of Sudan*,
590 U.S. 418 (2020)....................41

**TABLE OF AUTHORITIES**
***(continued)***

**Page**

*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017), vacated and remanded on other grounds, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020)....23, 26, 41

*Patrick v. LeFevre*,
745 F.2d 153 (2d Cir. 1984)....7

*Redd v. New York Div. of Parole*,
678 F.3d 166 (2d Cir. 2012)....7

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000).... *passim*

*Riviello v. Waldron*,
47 N.Y.2d 297 (N.Y. 1979)....115

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)....10, 20, 22

*Rule v. Brine, Inc.*,
85 F.3d 1002 (2d Cir. 1996)....34

*Scollo v. Nunez*,
874 N.Y.S.2d 380 (2d Dep't 2009)....148

*Sec. Exch. Comm'n v. Airborne Wireless Network*,
No. 21-cv-01772 (GM) 2023, WL 5938527 (S.D.N.Y. Sept. 12, 2023)....34

*Sec. Exch. Comm'n v. Apuzzo*,
689 F.3d 204 (2d Cir. 2012)....142

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*,
391 F.3d 77 (2d Cir. 2004)....5

*Small v. Lorillard Tobacco Co.*,
94 N.Y.2d 43 (1999)....146

*Smith v. City of New York*,
697 F. App'x 88 (2d Cir. 2017)....36

*Spetner v. Palestine Inv. Bank*,
No. 19-cv-5 (EK)(JAM), 2026 WL 2350124 (E.D.N.Y. Aug. 13, 2026)....14, 106

**TABLE OF AUTHORITIES**
***(continued)***

**Page**


*Strauss v. Credit Lyonnais S.A.*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013) ....................37, 131

*In re Terrorist Attacks on Sept. 11, 2001*,
2022 U.S. Dist. LEXIS 172943 (S.D.N.Y. Sept. 23, 2022)....................113

*In re Terrorist Attacks on Sept. 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005)....................113, 146

*In re Terrorist Attacks on September 11, 2001*,
03-MD-1570 (GBD) (SN), 2025 WL 238768 (S.D.N.Y. Aug. 18, 2025)....................37

*In re Terrorist Attacks on September 11, 2001*,
03-MD-1570 (GBD) (SN) 2025 WL 2485427 (S.D.N.Y. Aug. 28, 2025) (Aug. 8, 2025) (Daniels, J.)....................32

*In re Terrorist Attacks on September 11, 2001*,
2008 WL 2073447 (S.D.N.Y. Dec. 23, 2008) ....................20

*In re Terrorist Attacks on September 11, 2001*,
2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023) ....................41, 42, 43

*In re Terrorist Attacks on September 11, 2001*,
298 F. Supp. 3d 631 (S.D.N.Y. 2018).................... *passim*

*In re Terrorist Attacks on September 11, 2001*,
392 F. Supp. 2d 539 (S.D.N.Y. 2005)....................146

*In re Terrorist Attacks on September 11, 2001*,
740 F. Supp. 2d 494 (S.D.N.Y. 2010), *aff'd.* 714 F.3d 118 (2d Cir. 2014)....................20, 25, 113

*In re Terrorist Attacks (Sudan)*,
03-MD-1570 (SN), 2023 WL 5132138 (S.D.N.Y. Feb. 27, 2024)....................26, 119

*Time Warner City Cable* v. *Adelphi Univ.*,
813 N.Y.S.2d 114 (2d Dep't 2006)....................126

*Tolan v. Cotton*,
572 U.S. 650 (2014)....................5, 6, 16, 17

*Twitter, Inc v. Taamneh*,
598 U.S. 471 (2023).................... *passim*

**TABLE OF AUTHORITIES**
***(continued)***

**Page**

*United States v. Baker*,
899 F.3d 123 (2d Cir. 2018)....................................................................................34

*United States v. Bellomo*,
176 F.3d 580 (2d Cir. 1999)....................................................................................33

*United States v. Bin Laden*,
397 F. Supp. 2d 465 (S.D.N.Y. 2005), *aff'd In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008)....................................................33

*United States v. Bryce*,
208 F.3d 346 (2d Cir. 1999)....................................................................................43

*United States v. Danilovich*,
731 F. App'x 45 (2d Cir. 2018)................................................................................33

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011)..................................................................................134

*United States v. Fawwaz*,
694 F. App'x 847 (2d Cir. 2017)..............................................................................33

*United States v. Fuchs*,
467 F.3d 889 (5th Cir. 2006)..................................................................................127

*United States v. Ganji*,
880 F.3d 760 (5th Cir. 2018)..........................................................................127, 128

*United States v. Labat*,
905 F.2d 18 (2d Cir. 1990)............................................................................124, 127

*United States v. Mejia*,
543 F.3d 179 (2d Cir. 2008)....................................................................................36

*United States v. Mitchell*,
484 F.3d 762 (5th Cir. 2007)..................................................................................128

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999)............................................................................124, 127

*Weihai Lianqiao Int'l. Grp. Co. Ltd. v. A Base IX Co. LLC*,
799 F. Supp. 3d 195 (S.D.N.Y. 2025)....................................................................125

**TABLE OF AUTHORITIES**
***(continued)***

**Page**

*Weiss v. Nat'l Westminster Bank, PLC*,
993 F.3d 144 (2d Cir. 2021)....................20, 118, 132

*Weslowski v. Zugibe*,
96 F. Supp. 3d 308 (S.D.N.Y. 2015)....................113

*Williams v. KFC Nat'l Mgmt. Co*.,
391 F.3d 411 (2d Cir. 2004)....................6

*Wilson v. DiCaprio*,
717 N.Y.S.2d 174 (1st Dep't 2000)....................147

*Wm. Passalacqua Builders Inc. v. Resnick Devs. S. Inc.*,
933 F.2d 131 (2d Cir. 1991)....................124, 125

*Yu Zhang v. Sabrina USA Inc.*,
No. 18-CV-12332 (AJN), 2021 WL 1198932 (S.D.N.Y. Mar. 30, 2021)....................34

*Zeng v. New York City Hous. Auth.*,
No. 22-138-CV, 2023 WL 4553416 (2d Cir. July 17, 2023)....................34

*Zobay v. MTN Group Ltd.*,
695 F. Supp. 3d 301 (E.D.N.Y. 2023)....................30

**TABLE OF AUTHORITIES**
***(continued)***

**Page**

**Statutes**

18 U.S.C. § 2333 ........ *passim*

Anti-Terrorism Act, 104 Stat. 2250 ........ *passim*

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(b), 130 Stat. 852 (2016) ..xv

**Rules**

Fed. R. Civ. P. 56(a) ........ 5

**Regulations**

31 CFR § 501.807 ........ 46

**Other Authorities**

162 Cong. Rec. 52845 (daily ed. May 17, 2016) ........ 9

162 Cong. Rec. H5239 (House, Sept. 9, 2016) ........ 9

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **9/11 Commission** | **National Commission on Terrorist Attacks Upon the United States** |
| **Afandi** | **Ibrahim Afandi** |
| **al Obaid** | **Dr. Abdullah Bin Saleh Al-Obaid** |
| **Al Fadl** | **Jamal Al Fadl** |
| **al-Awlaki** | **Anwar al-Awlaki** |
| **al-Haramain** | **Al Haramain Al Masjed Al Aqsa** |
| **al-Hazmi** | **Nawaf al-Hazmi** |
| **al-Johani** | **Maneh al-Johani** |
| **al-Mihdhar** | **Khalid al-Mihdhar** |
| **Al-Mujil** | **Abd al-Hamid Sulaiman Al-Mujil** |
| **AQ** | **Al Qaeda or Al Qaida** |
| **Arnaout** | **Enaam Arnaout** |
| **ATA** | **Antiterrorism Act of 1990, Pub. L. No. 101-519, § 132, 104 Stat. 2250, 2250–54 (1990)** |
| **Azzam** | **Abdullah Azzam** |
| **Basha** | **Dr. Adnan Basha** |
| **Batterjee** | **Shaykh Adil Batterjee** |
| **BIF** | **Benevolence International Foundation** |
| **Bin Laden** | **Osama Bin Laden** |
| **CIA** | **U.S. Central Intelligence Agency** |
| **Crescent** | **Saudi Red Crescent** |
| **Department of Defense or DOD** | **U.S. Department of Defense** |
| **DIB** | **Dubai Islamic Bank** |

| | |
|---|---|
| **FBI** | **Federal Bureau of Investigation** |
| **FTO** | **Foreign Terrorist Organization** |
| **Hamas** | **Palestinian Islamic Resistance Movement** |
| **Hanjour** | **Hani Hanjour** |
| **Hassanein** | **Fatih el Hassanein** |
| **IIED** | **Intentional Infliction of Emotional Distress** |
| **IIRO** | **International Islamic Relief Organization** |
| **JASTA** | **Justice Against Sponsors of Terrorism Act, Pub. L. No. 114–222, § 2(b), 130 Stat. 852, 853 (2016)** |
| **Julaidan** | **Wael Julaidan** |
| **Khalifa** | **Mohammed Jamal Khalifa** |
| **Kingdom or Saudi** | **Kingdom of Saudi Arabia** |
| **Kohlmann** | **Evan Kohlmann** |
| **LBI** | **Lajnat al-Birr al-Islamiyyah** |
| **MAK** | **Maktab al Khidamat (“Bureau of Services”)** |
| **MILF** | **Moro Islamic Liberation Front** |
| **MWL** | **Muslim World League or League** |
| **Naseef** | **Dr. Abdallah Naseef** |
| **NGO** | **Non-Governmental Organization** |
| **Noorwali** | **Abdul Wahab Noorwali** |
| **OFAC** | **Office of Foreign Assets Control** |
| **Rabita Trust** | **The Rabita Trust** |
| **SDGT** | **Specially Designated Global Terrorists** |
| **SJR** | **Saudi Joint Relief Committee** |
| **State Department** | **U.S. Department of State** |

| | |
|---|---|
| **Taibah** | **Taibah International** |
| **Treasury or Treasury Department** | **U.S. Department of the Treasury** |
| **TWRA** | **Third World Relief Agency** |
| **U.N. of UN** | **United Nations** |
| **U.S.** | **United States of America** |
| **WAMY** | **World Assembly of Muslim Youth** |
| **Winer** | **Jonathan Winer** |

## INTRODUCTION

Plaintiffs submit this Memorandum of Law in opposition to the motions for summary judgment made by: Defendant Muslim World League ("MWL"); Defendant International Islamic Relief Organization ("IIRO"); and Defendants World Assembly of Muslim Youth and World Assembly for Muslim Youth International (together "WAMY").[1]

It is the Defendants' burden on these motions to demonstrate that, viewing the evidence in the light most favorable to the Plaintiffs 1) there is no disputed material issue of fact presented, 2) no reasonable jury could return a verdict for the Plaintiffs, and 3) Defendants are therefore entitled to judgment as a matter of law. Defendants cannot make any such demonstration.

To the contrary, based on the evidence developed over the course of discovery in this case, a reasonable jury could easily find that the Plaintiffs have proved all the necessary elements of both a JASTA aiding and abetting claim and a JASTA conspiracy claim (as well as state law

---

[1] A glossary of abbreviations utilized in this Memorandum is included following the Table of Authorities above.

References to "MM" are to Defendant MWL's Memorandum of Law dated April 15, 2026 (ECF 11985). References to "IM" are to IIRO's Memorandum of Law dated April 15, 2026 (ECF 11989). References to "WM" are to WAMY's Memorandum of Law dated April 15, 2026 (ECF 11993).

References to "PMS" are to Plaintiffs' Rule 56.1 MWL Statement of Facts. References to "PIS" are to Plaintiff's Rule 56.1 IIRO Statement of Facts. References to "PWS" are to Plaintiffs' Rule 56.1 WAMY Statement of Facts.

References to "MCS" are to Plaintiffs' Rule 56.1 MWL Counterstatement of Facts. References to "ICS" are to Plaintiffs' Rule 56.1 IIRO Counterstatement of Facts. References to "WCS" are to Plaintiffs' Rule 56.1 WAMY Counterstatement of Facts.

References to "Ex." are to the Exhibits annexed to the accompanying Declaration of J. Scott Tarbutton dated October 16, 2026.

References to "W Ex." are to the Exhibits annexed to the accompanying Declaration of Robert T. Haefele dated October 16, 2026.

causes of action for, or incorporating, aiding and abetting and conspiracy liability) against each of these three Defendants.

To begin with, there is no dispute that on September 11, 2001, Al Qaeda committed an act of international terrorism on American soil that injured the Plaintiffs by killing their loved ones and causing billions of dollars in property damage. Plaintiffs can and will show that these Defendants aided and abetted and conspired with Al Qaeda in support of its campaign to attack America.

More specifically, the evidence shows that beginning at the time of Al Qaeda's founding in or about 1988 and continuing through the September 11 attacks themselves, these Defendants – knowing full well that it was Al Qaeda's stated goal to kill American civilians all over the world – provided Al Qaeda with massive funding and various forms of logistical assistance on a continuous basis in order to advance Al Qaeda's targeting of the United States through acts of terror. This assistance encompassed all the forms of material support Al Qaeda most needed in order to attack America – money, access to the international banking system, personnel, false documentation, cover employment, transportation, facilities, training camps and recruitment (to name a few).

Defendants' financial and logistical support enabled Al Qaeda to develop its global strike capability and thus made it possible for Al Qaeda to recruit, train, and arm terrorists and to send them forth to commit terrorist attacks all around the world. Indeed, the support at issue in the present motion includes funding directly used for the very same terrorist training camps in Afghanistan where many of the September 11 hijackers trained and prepared for their deadly mission in the United States. Thus, Plaintiffs have made out a powerful case for JASTA secondary liability against these Defendants.

Importantly, this case is fundamentally different from many more difficult terrorism cases, because this is not a case where a commercial institution – driven by the desire for profit – merely failed to prevent a terrorist organization from using its platforms or bribed a government ministry infiltrated by terrorists. *See e.g., Twitter, Inc v. Taamneh,* 598 U.S. 471 (2023) and *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026).

Rather, here the evidence shows that Defendants – led by some of the same men who at different times also held leadership positions with Al Qaeda – covertly assisted Al Qaeda, because these Defendants secretly shared with Al Qaeda the goal of waging violent jihad against the United States – which the Defendants and Al Qaeda perceived to be the enemy of Islam.

Because Defendants posed as legitimate charities (and did indeed perform some legitimate charitable work) they did not *publicly* state that killing Americans was their goal. But based on the evidence that Defendants covertly provided hundreds of millions of dollars and other assistance over many years to Al Qaeda in a consistent, organized, and systematic manner – knowing full well that Al Qaeda was a purely terrorist organization and that Al Qaeda intended to kill Americans in terrorist attacks all over the world – the record readily supports an inference that the Defendants shared Al Qaeda's goal and provided support to advance Al Qaeda's terrorist mission. This showing goes well beyond what is required for aiding and abetting or conspiracy liability under JASTA.

The Plaintiffs have thus presented a legally and factually sufficient JASTA secondary liability case against these Defendants and are entitled to a trial. Defendants' motions for summary judgment should therefore be denied.

## SUMMARY OF ARGUMENT

This Memorandum is divided into six parts. In Part I we review the legal standard applicable to a motion for summary judgment in a JASTA case, with specific reference to the key issues presented in this case; and in that process we correct certain mistaken legal assertions advanced by the Defendants in their briefs on these motions.

In Part II we review Defendants' objections to certain parts of the evidence presented by Plaintiffs here. We do this before reviewing the facts so that it is clear why the Defendants' pleas that the Court simply ignore damning parts of the record should be rejected, and to provide clarity as to the actual record the Court must consider when passing upon these motions for summary judgment.

More specifically, we show that Defendants' objections to four categories of evidence are meritless. Those categories of evidence are: a) evidence developed in part from information provided by former Al Qaeda operative turned government informant, Jamal Al Fadl; b) Plaintiffs' experts' reports that have already withstood Defendants' *Daubert* challenges; c) government investigative reports (chiefly from the FBI and CIA) describing Defendants' support for terrorism and Al Qaeda; and d) certain OFAC designations.

In Part III we summarize the factual evidence against Defendants MWL and IIRO that is more fully set out in Plaintiffs' Rule 56.1 MWL and IIRO Statements and Counterstatements.

In Part IV we similarly summarize the factual evidence against WAMY that is more fully set forth in Plaintiffs' Rule 56.1 WAMY Statement and Counterstatement.

In Part V, as to Defendants MWL and IIRO we first demonstrate that, based upon the evidence presented in this case, and upon reasonable inferences following from that evidence, a reasonable jury could (and should) return a verdict for the Plaintiffs on their JASTA claims (and

state law claims) against each of these Defendants. In that connection, we further show that various arguments raised by the Defendants as defenses to Plaintiffs' case are unavailing.

More specifically, we show that Defendants' arguments concerning a) retroactivity, b) the absence of internal financial reports showing money flowing from Defendants to Al Qaeda, c) Defendants' audits and internal financial controls, and d) IIRO's status as MWL's alter ego, are all meritless and do not support summary judgment for Defendants.

In Part VI below we similarly demonstrate that a reasonable jury could (and should) return a verdict for the Plaintiffs on their JASTA (and state law) claims against Defendant WAMY.

# I. LEGAL STANDARDS

## A. Summary Judgment Generally

The legal standards generally applicable to a motion for summary judgment are well-settled and are, of course, already familiar to the Court. In brief, summary judgment is appropriate only where the movant establishes that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether that burden has been met, a district court must view the record as a whole in the light most favorable to the non-moving party, resolve all ambiguities in that party's favor, and draw every reasonable inference in its favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *Anderson,* 477 U.S. at 255*; Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150–51 (2000); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir. 2004). The court may not weigh evidence, assess witness credibility, or choose

between competing reasonable interpretations of the record. *Anderson*, 477 U.S. at 255; *Reeves*, 530 U.S. at 150–51 (2000); *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005).

The question on summary judgment is whether, viewing the evidence cumulatively and drawing all reasonable inferences in plaintiff's favor, a reasonable jury could find the elements of plaintiff's claims satisfied. *McCarthy v. New York City Tech. Coll. of City Univ. of New York*, 202 F.3d 161, 165 (2d Cir. 2000). Thus the question is not whether the court finds the defendant's interpretation of the evidence more persuasive than plaintiff's, or whether the plaintiff has established liability by a preponderance of the evidence.

Although a nonmovant may not rely on unsupported speculation or conclusory assertions, circumstantial evidence is fully competent to present issues of fact that require a trial, *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002); *see, e.g., Williams v. KFC Nat'l Mgmt. Co*., 391 F.3d 411, 422 (2d Cir. 2004); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (holding that plaintiff's "circumstantial evidence" was sufficient to "entitle him to proceed to trial"); *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (concluding that plaintiff presented sufficient circumstantial evidence to survive a motion for summary judgment). And reasonable inferences drawn from circumstantial evidence must be credited to the nonmovant on a motion for summary judgment. *Anderson*, 477 U.S. at 249; *Tolan*, 572 U.S. at 660; *see also In re Japanese Elec. Prods. Antitrust Litig*., 723 F.2d 238, 305 (3d Cir. 1983), rev'd on other grounds, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986) (rejecting the fragmentation of evidence, and explaining that direct and circumstantial evidence may "cumulate and reinforce" one another in supporting ultimate inferences).

This principle is particularly important where (as here) awareness, scienter, and the significance of assistance – all issues that are central to JASTA claims – involve the Defendants'

state of mind. A guilty state of mind is rarely established through direct admissions (and a direct admission to intentionally aiding and abetting the murder of thousands of innocents is rarer still); and so Plaintiffs' JASTA claims here, like many JASTA claims, depend in part on circumstantial evidence and upon reasonable inferences drawn from the totality of the Defendants' conduct. *Halberstam v. Welch, 705 F.2d 472, 486 (D.C. Cir. 1983)* ("[c]ourts have to infer agreement from indirect evidence in most civil conspiracy cases") and 487 (inference of knowing assistance necessary for aiding and abetting liability, and inference of illegal agreement for conspiracy liability, were each properly drawn from surrounding circumstances).

Moreover, questions involving state of mind are ill-suited for resolution on a motion for summary judgment, because they commonly depend upon competing inferences to be drawn from the evidence and upon the credibility of witnesses. *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (internal citations omitted); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) ("Issues of causation, intent, and motivation are questions of fact."); *Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149, 157 (2d Cir. 2000), certified question accepted, 95 N.Y.2d 879, 715 N.Y.S.2d 213, 738 N.E.2d 361 (2000) ("[S]ummary judgment is generally inappropriate where questions of intent and state of mind are implicated."); *Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989) (same).

Nor should the Court evaluate Plaintiffs' evidence piecemeal. The record must be assessed as a whole, because evidence that may appear innocuous or insufficient when viewed in isolation may nevertheless support a reasonable inference of liability when considered together with the surrounding facts, relationships, knowledge, duration of conduct, and course of dealing shown by the record. *See Reeves*, 530 U.S. at 150.

The Second Circuit articulated the whole-record rule in *Kaytor v. Elec. Boat Corp*., 609 F.3d 537 (2d Cir. 2010), where the court held that, in determining whether there is sufficient evidence in favor of the party opposing summary judgment to present a genuine issue of material fact, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record,… while drawing all reasonable inferences in favor of the nonmoving party, even though contrary inferences might reasonably be drawn." *Id*. at 545. As discussed below, these principles apply with particular force to claims, arising from support for terrorism. *Kaplan v. Lebanese Canadian Bank SAL, 999 F.3d 842, 865 (2d Cir. 2021)* (District court is required to "consider all the complaint's allegations, rather than considering each in isolation, and to accept as true all permissible inferences that could be drawn from the complaint as a whole").

Rule 56.1's materiality inquiry cannot be separated from the substantive ATA and JASTA standards that define the Plaintiffs' claims here. A factual dispute is material if it could affect the outcome under those governing standards, and not merely if it fits within Defendants' overly narrow view of what Plaintiffs must prove. *See Anderson*, 477 U.S. at 248. Accordingly, the Court must evaluate the record under the standards governing primary and secondary liability under the ATA as amended by JASTA.

**B. The Governing ATA and JASTA Standards**

It has been ten years since Congress amended the federal Anti-Terrorism Act (the "ATA"), 104 Stat. 2250, by enacting the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114–222, 130 Stat. 852 (2016). Since that time, a number of U.S. Supreme Court and federal Circuit Court decisions have addressed the elements required for a legally and factually sufficient ATA/JASTA secondary liability case. The Plaintiffs' case here easily

satisfies those elements and fits neatly within the legal framework of the ATA and JASTA for a secondary liability case.

That result is not surprising. JASTA is, of course, a statute of general application to all terrorism cases that is intended to provide "civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against person, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, Pub. L. No. 114-22, § 2(b), 130 Stat. 852, 853 (2016).

Yet, while JASTA is a statute of general application, it was in important part written with this September 11 litigation specifically in mind and with a view to clearing certain legal obstacles that might otherwise prevent the September 11 Plaintiffs from having their day in court. *See In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631, at 639–40 and 660 (S.D.N.Y. 2018). Thus JASTA's applicability provision pointedly declares that the statute applies to civil actions arising out of an injury "on or after September 11, 2001." 130 Stat. at 855. And the legislative history of JASTA is replete with statements indicating that Congress intended JASTA to help the September 11 Plaintiffs.[2] *See Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1160 (N.D. Cal. 2017).

---

[2] *See*, for example, 162 Cong. Rec. 52845 (daily ed. May 17, 2016) (statement of Sen. Cornyn) (JASTA "allows the families of the 9/11 tragedy to seek justice in our courts of law" and helps fulfill the promise of the original ATA by clarifying "the rules for secondary liability which may attach to terrorism sponsors"); 162 Cong. Rec. 52845, 52846 (daily ed. May 17, 2016) (statement of Sen. Schumer) (noting that JASTA would "allow the victims of 9/11 to pursue some small measure of justice by giving them a legal avenue to hold foreign sponsors of terrorism accountable for their actions"); 162 Cong. Rec. H5239, H5241 - H5242 (House, Sept. 9, 2016) (statement of Rep. Nadler) ("[B]ecause of certain court decisions

*footnote continued*

One of the ways JASTA eases the burden on plaintiffs in terrorism cases is by expressly providing for secondary liability. As originally enacted in 1990, the ATA enabled U.S. nationals to bring civil suits when injured in their "person, property, or business by reason of an act of international terrorism." 104 Stat. 2250 at 2251. In such a lawsuit the plaintiff can recover treble damages and the cost of the suit, including attorney's fees. 18 U.S.C. § 2333(a). But, as originally enacted, the ATA did not explicitly impose liability on those "who only helped terrorists to carry out an attack or conspired with them," and some courts accordingly determined that the ATA did not authorize that sort of secondary liability. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 482–83 (2023). *See e.g., Rothstein v. UBS AG*, 708 F.3d 82, 97–98 (2d Cir. 2013) (no secondary liability under original ATA).

In part as a response to such decisions, Congress enacted JASTA in 2016. Among other things, JASTA amended the ATA by explicitly providing in § 2333(d)(2) for two forms of secondary liability. Thus, following the enactment of JASTA, an injured plaintiff can sue the responsible terrorists directly pursuant to § 2333(a), or the plaintiff can sue anyone who "*aids or abets*, by knowingly providing substantial assistance, or who *conspires* with the person who committed such an act of international terrorism" pursuant to § 2333(d)(2) (emphasis added). *See Twitter*, 598 U.S. at 483–84.

More specifically, the ATA, as amended by JASTA, now reads in relevant part as follows:

> § 2333(a) ACTION AND JURISDICTION – Any national of the United States injured in his person, property or business by reason of an act of international terrorism … may sue therefor in any appropriate district

misinterpreting the Foreign Sovereign Immunities Act and the Anti-Terrorism Act, the 9/11 victims and their families have been unable to pursue their claims in court against some of the parties they believe were responsible for funding the attacks.").

> court of the United States and shall recover threefold the damages he or she sustains and the cost of any suit, including attorney's fees …
>
> (d)(2) LIABILITY – In an action under subsection (a) for an injury arising from an act committed, planned or authorized by any organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189) as of the date on which such terrorist act was committed, planned or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

Thus, there are now three theories of ATA liability: direct liability; aiding and abetting liability; and conspiracy liability.

As noted, when Congress passed JASTA, it expressly declared that the statute was enacted to provide civil litigants with "full access to the court systems" and the "broadest possible basis . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found" that have knowingly or recklessly provided material support or resources, directly or indirectly, to terrorists. To those ends, Congress expressly endorsed *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) as the "proper legal framework" for evaluating JASTA aiding and abetting claims. JASTA, 130 Stat. at 852; *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 435 (2d Cir. 2025).

*Halberstam* sets forth three elements that a plaintiff must establish for aiding and abetting liability: 1) the party whom the defendant aids "must perform a wrongful act that causes an injury," 2) the defendant must be "generally aware" of his "role as part of an overall illegal or tortious activity at the time he provides the assistance," and 3) the defendant must "knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477.

JASTA employs the traditional common law phrase "aiding and abetting" and points to *Halberstam's* common law framework as the primary guidepost for understanding the scope of § 2333(d)(2); and the phrase "aids and abets" in § 2333(d)(2), as elsewhere, "refers to a

conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter*, 598 U.S. at 493.

### C. Governing JASTA Aiding and Abetting Principles Relevant to Summary Judgment

Several settled principles govern the Court's evaluation of the record here.

As noted, *Halberstam* identifies three essential elements for aiding and abetting liability: a wrongful act, general awareness, and knowing substantial assistance.

The first of these elements is not in dispute here. The principal wrongdoer in the September 11 attacks was Al Qaeda. Defendants must and do concede that Al Qaeda was designated a Foreign Terrorist Organization (or "FTO") and that Al Qaeda committed wrongful acts of international terrorism on September 11, 2001 which caused the Plaintiffs' injuries – chiefly, the death of Plaintiffs' loved ones and destruction of billions of dollars of property – on September 11 itself. Thus there can be no doubt that both *Halberstam's* requirement of a wrongful act, and § 2333(a)'s threshold requirement that Plaintiffs be injured "by reason of an act of international terrorism" are satisfied here. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 330–31 (2d Cir. 2018) (causation focuses on relationship between alleged act of terrorism and plaintiff's injury, whereas aiding and abetting liability focuses on a relationship between secondary actor's alleged supportive conduct and the act of international terrorism).

The focus of Defendants' motions as to Plaintiffs' JASTA aiding and abetting claims is on the second and third *Halberstam* elements: general awareness, and knowing substantial assistance. Aiding and abetting liability attaches under JASTA when the defendant 1) is generally aware of its role as part of an overall illegal or tortious activity and 2) knowingly provides substantial assistance. *Ashley*, 144 F.4th at 435.

JASTA does not require that the defendant personally commit the terrorist act that injured the plaintiff (and Plaintiffs here do not, of course, allege that these Defendants personally committed the September 11 attacks). To the contrary, JASTA was enacted precisely in order to reach those who substantially assist the principal wrongdoer. *Kaplan v. Lebanese Canadian Bank SAL*, 999 F.3d 842, 856 (2d Cir. 2021); *Linde*, 882 F.3d at 329.

And because JASTA permits recovery against those who aid and abet international terrorism either "directly or indirectly," liability attaches when the "defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary." *Ashley*, 144 F.4th at 437, quoting *Kaplan*, 999 F.3d at 856 (quoting JASTA, 130 Stat. at 853).

As to the second *Halberstam* element – general awareness – the phrase "generally aware" connotes "something less than full, or fully focused, recognition." *Ashley,* 144 F.4th at 438 *(*quoting *Kaplan,* 999 F.3d at 863). Plaintiffs need only adduce evidence from which a reasonable jury could conclude that the defendant was generally aware of its role in some illegal or tortious activity from which terrorist violence was a foreseeable consequence. Plaintiffs need not show that a defendant was aware of its role in, or precise details about, the *specific* terrorist attack that caused the plaintiff's injury. *Ashley,* 144 F.4th at 438 (citing *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021)).

The third and final element of the *Halberstam* framework – *i.e.,* that the defendant provided *knowing* and *substantial* assistance – is comprised of "twin requirements" that are "part of a single inquiry designed to capture conscious and culpable conduct." *Ashley,* 144 F.4th at 438 (citing *Twitter*, 598 U.S. at 504). The two requirements of knowing and substantial assistance work in tandem with one another, such that a lesser showing of one can be offset by a greater

showing of the other. *Id*. (citing *Twitter*, 598 U.S. at 491–92); *see Spetner v. Palestine Inv. Bank*, No. 19-cv-5 (EK)(JAM), 2026 WL 2350124 at *12 (E.D.N.Y. Aug. 13, 2026) ("Knowledge and substantial assistance function on a sliding scale 'a lesser showing of one' demands a greater showing of the other") (citing *Twitter*, 598 U.S. at 491–92.)

*Halberstam* identifies six factors that are relevant as to whether a defendant's assistance is substantial, namely: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) defendant's presence or absence at the time of the tort; (4) defendant's relation to the principal; (5) defendant's state of mind; and (6) the period of defendant's assistance. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483–84). Here, as developed below, five of these six factors support a finding of substantial assistance; the lone exception is that Defendants were not personally present at the scene of the 9/11 attacks.

Importantly, the *Halberstam* decision's three elements and six factors should not be taken as "inflexible codes." *Twitter*, 598 U.S. at 497. Instead, *Halberstam's* framework rests on the same conceptual core that has animated aiding and abetting liability for centuries – namely, that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed. *Twitter*, 598 U.S. at 493 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

And despite the need for conscious culpable conduct, the "act" requirement is not "stringent." *Twitter*, 598 U.S. at 492. "The quantity of assistance [is] immaterial, so long as the accomplice did *something* to aid the crime." *Spetner*, 2006 WL 2352124, at *12 (*quoting Rosemond v. United States*, 575 U.S. 65, 73 (2014)) (emphasis in original).

As with the general awareness element, in a JASTA aiding and abetting case the requirement of knowing and substantial assistance does not require proof of operational knowledge, direct dealings with attack perpetrators, or one-to-one traceability between particular assistance and a particular attack. Although a close nexus between the assistance and the terrorist act may strengthen an aiding and abetting claim, the absence of such a direct nexus is not dispositive. *Ashley*, 144 F.4th at 439 (citing *Twitter*, 598 U.S. at 495–97).

Moreover, where proof of a concrete nexus is lacking, courts have found that aiding and abetting liability may attach based on a showing that the defendant aided and abetted "a broad category of misconduct." *Ashley*, 144 F.4th at 445. Such a showing can be established where, for example, the defendant has engaged in "pervasive, systemic and culpable such that [the court] can say defendant aided every wrongful act." *Id.*; *Twitter*, 598 U.S. at 496. (As developed below, this legal standard aptly captures the hand-in-glove relationship that has existed between Al Qaeda and these Defendants throughout Al Qaeda's history; thus, as one Al Qaeda planning document memorably put it, Defendants MWL and IIRO served as the launching points for Al Qaeda's terrorist attacks. ICS ¶¶ 1, 13, 179.)

In the end, the relevant inquiry always remains whether the defendant consciously and culpably participated in conduct that substantially assisted the relevant terrorist enterprise *or* the particular wrongful act that injured plaintiffs. *Twitter*, 598 U.S. at 493–504. Stated another way, the crux of the fact-sensitive balancing of the six *Halberstam* factors is simply to verify that the defendant's conduct is significant and culpable enough to impose liability. *Ashley*, 144 F.3d at 439.

An analysis of defendant's knowing and substantial assistance under the JASTA framework is highly fact-intensive and changes on a case to case basis. *Ashley*, 144 F.4th at 443;

*Honickman*, 6 F.4th at 500. And because the second and third *Halberstam* elements require the evaluation of knowledge, awareness, culpability, relationships among actors, the significance of assistance, and competing inferences regarding the role that assistance played in the relevant terrorist enterprise, they present quintessential fact questions that are ordinarily not capable of determination as a matter of law. *See Linde*, 882 F.3d at 329–30.

Accordingly, where the record would permit a reasonable jury to draw competing inferences concerning the defendant's awareness, state of mind, relationship to the principal, duration of assistance, or the significance of the assistance provided, summary judgment is inappropriate. The Court's role is not to decide how the *Halberstam* elements and factors ultimately *should* be weighed, but only whether a reasonable jury *could* weigh them in Plaintiffs' favor.

### D. Defendants' Formulation of the Standard Is Incomplete

Defendants correctly observe that mere speculation and bare conclusory allegations cannot defeat summary judgment. But their motions convert that unremarkable principle into a series of legal errors: they ask this Court to weigh competing inferences, to isolate evidence rather than to assess the cumulative record, and to impose ATA/JASTA requirements that the governing law does not impose. *See Anderson*, 477 U.S. at 255; *Reeves*, 530 U.S. at 150.

Those errors matter here. Defendants' arguments about attenuation, alternative explanations, purported gaps, and innocent interpretations may be appropriate arguments for trial; but they are not grounds for summary judgment where the cumulative record readily supports contrary reasonable inferences. *See Tolan,* 572 U.S. at 657; *Anderson*, 477 U.S. at 255.

Nor may Defendants defeat liability by demanding direct proof of operational knowledge, direct transfers to the attack perpetrators, or one-to-one traceability between particular resources and the attacks. The governing ATA/JASTA standards do not require such proof, but instead

require a holistic inquiry into general awareness, substantial assistance, culpability, and nexus. *See Twitter*, 598 U.S. at 495–497; *Ashley*, 144 F.4th at 437–39; *Kaplan*, 999 F.3d at 856–866; *Halberstam*, 705 F.2d at 483–84.

Rule 56.1 does not permit Defendants to disaggregate the record and require each individual item of evidence to independently establish liability. Rather, at this stage, reasonable competing inferences belong to the Plaintiffs, *Tolan*, 572 U.S. at 657–60; *Anderson*, 477 U.S. at 255; and the Court must evaluate whether the cumulative record – considered collectively, and not in isolated pieces – would permit a reasonable jury to find the elements of Plaintiffs' JASTA claims satisfied. *See Reeves*, 530 U.S. at 150. Indeed, while the Court is required to review the record as a whole, the Court must disregard any and all evidence favorable to the moving party that the jury would not be *required* to believe. *Reeves*, 530 U.S. at 151.

In short, summary judgment must be denied if the evidence – viewed collectively and in Plaintiffs' favor – would permit a reasonable jury to find that Defendants knowingly provided substantial assistance to the relevant terrorist enterprise or principal violation, either directly or through intermediaries, or otherwise engaged in conduct actionable under the ATA or JASTA. *See Twitter*, 598 U.S. at 495–497; *Ashley*, 144 F.4th at 437–39; *Honickman*, 6 F.4th at 495–501; *Kaplan*, 999 F.3d at 856–866; *Linde*, 882 F.3d at 329–330.

### E. Plaintiffs' Aiding and Abetting Claims Are Especially Strong Because Defendants Shared Common Cause with Al Qaeda

The law of JASTA aiding and abetting has been developed chiefly in what might be termed "borderline" cases in which a commercial institution serving the general public – such as a bank, or a social media platform in *Twitter* – provided services that were alleged to have aided terrorist organizations. Many of these cases have rested on allegations that the commercial defendant was generally aware that terrorists were seeking to use the commercial defendant's

platform and that the defendant failed adequately to police and prevent that usage. These cases of essentially passive support have typically lacked evidence that defendant shared common cause with the benefitting terrorist organization or intended to help the terrorist organization succeed in its mission.

Even still, a commercial defendant's conduct has been found in some cases to have a sufficient connection with a terrorist attack as to be actionable under JASTA. So, for example, in *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026), it was alleged that the defendant (a pharmaceutical manufacturer) provided cash bribes and drugs to certain terrorist groups (who controlled the Iraqi Ministry of Health) that financed those groups' purchases of arms and payments to fighters which in turn sustained a campaign that killed or injured thousands of Americans. JASTA liability attached in important part because the defendant "a provider of routine services, [did] so in an unusual way," by paying bribes and supplying drugs. *Atchley*, 165 F.4th at 605–6 (citing *Twitter*, 598 U.S. at 502).

By way of contrast, in some cases there is too weak a connection between defendant's conduct and the terrorist act to support liability. So, for example, in *Twitter* itself no JASTA aiding and abetting liability was made out, because the defendant social media company Twitter merely made its platform available to ISIS as Twitter did to all its customers, with no showing that Twitter wished to advance ISIS's terrorist mission and no evidence of any connection between the alleged assistance and the ISIS nightclub attack that was the subject of that case. At base, the plaintiffs in *Twitter* merely alleged that Twitter should have done more to prevent ISIS from accessing Twitter's platform – a theory that (however styled) resembled negligence more than it did aiding and abetting.

The present case is fundamentally different from, and much stronger than, these typical "borderline" cases involving commercial providers of generally available services as defendants. That is so because the Defendants here were not commercial institutions who, driven by the desire for profit, merely did business with terrorist organizations in routine ways or failed to prevent terrorists from accessing Defendants' commercial services.

Rather, in this case (as will be developed below) the evidence readily supports the inference that Defendants were covertly united in cause and purpose with Al Qaeda, and deliberately provided knowing and substantial assistance to terrorist activities – including the September 11 attacks – because Defendants shared with Al Qaeda the goal of directing violent terrorism throughout the world against those whom the Defendants and Al Qaeda perceived to be enemies of Islam. (Or – as Osama Bin Laden memorably put this idea in a 1999 interview with Al Jazeera, when speaking about Al Qaeda founder and leading MWL and IIRO figure Wa'el Julaidan – "We are all in one boat, …." ICS ¶¶ 324, 522.)

Summary judgment should be denied because, based on the evidence presented here, a reasonable jury could (and should) conclude that these Defendants consciously and culpably participated in Al Qaeda's wrongdoing so as to help make it succeed. *Twitter*, 598 U.S. at 493.

### F. Causation, Foreseeability, and Global Strike Capability

**- Causation -**

Defendants spill a great deal of ink advancing arguments made obsolete by JASTA and no longer applicable to this case.

This case is principally a JASTA secondary liability case in which Plaintiffs allege that these Defendants both aided and abetted Al Qaeda and conspired with each other and Al Qaeda. Yet in their motion papers Defendants at many points continue to address this case as if it were an ATA direct liability case. Their arguments reflect a fundamental misunderstanding of

secondary liability under JASTA and the *Halberstam*/JASTA framework, and of the critical difference between ATA primary liability and JASTA secondary liability.

Defendants' confusion is made clear by their continued reliance on *pre*-JASTA case law to support their motion for summary judgment dismissing Plaintiffs' *JASTA* claims. So, for example, Defendants place great reliance on *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), on the Second Circuit's decision in *In re Terrorist Attacks on September 11, 2001*, 708 F.3d 82 (2d Cir. 2013), and on this Court's decisions in both *In re Terrorist Attacks on September 11, 2001*, 2008 WL 2073447 (S.D.N.Y. Dec. 23, 2008), and *In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494 (S.D.N.Y. 2010), *aff'd.* 714 F.3d 118 (2d Cir. 2014). In particular, Defendants appear to argue that these pre-JASTA cases stand for the proposition that Plaintiffs' JASTA claims must be dismissed because Plaintiffs have not demonstrated proximate cause. (*See* WM 69-70, MM 29-30, and IM 35-40.)

The pre-JASTA cases that Defendants rely on in this regard are plainly irrelevant, and Defendants are plainly wrong. Proximate cause is a relevant consideration in an ATA *direct* liability case; but proximate cause is not a requirement for a JASTA secondary liability case like this one.

As explained in *Bonacasa v. Std. Chartered PLC*, 22 CV 3320, 2023 WL 2390718 at *14-15 (S.D.N.Y. Mar. 7, 2023) - and as is apparent from the *Halberstam* decision itself - in a JASTA *secondary* liability case such as this one, causation is subsumed within and established by satisfying the requirements of *Halberstam*, and there is no need for plaintiff to further demonstrate traditional proximate cause: "Congress explicitly disclaimed any proximate cause when it passed the JASTA, explaining that liability could flow 'directly or indirectly.' JASTA … *accord*, *Kaplan*, 993 F.3d at 855. *Congress's* directive that JASTA *liability can flow 'indirectly'*

*disclaims any proximate cause requirement*, which demands quite the opposite - that an injury flow 'directly from' the tortious act…" (emphasis added, internal citations omitted).

In other words, in a JASTA secondary liability case such as this one, the aiding and abetting and conspiracy frameworks themselves determine whether the Defendants' conduct is sufficiently culpable and related to the primary wrongdoer's attack to impose liability. There is no additional "causation" requirement layered on top of those frameworks. That is the reason why none of the leading cases that explicate secondary liability and JASTA secondary liability make any mention of any purported requirement to demonstrate proximate causation. *See* e.g. *Halberstam*, 705 F.2d at 477-78; *Twitter*, 598 U.S. at 497; and *Ashley*, 144 F.4th at 437.

It is of course beyond dispute that § 2333(a) authorizes a private right of action for plaintiffs injured in their person, business, or property "by reason of an act of international terrorism." However, in a secondary liability action, the act of international terrorism that is the focus of this preliminary inquiry is the terrorist attack itself - here the September 11th attacks- and the statutory causation requirement is satisfied so long as Plaintiffs' injuries were proximately caused by the September 11th attacks. That is not in dispute in this case. *See Linde,* 882 F.3d at 330-31 (causation focuses on relationship between alleged act of terrorism and plaintiff's injury; whereas aiding and abetting instead focuses on the relationship between the secondary actor's alleged supportive conduct and the act of international terrorism).

By enacting JASTA, Congress directed that persons who support terrorism, directly or indirectly, may be held liable for such acts of international terrorism pursuant to secondary liability (aiding and abetting or conspiracy) theories, consistent with the framework announced in *Halberstam*. In such cases, the aiding and abetting and conspiracy frameworks determine whether there is a sufficient nexus between the defendant's conduct and the tort committed by

the primary wrongdoer – here Al Qaeda – to impose liability. For purposes of aiding and abetting analysis, the nexus inquiry focuses on whether the defendant knowingly provided substantial assistance; and for purposes of conspiracy the analysis turns on the existence of an agreement and harm resulting from an overt act in furtherance of the conspiracy.

There is no additional inquiry layered on top of the aiding and abetting and conspiracy frameworks to determine whether the secondarily liable defendant's own actions "proximately caused" the plaintiff's injuries in a JASTA secondary liability case. That is work already done by the substantive requirements and limitations of the aiding and abetting and conspiracy frameworks, which control. *Ashley, Kaplan*, and *Atchley* all confirm this principle. The analysis in those decisions makes it clear that the nexus inquiry focuses entirely on the secondary liability principles themselves, and none of these decisions include any reference to an additional proximate cause inquiry layered on top of the secondary liability standards.

*Primary* liability under the ATA is fundamentally different. Under a primary liability theory, the act of "international terrorism" providing the basis for the claim is the defendant's own conduct in violation of the ATA's material support and criminal provisions. And because § 2333(a) requires an injury "by reason of [the] act of international terrorism" that is the basis of the claim, primary liability cases require a showing that the defendant's own conduct that is the act of international terrorism forming the basis of the suit proximately caused the plaintiff's injuries. *Rothstein* solely concerned that primary liability analysis, which has no bearing on Plaintiffs' secondary liability claims under JASTA.[3]

---

[3] Even for primary liability claims, Defendants deeply misread *Rothstein*. The ruling in that case turned on the Court's finding that the complaint contained no plausible allegations sufficient to support an inference that any terrorist organization received any money as a result of the defendant's conduct. That conclusion flowed from the novel and attenuated

*footnote continued*

Moreover, even if traditional proximate cause were required for a JASTA secondary liability case – which it is *not* – that requirement would easily be met under the facts of this case.

"Proximate cause" is, of course, a traditional concept in the law of torts, and its meaning has been expounded many times. Proximate cause requires only "some reasonable connection between the act or omission of the defendant and the damage which plaintiff has suffered." *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), vacated and remanded on other grounds, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020) (quoting Prosser and Keeton on the Law of Torts 263 (5th Ed. 1984)). The requirement of proximate cause eliminates the "bizarre" and precludes liability "in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as a mere fortuity." *Owens*, 864 F.3d at 794 (citing *Jerome B. Grubart Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995); *Paroline v. United States*, 572 U.S. 434, 444 (2014)).

In this case Plaintiffs would satisfy any proximate causation requirement in several distinct ways. Initially, Defendants provided support that Al Qaeda used and relied upon in developing, planning, and carrying out the September 11 attacks. In addition and separately, Defendants were among Al Qaeda's chief sources of financial support, providing Al Qaeda with hundreds of millions of dollars and with other logistical support that made *all* of Al Qaeda's activities – including training the 9/11 hijackers in Afghanistan – possible. Thus, Defendants' conduct was a "substantial factor" in the 9/11 attacks and not a "mere fortuity."

---

theory of that case, which is not remotely analogous to the claims at issue here. *Rothstein* did not remotely foreclose primary liability claims based on indirect support, as Defendants suggest, and the Second Circuit's subsequent decision in *Linde* forecloses such an argument.

In short, proximate cause is not an element of a JASTA secondary liability claim; rather it is sufficient for the plaintiff to satisfy the three-part *Halberstam* test. And, on the facts of this case, proximate cause would in any event be easily made out.

**– Foreseeability –**

As noted, the three central requirements for a JASTA aiding and abetting case are 1) a wrongful act, 2) general awareness, and 3) knowing substantial assistance. While aiding and abetting liability under JASTA does not include a proximate cause requirement, the *Halberstam* framework does include a foreseeability dimension, which is largely subsumed within the general awareness requirement and is easily satisfied in this case by reason of the evidence of Al Qaeda's relentless targeting of the United States. To be "generally aware" of its part in tortious conduct, the JASTA aider and abettor "need not be aware of its role in the specific terrorist attack that caused plaintiff's injury, [but] it must be generally aware of its role in some illegal activity from which the terrorist attack was *foreseeable*." *Ashley*, 144 F.4th at 138; *Honickman* 6 F.4th at 496. (Emphasis added.)

Here, the evidence shows that targeting the United States was Al Qaeda's declared mission from the moment it was established, a mission Bin Laden announced early on to Al Qaeda's collaborators and supporters. Al Qaeda openly and publicly declared that mission to the entire world through formal fatwas issued in 1996 and again in 1998. Al Qaeda relentlessly planned attacks throughout the 1990's and successfully mounted attacks on the U.S. embassies in Kenya and Tanzania in 1998 and the U.S.S. Cole in 2000. The Defendants continued to provide substantial funding to Al Qaeda and, in the case of MWL/IIRO, funding for the Al Qaeda terrorist training camps located in Afghanistan (camps at which at least seven of the 9/11 hijackers were trained). *See* Sections *III(D) and III(D)(3) infra.*

When a defendant funds and collaborates with an international terrorist organization that is dedicated to killing Americans all over the world, then it is a reasonably foreseeable (indeed, almost inevitable) consequence that terror attacks designed to kill Americans in the United States (where, of course, most Americans live) – such as the 9/11 Attacks – will follow. *See Finan v. Lafarge S.A.*, 22-cv-7831 and 23-cv-5691(NGG) (PK), 2025 WL 2504317, at *18-19 (E.D.N.Y. Aug. 29, 2025) (Plaintiffs plausibly alleged general awareness necessary to a JASTA aiding and abetting claim when defendants chose to continue to pay millions of dollars to ISIS and ANF knowing that ISIS and ANF targeted U.S. citizens in order to advance their terrorist objectives). *See also Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F. Supp. 2d 86, 105 (D.D.C. 2003) ("Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda, given the [] allegations that, prior to September 11, al Qaeda and Osama bin Laden had proclaimed their intentions to commit murderous terrorist activities against the United States and its citizens . . . and had accompanied these words with actions by implementing, and publicly acknowledging responsibility for, such terrorist schemes as the 1993 bombing of the World Trade Center, the 1998 attack of U.S. embassies in Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in Yemen."); *In re Terrorist Attacks on Sept. 11, 2001 ("Terrorist Attacks V")*, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("it is wholly foreseeable that a terrorist organization could use any material support provided to it as part of a broader strategy to promote terrorism. Those who knowingly or with deliberate indifference provide material support to a terrorist organization, regardless of their benign stated purpose for doing so, assume the risk that the support provided will be used by terrorists to commit violent terrorist acts.")

Thus, Plaintiffs have easily satisfied the foreseeability component of the general awareness requirement for a JASTA aiding and abetting claim.

**– Global Strike Capability –**

In their briefs on this motion, Defendants purport to be mystified by Plaintiffs' assertion that Defendants knowingly supported Al Qaeda in developing Al Qaeda's "global strike capabilities" (*see* e.g., IM p. 37: "'global strike capabilities' *whatever that means*") (emphasis added); and Defendants argue that by using that phrase the Plaintiffs are arguing in very simplistic terms that Defendants are liable merely because Defendants "assisted terrorist attacks generally" (*see* e.g., IM at 57).

Defendants plainly misstate Plaintiffs' theory of the case, and Defendants deliberately ignore the relevant principles of law that govern here. Plaintiffs do not contend that general support for terrorism standing alone makes a defendant liable for anything. Rather, Plaintiffs' use of the shorthand phrase "global strike capabilities" is just a slightly different way of saying (as this Court did in the *Sudan* case) that Defendants' assistance was undeniably substantial because it "increased Al Qaeda's 'operating capacity' as a global terrorist organization*." In re Terrorist Attacks (Sudan)*, 03 MDL 1570 (GBD) (SN) 2023 WL 5132138, at *7 (S.D.N.Y. Feb. 27, 2024).

And Plaintiffs' theory of foreseeability is similarly consistent with the legal principles most fully developed in *Twitter*, and also set forth by this Court in the *Sudan* case: namely, that harm is sufficiently foreseeable for aiding and abetting liability where (as here) the defendant acts to support some future attacks to be planned by Al Qaeda on the United States; but the defendant need not know that its support was specifically for the 9/11 Attacks. *In re Terrorist Attacks (Sudan)*, 2023 WL 5132138, at *7.

Al Qaeda's global strike capabilities were part and parcel of Al Qaeda's ability to kill Americans *on American soil*, as it did on September 11. Al Qaeda did not have a significant

footprint inside the United States prior to 9/11. Thus, none of the 9/11 hijackers were Americans or resided in the United States. Instead, they infiltrated the U.S. shortly before September 11 in order to prepare for and carry out the 9/11 attacks. And it was Al Qaeda's *global* infrastructure and *global* strike capabilities – which enabled Al Qaeda to recruit, train, arm, house, feed, and otherwise support the 9/11 hijackers outside the United States for years prior to the 9/11 attacks – that made the 9/11 attacks on the United States possible.

Similarly, it is important to recognize that Defendants' conduct at their various locations outside the United States supported terrorism directed at the United States. By way of illustration, according to CIA reports the failed 1994-95 "Bojinka Plot" was hatched *in the Philippines* by Al Qaeda using IIRO's offices there, and the Plot prominently involved Mohammad Jamal Khalifa – Osama Bin Laden's brother-in-law and the long-time head of IIRO's Philippines office. The Bojinka Plot was in important part a planned terrorist attack on Americans *inside the United States*. It involved, among other things, crashing a Philippine jet airliner into the CIA headquarters in *Virginia*, blowing up other flights bound for major United States airports, and killing then-*U.S.* President Clinton. Although the Plot was foiled, it was a precursor to, and served as a planning tool for, the 9/11 attacks. (*See* Ex. 36, Winer Report I, ¶ 6.6.6.6.).

Thus, because Al Qaeda was a truly global terrorist organization – with truly *global* strike capabilities supported by these Defendants – Al Qaeda could and did employ assets outside the United States in order to attack Americans on American soil.

In short, Plaintiffs' use of the phrase "global strike capabilities" merely tracks this Court's and other courts' description of what is required to demonstrate "substantial support."[4]

**- 2018 *KSA* Decision -**

Defendants also suggest that this Court has somehow already decided the issues of causation and liability in this case in their favor by virtue of this Court's 2018 Decision in the *Saudi Arabia* litigation. *See e.g*., IM at 38 ("[T]his Court has already decided that IIRO did not cause Plaintiffs' injuries arising out of the 9/11 Attacks," and *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018)).

Defendants fundamentally misunderstand the context and focus of the 2018 ruling and their arguments relying on it are obviously wrong. The issue in the 2018 *Saudi Arabia* Decision was whether there was *jurisdiction* under the FSIA over Saudi Arabia – a sovereign nation. The portion of the decision invoked by Defendants concerned § 1605B's jurisdictional causation provision – a provision that requires a proximate causation analysis that is not part of the JASTA secondary liability inquiry. Indeed, the Court held JASTA's secondary liability cause of action unavailable in cases against foreign states, ECF No. 8862 at 12, and the 2018 decision thus did not consider aiding and abetting or conspiracy liability at all. Moreover, because the Court found that the conduct of the charities was not attributable to the government of Saudi Arabia, *In Re Terrorist Attacks on September 11, 2001*, 298 F.Supp. 3d 631, 655-58 (S.D.N.Y. 2018), the Decision's analysis solely addressed the issue of causation in the context of a claim against the Kingdom for indirect support flowing through the charities. While Plaintiffs respectfully disagree with the result, the Court's holding concerning the causal sufficiency of such indirect support for claims against Saudi Arabia under a primary liability theory does not speak to whether the Defendants' direct support for Al Qaeda satisfies proximate cause in a case against them.

Further still, the record concerning Defendants' support for Al Qaeda now before the Court is different from any that may have been considered in relation to the distinct legal inquiry that occurred in 2018. The present record includes hundreds of thousands of pages that have been

exchanged in discovery (including newly declassified documents), fact witnesses testimony, and expert witness testimony that was not in issue in the 2018 ruling. (In particular, as detailed in III(b) below, expert reports and testimony submitted by the Plaintiffs since 2018 draw an even closer connection between Defendants' support for Al Qaeda and the 9/11 terror attacks.) Plainly then, this Court's 2018 comments in the *Saudi Arabia* case about the charities in no way decided any issue in *this* case.

Indeed, it is difficult to take this argument seriously. To begin with, if Defendants genuinely believed that this Court's 2018 Decision in the *Saudi Arabia* litigation decided the issue of liability in these Defendants' favor, then it makes no sense to suppose that Defendants would wait for eight years following that 2018 Decision before first moving for summary judgment.

Most obviously, the Court must decide these summary judgment motions now based on the much fuller record as it exists *today*, and based on the most recent decisions of the U.S. Supreme Court and federal Circuit Courts explicating the ATA and JASTA.

**G. JASTA Conspiracy Liability**

In addition to providing for aiding and abetting liability, JASTA also provides for conspiracy as a form of secondary liability, and (as with aiding and abetting) Congress intended that the *Halberstam* decision be the guide for JASTA conspiracy claims. *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir. 2023).

Generally speaking, a JASTA civil conspiracy claim (like any civil conspiracy claim) requires four elements: 1) an agreement between two or more persons; 2) to participate in an unlawful act; 3) injury caused by an unlawful overt act; and 4) that the overt act causing plaintiff's injury be done pursuant to and in furtherance of the common scheme. *Halberstam*,

705 F.2d at 477; *Freeman*, 57 F.4th at 76; *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022); *Zobay v. MTN Group Ltd.*, 695 F. Supp. 3d 301, 354 (E.D.N.Y. 2023).

The first and most critical element of conspiracy liability is the existence of an *agreement* between two or more parties to engage in an unlawful act. *Twitter,* 598 U.S. at 489–90.

Once again, the existence of an agreement must ordinarily be inferred from circumstantial and indirect evidence revealing a common intent; and a tacit – as opposed to explicit – understanding is sufficient. *Halberstam*, 705 F.2d at 477; *Freeman*, 57 F.4th at 70 and 76–77. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (noting that "conspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven through inferences that fairly may be drawn from the behavior of the alleged conspirators") (internal citations omitted). The existence of an agreement may be inferred from the relationship between the parties, their overt acts, their concert of action, and the totality of their conduct. *Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. City of Miami, Fl*, 637 F.3d 1178, 1192 (11th Cir. 2011).

While the co-conspirators must be "pursuing the same object," *Freeman*, 57 F.4th at 79 (quoting *Halberstam*, 705 F.2d at 487), JASTA conspiracy liability does *not* require that the defendant interact directly with the terrorist attacker, and there is no requirement that each member of the conspiracy conspire directly with other members of the conspiracy, or be aware of all acts committed in furtherance of the conspiracy. *Freeman*, 57 F.4th at 77–79. Instead, liability attaches so long as the overt act giving rise to the plaintiff's injury was carried out in pursuit of the common scheme. *Id.* at 76.

Once a conspiracy has been formed then all its members are liable for injuries caused by acts performed pursuant to, or in furtherance of, the conspiracy. A conspirator need not

participate actively in, or benefit from the wrongful action in order to be found liable. Moreover, the conspirator need not plan or know about the injurious action, so long as the purpose of the tortious action was to advance the overall purpose of the conspiracy. *Halberstam*, 705 F.2d at 481; *see also King v. Habib Bank Ltd* No. 20-cv-4322 (LGS), 2022 WL 4537849, at *10–11 (S.D.N.Y. Sept. 28, 2022).

Thus, a conspiracy claim is in some respects a simpler claim to prove that an aiding and abetting claim in that conspiracy does not require a showing concerning the "substantiality" of the defendant's own assistance. Instead, the defendant's liability flows from defendant's agreement to participate in the conspiracy, which binds all the conspirators to all acts undertaken in furtherance of the conspiracy.

Based on these well-settled principles of the law of conspiracy, Plaintiffs' burden to make out a valid conspiracy case has easily been met here because 1) the overlap between Al Qaeda's and Defendants' leadership and 2) the long-term, substantial and coordinated nature of Defendants' assistance to Al Qaeda both strongly support the reasonable inference that there was an agreement for Al Qaeda to commit acts of terrorism and for the Defendants to foot the bill and otherwise support those acts of terrorism. (*See* V(c) below.)[4]

---

[4] Defendants (WM at 70-71) contend that Plaintiffs' aiding and abetting claims grounded in state law fail. They are wrong. As this Court has previously recognized in litigation against the Taliban and Iran, the elements of state law aiding and abetting claims are substantially similar to those for aiding and abetting claims under JASTA and the ATA. *See, e.g.,* Report & Recommendation (Taliban), ECF No. 12318 at 22-23 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) as the correct standard to apply under New York law), adopted at ECF No. 12331; Memorandum Decision & Order (Iran), ECF No. 9666 at 8 (applying the *Halberstam* factors under New York state law). Accordingly, if Plaintiffs' JASTA/ATA claims can proceed, so too can Plaintiffs' state law aiding and abetting claims.

And, for similar reasons, Plaintiffs' state law conspiracy claims can proceed too. *See Lindsay v. Lockwood*, 163 Misc. 2d 228 (S. Ct., Monroe Co. 1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) for New York's conspiracy liability standard). *See also Cresser v. American Tobacco*, 174 Misc. 2d 1, fn. 4 (S. Ct., Kings Co. 1997).

## II. EVIDENTIARY ISSUES

When ruling on a Rule 56 summary judgment motion, the Court "must rule on evidentiary objections that are material to its decision." *In re Terrorist Attacks on September 11, 2001*, 03-MD-1570 (GBD) (SN) 2025 WL 2485427, at *4-*5 (S.D.N.Y. Aug. 28, 2025) (Aug. 8, 2025) (Daniels, J.) (citations omitted). It is therefore useful as a preliminary matter to discuss the Defendants' voluminous evidentiary objections to Plaintiffs' proof here, many of which are misplaced.

The Defendants here raise four chief evidentiary objections. Those objections concern: 1) the admissibility of, and weight to be assigned to, the "testimony" of CIA and FBI informant Jamal Al Fadl ("Al Fadl") (IM at 7-16); 2) the admissibility of, and weight to be assigned to, the testimony of Plaintiffs' expert witnesses (MM at 21-26; and *passim*; IM at 34-37; WM at 4-6); 3) the admissibility of government investigative reports (MM at 7-101; IM at 1-2 and 14-15; WM at 20-21); and 4) the admissibility of, and weight to be assigned to certain OFAC designations (MM *passim*; IM at 16-21; WM at 19-21).

### A. Al Fadl

Defendant IIRO (and, to a lesser degree, Defendant MWL) expend considerable effort attacking the credibility of former Al Qaeda operative, turned U.S. government informant, Jamal Ahmed Al Fadl ("Al Fadl"). (IM 7-16; MM at 8 and notes 11-12). They argue in substance that because Al Fadl was a member of Al Qaeda who skimmed funds from Al Qaeda before defecting, his "testimony" is incredible. Defendants further argue that by extension various finished FBI, CIA, and other U.S. government reports implicating the Defendants as Al Qaeda supporters – reports that allegedly (according to Defendants themselves) rely wholly on Al Fadl – must either be excluded from evidence altogether, or be assigned no weight on these motions for summary judgment. *Id.*

Defendants are clearly wrong. To begin with, it is common and appropriate in a case involving criminal conduct – and the September 11 attacks were, of course, crimes of mass murder – for the case to be built in important part upon the testimony of, or information derived from, a cooperating witness who is a former member of the criminal conspiracy at issue. By definition, former criminals are important witnesses in cases about crimes because ordinarily they alone possess detailed *first-hand* knowledge about the crime. *See United States v. Danilovich*, 731 F. App'x 45, 49 (2d Cir. 2018); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) (it was within the province of the jury to decide whether testimony of former acting crime boss was probative of criminal enterprise's structure and rules); *United States v. Fawwaz*, 694 F. App'x 847 (2d Cir. 2017) (affirming convictions for conspiracy to murder where former Al Qaeda members turned government witnesses identified members of Al Qaeda).

Al Fadl himself is a good illustration of this truth. Because he worked closely with Bin Laden and with Al Qaeda's other leaders, the 9/11 Commission found that Al Fadl's becoming a government informant "provided a major breakthrough of intelligence on the creation, character, direction and intentions" of Al Qaeda. ICS ¶ 111.

Moreover, although Defendants' briefs here attempt to give the impression that Al Fadl is some new and untested accuser whose credibility has never been examined, the opposite is true. Al Fadl's testimony as a government cooperating witness has already been tested and accepted at the trial level and on appeal in the course of criminal prosecutions of Al Qaeda terrorists, notwithstanding the presentation of all the same impeachment material that Defendants point to here in order to attack Al Fadl's credibility. *See United States v. Bin Laden*, 397 F. Supp. 2d 465 (S.D.N.Y. 2005), *aff'd In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).

Thus, Al Fadl's testimony was reliable enough to help prove guilt beyond a reasonable doubt in a criminal case; accordingly, information that Al Fadl provided to the U.S. government in his role as an informant is *a fortiori* also reliable enough to present a disputed issue of fact precluding summary judgment for the Defendants here. *See United States v. Baker*, 899 F.3d 123, 129–30 (2d Cir. 2018); *City of New York v. Golden Feather Smoke Shop Inc.*, No. 08-cv-03966 (CBA)(JMA) 2013 WL 3187049, at *19 n. 5 (E.D.N.Y. June 20, 2013); *Sec. Exch. Comm'n v. Airborne Wireless Network*, No. 21-cv-01772 (GM) 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023); *Johnson & Johnson v. S. Pointe Wholesale Inc.*, No. 08-cv-1297 (SLT)(SMG) 2014 WL 12558573, at *9 (E.D.N.Y. Apr. 4, 2014). *See generally, Louis Vuitton Malletier S.A. v. Ly USA Inc.*, 472 F. App'x 19, 22 (2d Cir. 2012) (broad conclusory attacks on credibility and bias of cooperating witness insufficient to defeat summary judgment) (citing *Island Software & Computer Serv. Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)).

More generally, all that Defendants have done in this connection is to present arguments that might appropriately be addressed to a jury as to why Al Fadl might not be worthy of belief. But that plainly does not entitle Defendants to summary judgment. Assessments of credibility and choices between conflicting versions of events are matters for the jury, and not for the court to decide on a motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The court must eschew credibility assessments. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). And that holds true even where more serious doubts have been cast than here as to the credibility of a witness, or where the court might find competing evidence more persuasive. *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332 (AJN), 2021 WL 1198932, at *2 (S.D.N.Y. Mar. 30, 2021); *Zeng v. New York City Hous. Auth.*, No. 22-138-CV, 2023 WL 4553416, at *4 (2d Cir. July 17, 2023).

In other words, Defendants' efforts to argue that Al Fadl is not a witness worthy of belief are just that – mere arguments. They raise disputed issues of fact that arguably call into question whether Al Fadl should be believed by the finder of fact at trial; but they do not entitle Defendants at this stage to exclude Al Fadl's testimony, or to exclude information that he provided to the government, or to summary judgment.

Defendants also suggest that the government reports that purportedly rely wholly on information provided by Al Fadl must be excluded because Al Fadl was not deposed by the Plaintiffs in this case.

Defendants are wrong for at least four different reasons.

First, the fact that Al Fadl was not deposed by either side cannot serve to carry Defendants' burden to demonstrate that the relevant government reports are somehow "untrustworthy." (*See* II(c) below.) Here, Al Fadl's testimony and the information he provided to government investigators has been deemed to be trustworthy both by the courts and by the 9/11 Commission - which relied extensively upon Al Fadl's statements to support the Commission's findings concerning Al Qaeda's history and the sources of Al Qaeda's support.

Second, IIRO incorrectly characterizes eight "Al Fadl Accusations" as being based solely on Al-Fadl's word.[5] Yet, as set forth below (in Part III(H)), each of these so-called Al Fadl accusations is supported by other, independent evidence.

[5] Specifically, IIRO catalogues eight "Al Fadl Accusations": (i) that Bin Laden and Al Qaeda used Wael Julaidan, as head of IIRO in Peshawar, to create ID cards allowing Al Qaeda personnel to cross the Pakistan-Afghanistan border; (ii) that IIRO funded six terrorist training camps in Afghanistan; (iii) that IIRO was "interwoven" into Al Qaeda and supplied cover documents falsely identifying operatives as relief workers; (iv) that Bin Laden identified prominent international Muslim charities as primary sources of Al Qaeda fundraising; (v) that IIRO ran an Al Qaeda guesthouse in Peshawar; (vi) that IIRO personnel appeared on the "Golden Chain" list; and (vii & viii) that Julaidan was one of Bin Laden's closest friends and funded Al Qaeda via hawala while working for IIRO. IM at 9–10.

Third - while a deposition is not in any event a requirement for the admission of government reports - the fact that Al Fadl was not deposed by either side here does not mean that he will not testify in response to a trial subpoena, or that his prospective testimony cannot be considered in opposition to a motion for summary judgment. Material relied upon at the summary judgment stage need not be presented to the district court in admissible form at that time; rather, such evidence may be relied upon at the summary judgment stage so long as the evidence 'will be presented in admissible form at trial.' *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) *(quoting Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (*per curiam*)). *See* ECF 11182 at 9 ("When the Court considers the content of the primary sources in the FBI's reports, it assumes that it is possible for the original witness to be available at trial, and that the original source statements could be presented in an admissible format then. *See Emanuel v. Gap, Inc.*, No. 19-cv-03617 (PMH) 2022 WL 3084317, at *3 (S.D.N.Y. Aug. 3, 2022) ("'It may well be that the facts as presented are not in admissible form at the time of the motion. They do not have to be. Parties can dispute at trial whether potentially inadmissible facts can be admitted at trial.' *Id."*))

Fourth and finally, Defendants' attacks on Al Fadl's prior statements and testimony wholly fail to engage with the fact that Plaintiffs' experts are permitted to rely upon those materials in order to support their opinions in this case. *See United States v. Mejia*, 543 F.3d 179, 197 (2d Cir. 2008) (pursuant to FRE 703 "experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions," citing *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 2005)). *See e.g., Linde v. Arab Bank PLC*, 922 F. Supp. 2d 316, 331 (E.D.N.Y. 2013) (pursuant to Rule 703 permitting expert testimony based on what would otherwise be inadmissible hearsay testimony in

terrorism case); *Strauss v. Credit Lyonnais S.A.*, 925 F. Supp. 2d 414, 439 (E.D.N.Y. 2013) *on reconsideration in part* No. 06 CV 702DLIMDG, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017) (same).

**B. Expert Reports and *Daubert* Challenges**

Expert testimony is not only proper, but often sufficient and even indispensable in terrorism cases, because first hand evidence of terrorist activities is difficult, if not impossible, to obtain. *Force*, 464 F. Supp. 3d 323, 336-37 (D.D.C 2020) (citing *Owens*, 864 F.3d 751 at 785 and 787 (D.C. Cir. 2017)).

Defendants improperly attempt to relitigate their *Daubert* motions throughout their summary judgment motion papers, renewing their attacks on Plaintiffs' experts. (*See* MM *passim*, IM at 16-21; WM at 19-21.) In that process, the Defendants significantly mischaracterize the tenor and import of this Court's *Daubert* rulings.

They assert that this Court's *Daubert* rulings somehow indicate that "Plaintiffs have used unqualified idealogues to attempt to convert untenable opinions into an evidentiary basis for this case." MM at 24-25.

That assertion is false. By way of important example, this Court first reviewed Plaintiffs' expert Jonathan Winer's "significant" experience "as the senior U.S. diplomat focused on cross-border financial crime" who worked closely with the White House in "coordinating the country's counterterrorism efforts;" and the Court then found that Winer is qualified to discuss the involvement of the charities in international terrorist finance during the period heading up to the 9/11 attacks. ECF 9060 at 14-17, adopted *In re Terrorist Attacks on September 11, 2001*, 03-MD-1570 (GBD) (SN) 2025 WL 238768 (S.D.N.Y. Aug. 18, 2025) : *In re Terrorist Attacks on September 11, 2001*, 03-MD-1570 (GBD) (SN), 2025 WL 238768, Dkt. No. 11880 (S.D.N.Y.

Mar. 18, 2026) ("*In re Terrorist Attacks (Daubert)*"). That is a far cry from characterizing Plaintiffs' expert as an "unqualified idealogue[]."

As often happens in a *Daubert* ruling, the Court did limit Winer's testimony in a small number of discrete respects (precluding him, *inter alia*, from offering testimony about Islamic religious doctrine as outside his area of expertise, and precluding him from stating legal conclusions. ECF 9060 at 24-25.)

But this Court has held *admissible* the *heart* of Winer's testimony – namely, that Defendants MWL, IIRO and WAMY provided "funding and training to Al Qaeda … Some of Winer's statements find support (or contradiction) in documentary evidence about which the parties and their experts disagree … [But these] are factual disputes that a jury should decide and are fitting fodder for cross-examination." ECF 9060 at 19.

And the heart of the expert testimony provided by Mr. Winer is damning and forecloses Defendants' arguments for summary judgment. As stated in the executive summary to Mr. Winer's first Report:

> Al Qaeda, founded by a Saudi, bin Ladin, in 1988, spent about *$30 million* a year in direct expenditures to run its operations. In addition to these funds, it relied *on spending by Islamic charities many times that amount per year* to indoctrinate, recruit, train, house, transport, equip, and arm Islamic fighters and terrorists, and to operate al Qaeda and affiliated and associated terrorist groups. *This support enabled al Qaeda to develop the ability to carry out terrorism on a global basis by the time it carried out the 9/11 attacks.*
>
> *Those charities included the International Islamic "Relief Organization ("IIRO,") the Muslim World League ("MWL"), and the World Assembly of Muslim Youth ("WAMY"), among others.*
>
> *The funds and support from the charities assisted al Qaeda and its affiliates in essentially every aspect of their terrorist activities.* These included indoctrinating fighters and terrorists, by providing materials in mosques and madrassas that taught Muslims it was proper to kill non-believers (that is, Christians, Jews, those not believing in God, such as the Soviets, and Muslims they viewed as apostates for having different views

> of Islam); helping to recruit jihadists and terrorists, through the propagation process and by facilitating their transport to and support in combat zones; buying weapons for jihadists and terrorists; providing storage facilities for weapons for jihadists and terrorists; providing training camps for jihadists and terrorists where they were taught how to use weapons and make bombs; disseminating terrorist training manuals to jihadists and terrorists; providing food, housing and medical care to jihadists and terrorists; providing cover to people engaged in terrorism, such as by providing fake work papers to jihadists and terrorists; providing office space for al Qaeda and its agents to do business as they engaged in such activities as weapons purchases; and raising funds for and transmitting funds to al Qaeda and to those working with it. Such funding and related support in turn enabled al Qaeda to make direct expenditures as needed to build its global capacity to attack the United States.

Ex. 36, Winer Report I, at ¶¶ 31-35 (emphasis added).

Although Mr. Winer does not attempt to provide a precise estimate in dollars and cents beyond opining that it was "many times" thirty million dollars a year,[6] this expert testimony (and the underlying evidence upon which Mr. Winer relies) have been found admissible by this Court

[6] As Mr. Winer explained at ¶ 3.12 of his original Report, it is "not possible to determine an exact dollar amount given by IIRO, WAMY and MWL for terrorism. The charities did not accurately report support they provided for terrorism"

Winer's multiples of 30 million dollars per year estimate ("spending by Islamic charities many times that amount per year") comes in part from the 9/11 Commission Staff Monograph on Terrorist Financing, *see* **https://gffivinfo. library.unt.edu/ 911/staff_statements/911_TerrFin_Monograph.pdf** Ex. 1 at p. 4; "Al Qaeda and Usama Bin Ladin obtained money from a variety of sources. Contrary to common belief, Bin Ladin did not have access to any significant amounts of personal wealth (particularly after his move from Sudan to Afghanistan) and did not personally fund al Qaeda, either through an inheritance or businesses he was said to have owned in Sudan. Rather, *al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities* and the use of well-placed financial facilitators who gathered money from both witting and unwitting donors, primarily in the Gulf region." (Emphasis added.)

*See also* Ex. 10, Saudi-Based Financial Support for Terrorist Organizations, November 14, 2002, CIA_00143-158 at 147 ("[REDACTED] al-Qa'eda and several other terrorist and militant groups consider Saudi Arabia a key base of financial support. [REDACTED] we estimate that since the mid-1990s terrorist groups have received tens of millions of dollars a year from Saudi Arabia. Most of the money originates from wealthy donors, fundraisers who solicit smaller donations, and non-governmental organizations (NGOs)."

in its *Daubert* ruling. This evidence thus entitles a reasonable jury to conclude, *inter alia*, that these Defendants provided Al Qaeda and affiliated and associated terrorist groups with multiples of thirty million dollars a year, every year, in order to operate Al Qaeda and its affiliated terrorist groups. (Similarly, the 9/11 Commission Staff Monograph on Terrorist Financing cited at fn. 6 directly below concludes that Islamic charities funded Al Qaeda, "to the tune of thirty million dollars per year.") As stated by Mr. Winer, that money was used, *inter alia*, to facilitate the transport of Al Qaeda terrorists around the world, to purchase and store weapons, and to feed, house, and train terrorists. And Mr. Winer's expert testimony further indicates that, beyond providing money to Al Qaeda, Defendants gave important logistical support to Al Qaeda by providing false cover identities and fake work papers to Al Qaeda terrorists and by providing other forms of material support and resources beyond money.

In other words, per Mr. Winer's admitted expert testimony, these Defendants partnered intimately with Al Qaeda and were among Al Qaeda's chief sources of funding and of logistical support, providing financial and other assistance vital to Al Qaeda's very existence and virtually all of its terrorist activities.

Defendants would apparently like to relitigate their *Daubert* motions now on this motion for summary judgment. But the Court has held that this damning expert testimony *is* admissible. The expert evidence must therefore be considered by the Court on this motion for summary judgment. And Plaintiffs' admissible expert testimony concerning Defendants' pervasive support for Al Qaeda *by itself* provides a solid basis for denying the motion for summary judgment (although there is, of course, a wealth of other evidence to the same effect).

**C. Government Investigative Reports**

All three Defendants object in somewhat vague terms to the admissibility of government investigative reports (chiefly FBI and CIA reports) proffered by Plaintiffs. Thus, MWL

complains that these reports contain "speculative inconclusive statements." (MM at 7.) IIRO speaks of the reports' "lack of factual support and other [unspecified] evidentiary issues." (IM at 14.) And WAMY complains that the reports "do not include reliable evidence." (WM at 20.) Notably, Defendants nevertheless then cherry pick through some of the reports and point with apparent glee to a few reports that do not mention one or more of the Defendants – as if the Defendants' absence from *some* reports somehow absolves them altogether. (*See e.g.,* IM at 14 - celebrating fact that October 2001 CIA report does not mention IIRO).

Defendants' vague objections notwithstanding, the proffered CIA and FBI reports are clearly admissible. Indeed, this Court has already rejected quite similar arguments in connection with CIA reports proffered by the Plaintiffs in Plaintiffs' case against Dubai Islamic Bank ("DIB"). *See In re Terrorist Attacks on September 11, 2001,* 2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023) (hereinafter "*In re Terrorist Attacks (DIB*)") at *5–*7.

Fed. R. Evid. ("FRE") 803(8) provides in substance that a record or statement of a public office – such as the CIA and FBI reports here – is admissible in a civil case if it sets out factual findings from a legally authorized investigation and the opponent does not show that the circumstances indicate a "lack of trustworthiness." *See* FRE 803(8)(A)(iii) and FRE 803(8)(B); *Owens*, 864 F.3d 751, 792–93 (D.C. Cir. 2017) vacated and remanded on other grounds, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020) (applying public records exception to State Department reports containing factual findings and conclusions as to Sudan's support of terrorism).

The United States Supreme Court has endorsed a "broad approach to admissibility" under Rule 803(8), pursuant to which the phrase "factual findings" includes "conclusion[s] or opinion[s] contained within a public record." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Once proffered, a public record is presumptively admissible, and the opponent bears the

burden of showing it is unreliable. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

Here there can be no reasonable dispute that the documents in question were prepared by the CIA and FBI as part of their respective legally authorized investigations – investigations in which those government agencies gathered and evaluated intelligence concerning Al Qaeda's sources of financial and logistical support. Similarly, there can be no reasonable dispute that the FBI and CIA prepared these intelligence assessments in order to inform and guide policy-making decisions at the highest levels of the U.S. government. That is evident from the texts of the documents themselves. Moreover, the reports include both particularized facts and conclusions drawn from those facts by the FBI and CIA. Accordingly, they are presumptively admissible.

More generally, the Second Circuit uses four factors to evaluate the trustworthiness of a government report: "a) the timeliness of the investigation; b) the special skills or experience of the official; c) whether a hearing was held and the level at which it was conducted, and d) possible motivation problems." *Bridgway,* 201 F.3d at 143; *In re Terrorist Attacks (DIB),* 2023 WL 2430381, at *7.

Here, with the possible exception of a hearing (which is ordinarily inapplicable in the context of CIA and FBI investigations, but can be considered as satisfied here by virtue of the reports' use at the 9/11 Commission hearings, *see In re Terrorist Attacks (DIB)*, 2023 WL 2430381, at *7), all these factors point to trustworthiness. The FBI and CIA operatives who wrote these reports were highly skilled. They were keenly motivated to find the truth in order to protect people from terrorism. And their investigations were conducted in a timely fashion, so that their contemporaneous conclusions are highly probative and should hold great weight with

the finder of fact at trial in this case – who will be tasked with deciding what happened decades ago.[7] *See In re Terrorist Attacks (DIB),* 2023 WL 2430381, at *6-7.

The FBI and CIA reports are also admissible pursuant to FRE 807, the "catch-all" hearsay exception. Under FRE 807, a statement will be admitted if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." *United States v. Bryce*, 208 F.3d 346, 350–51 (2d Cir. 1999).

Plaintiffs' proffered FBI and CIA reports satisfy all the requirements of FRE 807 because, as noted, they were intended to be used and were used to inform decision-making at the highest levels of the federal government, and include particularized facts and conclusions drawn from those facts by the FBI and CIA. The reports bear on material facts – namely, the nature of each Defendant's relationship to and support for Al Qaeda and its terrorist activities. Today, twenty five years after the September 11 attacks and nearly forty years after the founding of Al Qaeda, these reports provide the most probative evidence of each Defendant's covert involvement with Al Qaeda. And the admission of these reports is both consistent with the Federal Rules of Evidence and advances the interests of justice. That is so because the

---

[7] Each of the Defendants points to the fact that the 9/11 Commission reviewed some of these reports and did not affirmatively accuse Defendants of direct involvement in the 9/11 attacks; and Defendants further argue that the 9/11 Commission Report thus authoritatively absolves them of guilt. (WM at 20; IM at 14; MM at 8-9).

This argument obviously overstates the scope and purpose of the 9/11 Commission Report.

More importantly for present purposes, this argument also unintentionally undermines the Defendants' objections to the CIA and FBI reports at issue. Because the 9/11 Commission Report – which Defendants hold out as reliable and admissible – reviewed and considered the CIA and FBI reports at issue here, the 9/11 Commission Report is a further indication that those reports *are* themselves reliable and admissible.

admission of these reports will both facilitate the ability of the finder of fact at trial to find the truth, and will advance Congress's intent in enacting JASTA to hold to account all those responsible for terrorist attacks committed on American soil. Finally, it should go without saying that Plaintiffs have given Defendants adequate notice that they intend to use these reports as evidence. Accordingly, the CIA and FBI reports are admissible under FRE 807, as well as FRE 803(8).

In the light of this overwhelming case for admissibility, Defendants' vague and cursory complaints that some of the reports include "speculative inconclusive statements," do not include "reliable evidence," and suffer from a "lack of support and other [unspecified] evidentiary issues" amount to very little.

The reports are presumptively admissible; thus, in order to exclude any particular report the Defendants must make some sort of *specific* and *concrete* showing why exclusion of that particular report might be appropriate. As it is, Defendants' objections serve only to demonstrate the maxim that the truth hurts, and that Defendants would prefer that the ultimate finder of fact in this case not see this probative and damning evidence.

**D. OFAC Designations**

Defendants complain at some length about evidence proffered by Plaintiffs and discussed by both sides' experts showing that the Office of Foreign Assets Control ("OFAC") designated both Abdul Hamid Mujil ("Mujil") – who served in various high level positions within IIRO in Saudi Arabia from 1989 through 2006 – and IIRO's Indonesia and Philippines Offices as Specially Designated Global Terrorists (or "SDGTs"). (IM at 16-19; MM *passim*.)

Notably, Defendants do not appear to agree among themselves as to the significance of OFAC designations. Thus, IIRO argues at length that OFAC designations essentially mean nothing, because they do not require any burden of proof. (IM at 16-19.) But WAMY seems to

place great stock in the significance of OFAC designations, because WAMY argues that the "absence of designation [of WAMY by OFAC] is powerful evidence that WAMY did not provide any aid to Al Qaeda nor engage in wrongful conduct giving rise to liability under JASTA." (WM at 20.)

It is also not clear whether Defendants contend that this OFAC evidence is altogether inadmissible, or whether Defendants instead more modestly contend that this evidence should be given little weight. (*See e.g.*, IM at 16 "OFAC Designations … Are Not Evidence of Involvement in the 9/11 Attacks.") If Defendants do contend that evidence about OFAC designations is inadmissible, then it would appear that that ship has already sailed. This Court's *Daubert* ruling already permits both sides' experts to testify about OFAC designations. *See* ECF 11157 at 41-44.

The thrust of Defendants' complaints about the OFAC evidence is fairly clear. Defendants argue that OFAC designations are not entitled to great weight because they do not embody a finding of guilt or innocence, and do not require that OFAC find by a preponderance of the evidence that a designated person or entity is involved in terrorism. (IM at 16-18.) Furthermore, Defendants quarrel with the specific OFAC designations at issue in this case, arguing that OFAC's designations were either altogether false or unsubstantiated. (IM at 18-19.)

Defendants' arguments on this point miss the mark in a number of important respects.

First, it is (of course) true that an OFAC designation is the result of an investigation conducted by OFAC based on intelligence reports provided by other components of the government of the United States (including the FBI and CIA), and is not the product of quasi-judicial proceeding conducted by OFAC at which evidence is presented and weighed against a stated legal standard (such as a preponderance of the evidence). But the same is true for many

intelligence assessments (such as the CIA and FBI reports discussed above), and is no bar to admissibility.

And, on the other hand, while no quasi-judicial proceeding *precedes* an OFAC designation, once OFAC has issued a designation a designated person or entity can then challenge that designation before OFAC and the courts. *See* 31 CFR § 501.807, and *see e.g.*, *Kindhearts for Charitable Humanitarian Dev. Inc. v. Geithner,* 647 F. Supp. 2d 857 (N.D. Ohio 2009) (court challenge to SDGT designation). Notably, IIRO and Mujil did not raise such challenges here. That would appear to be a tacit admission on their part that these designations were well-founded, and that tacit admission gives these OFAC designations even greater credibility. In sum, the designations and memoranda announcing them reflect the factual findings of OFAC within the scope of its investigative authority, and Defendants have made no showing that they are untrustworthy. Thus, they are admissible. FRE 803(8).

Second, even if it were correct – as Defendants contend – that these OFAC designations are not evidence of Defendants' direct involvement in the 9/11 attacks themselves, that is not a bar to admissibility (and argues to the wrong legal standard for liability as well). As noted, it is not required by JASTA that Plaintiffs prove that the Defendants had advance knowledge about the 9/11 attacks in particular. *Ashley*, 144 F.4th at 439. Rather, what is required is that Plaintiffs present a body of evidence that taken as a whole would allow a reasonable jury to conclude that Defendants were generally aware of their participation with Al Qaeda in tortious conduct from which terrorist violence was a foreseeable consequence, and that Defendants provided Al Qaeda with knowing substantial assistance. (*See* I(c) above.)

Thus, while these OFAC designations *by themselves* would not prove general awareness and knowing substantial assistance, they are admissible because they are one part of a much

larger body of evidence demonstrating that IIRO and MWL were knowingly and intentionally involved in supporting international terrorism, and in particular Al Qaeda.

Third – as to Defendants' claim that these OFAC designations were false or unsubstantiated – that claim raises a disputed issue of fact that must be resolved at trial. But the mere fact that evidence is disputed is no bar to its admissibility, and is irrelevant on a motion for summary judgment.

Fourth, Defendants are correct that (as explained by Defendants' experts and acknowledged by Plaintiffs' experts) OFAC designations are not *conclusive* proof of guilt, because they are not the product of a judicial or quasi-judicial proceeding. But that consideration does not mean that OFAC designations are inadmissible as evidence. Rather, that consideration goes to the *weight* to be afforded this OFAC evidence.

In terms of properly assessing the weight of the OFAC evidence, Defendants do not and cannot present any reason why the following approach should not be taken: a) Plaintiffs can present evidence of the OFAC designations; b) Defendants can then present expert evidence explaining how such designations come about; c) Defendants can then argue that, in view of the nature of the process that produces OFAC designations, such designations are entitled to little weight; and d) the jury (with the benefit of careful instructions from the trial Judge) can then assign whatever weight the jury sees fit to the OFAC evidence.

Fifth and relatedly, Defendants do not and cannot point to *any* authority for the proposition that OFAC designations are inadmissible. To the contrary, the one case on point cited by Defendant IIRO, *Gill v. Arab Bank PLC*, 893 F. Supp. 2d 523, 535 (E.D.N.Y. 2012), does not authoritatively settle the issue; but the *Gill* decision does appear to *favor* the admissibility of designation evidence, provided that (as suggested directly above) such evidence

is coupled with expert testimony that explains the designation process so that the finder of fact correctly understands what an OFAC designation does, and does not, signify. *See also Levin v. Bank of New York Mellon*, No. 09-cv-5900 (RPP), 2013 WL 5312502, at *10 (S.D.N.Y. Sept. 23, 2013) (fact that a party is on OFAC's SDN list and is subject to blocking sanctions is admissible and is considered on motion for summary judgment).

In sum, the OFAC evidence at issue here is not "the case-cracker" by any means. But it is a relevant part of a much larger body of evidence illuminating IIRO's (and its parent MWL's) substantial support for international terrorism, and this evidence is therefore relevant to, and probative of, Plaintiffs' JASTA claims. The OFAC designations by themselves are not conclusive proof of anything. But, on the other hand, the mere fact that OFAC designations are not the product of a quasi-judicial proceeding requiring proof by preponderance of the evidence goes to the weight of this OFAC evidence, and not its admissibility.

Moreover, Defendants again fail to engage with the fact that these OFAC designations are also part of the body of evidence that Plaintiffs' experts properly relied upon for their opinions. (See II(a) above). Defendants' own experts concede as much, by considering the existence or non-existence of OFAC designations in support of their own opinions. And this Court has already stated that it will permit expert testimony about OFAC designations. ECF No. 11157 at 41-44.

Accordingly, for all these reasons, the proffered OFAC evidence should be considered by the Court on this motion for summary judgment, and should be admissible at trial.

## III. MWL AND IIRO FACTS

The record in this case has been assembled over two decades of litigation and discovery. It includes: contemporaneous U.S. intelligence and diplomatic reporting; Treasury Department designation records; documents seized from Al Qaeda's own files; Defendants' internal records and the testimony of their officers; and the accounts of Al Qaeda insiders. It also includes, among other items, witness depositions in this case, and reports and testimony from Plaintiffs' experts that illuminate and synthesize this sprawling body of evidence.

The facts in this case are summarized here in Point III (with respect to MWL and IIRO) and in Point IV directly below (with respect to WAMY). They are set forth in greater detail in: Plaintiffs' Rule 56.1 Statements and Counterstatements.

By way of background, the record establishes that the partnership between Osama bin Laden and Defendants MWL and IIRO dated to the period of the Soviet-Afghan conflict (through Maktab al Khindanat or "MAK") when they played a pivotal role in supporting the Mujahideen and foreign fighters against the Soviets.

As detailed below, MWL and IIRO operated as a single, centrally controlled Saudi institution. That institution was embedded in the Peshawar network in Pakistan from which Al Qaeda was formed, and Al Qaeda's founders planned from the outset to use MWL and IIRO offices, funds, and credentials to "launch" terrorist attacks.

The relationship did not end when the Soviets left Afghanistan in 1988 and Al Qaeda turned its weapons on the United States. Rather, the symbiotic relationship between MWL/IIRO and Al Qaeda continued, through some of the same officials and same offices, throughout the 1990's and during the period during which the September 11 hijackers were trained in Afghanistan and then came to the United States to commit the 9/11 attacks.

From its formation, Al Qaeda's mission centered on carrying out attacks against the United States and "[p]lans to attack the United States were developed with unwavering singlemindedness throughout the 1990s." 9/11 Commission at 49. Bin Laden began issuing diatribes targeting the United States even before arriving in Sudan.

In 1988, when Al Qaeda was formed, Bin Laden expressly affirmed that it was the personal obligation of all Muslims to wage jihad against all enemies of Islam. ICS ¶ 200. In 1990, at the Bin Laden family mosque, Bin Laden singled out the United States as the primary target of this global jihad, asserting that the "Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." ICS ¶ 200; MSC ¶ 265; Ex. 152 at PEC-KSA 000229. In 1992, Al Qaeda leadership issued a formal fatwa singling out the United States for attack, and Bin Laden thereafter "delivered on oft-repeated lecture on the need to cut off the head of the snake." 9/11 Commission Report at 59. In 1993 Bin Laden issued a fatwa advocating violence against Americans based in Mogadishu, Somalia - thus leading to the Battle of Mogadishu. ICS ¶ 200; MSC ¶ 265; Ex. 15 at CIA 000349. And finally in 1996 and 1998 Bin Laden issued two additional fatwas calling for killing Americans all over the world. ICS¶¶ 200, 205. Stated simply, Al Qaeda's campaign to target Americans through acts of terrorism was no secret, and was especially clear to Al Qaeda's partners and supporters.

As detailed below, from the time of Al Qaeda's founding and continuing on until September 11, 2001 and beyond, MWL and IIRO deliberately and substantially supported Bin Laden's and Al Qaeda's jihad against Americans.

### A. MWL and IIRO Operated as a Single Institution Under Centralized Control

#### (1) MWL Created IIRO and Governs IIRO Through MWL's Own Officers

MWL established IIRO in 1978, and IIRO's own annual reports describe IIRO as an "offshoot" of MWL. ICS ¶¶ 27, 500; Ex. 82 at IIRO 215; Ex. 83 at IIRO 331-441; Ex. 26 at 57, 94. IIRO's constitution was approved by MWL's Constituent Council, MWL's legislative body, at its 35th session. ICS ¶¶ 27, 500; Ex. 82 at IIRO 215; Ex. 83 at IIRO 337; Ex. 26 at 95–96. IIRO's Secretary General attends the Constituent Council's biannual meetings and submits periodic reports to it on IIRO's activities. Ex. 83 at IIRO 338.

MWL's Secretary General serves *ex officio* as Chairman of IIRO's Board of Directors and of its General Assembly, and IIRO describes its Board as its highest policy-making body, whose decisions bind IIRO's executive. ICS ¶¶ 27, 35; Ex. 23 at 70-71; Ex. 26 at 54, 98-99; Ex. 82 at IIRO 216; Ex. 83 at IIRO 338.

IIRO's Secretary General, Dr. Adnan Basha ("Basha"), was nominated to his post by MWL's Secretary General, and seven MWL officials sat on IIRO's Board: MWL's Secretary General, its Assistant Secretary General, its Director General of Finance and Administration, and four members of MWL's Constituent Council. ICS ¶¶ 27, 500; Ex. 26 at 100, 128-30; Ex. 131 at 1-2. Before joining IIRO, Basha himself spent twenty years at MWL as its Assistant Secretary-General for Education and Culture. Ex. 77 at FED-PEC 220556. Basha later returned to MWL and continued to serve as an advisor to MWL through at least 2019. MCS ¶ 36; Ex. 184 at Basha 0001.

Successive MWL Secretaries General confirmed the arrangement under oath. Dr. Abdullah al Obaid testified that he chaired IIRO's Board because of his status as MWL Secretary General, and he declared that "the IIRO is a *subsidiary* of the Muslim World League." ICS ¶¶

27, 500; Ex. 23 at 70-71, 75-78; Ex. 22 ¶ 12 (emphasis added). Dr. Abdullah al Turki testified that he chaired IIRO's Board for the entire duration of his roughly fifteen-year tenure as MWL Secretary General. Ex. 24 at 242-43. MWL's Secretary General holds a position equivalent to that of a Saudi government minister, and when IIRO's auditor reported on the financial irregularities at IIRO's Eastern Province office, the report was provided to MWL's Secretary General. ICS ¶¶ 27, 91; Ex. 27 at 274.

MWL now contends that the word "subsidiary" was a mistranslation of what Mr. Obaid said, but al Obaid and his counsel approved the filing of that declaration; moreover, al Obaid testified that IIRO works under MWL's umbrella, and MWL's own organizational chart identifies IIRO as part of the Muslim World League. MCS ¶¶ 81, 115; Ex. 23 at 75-76; Ex. 139 at MWL 19138.

MWL's control reached IIRO's most consequential personnel decisions. On March 8, 1999, IIRO's Executive Committee met at IIRO's Jeddah headquarters, "presided [over] by His Highness, the Secretary General of the Muslim World League, Director of the Organization, and Chairman of the executive Committee Dr. Abdullah Bin Saleh Al-Obaid," and with MWL Secretary General al Obaid, IIRO Secretary General Basha, and Golden Chain donor Ibrahim Afandi all participating, resolved to nominate Wa'el Hamza Julaidan to IIRO's urgent aid committee "and that Mr. Wael Julaidan should become the Secretary General." ICS ¶ 324; Ex. 124 at IIRO 287007, 287012; *see infra* § III.D.4.

IIRO also reported to MWL's Secretary General on terrorism investigations, embezzlement, and other irregularities in its branch offices, including the continued surveillance of IIRO's Kosovo facilities by KFOR and Italian forces after the raid on the joint IIRO/Saudi Joint Relief Committee office in Pristina, the discovery by auditors of wholesale expense

fabrications and diversions of funds from IIRO's Pakistan office, and, at the MWL Secretary General's "Strictly Confidential and Top Urgent" request, the conduct of IIRO-Indonesia's Director. MCS ¶ 81; Ex. 205 at IIRO 122181-82; Ex. 206 at IIRO 31131; Ex. 207 at IIRO 59709.

**(2) MWL and IIRO Held Themselves Out as One Organization, and the United States Treated Them as One**

IIRO's internal records, including its Executive Committee and Board minutes, its Secretary General's circulars to foreign offices, and the correspondence of its Pakistan office, are printed on joint letterhead reading "Muslim World League / International Islamic Relief Organization." Ex. 124 at 287007; Ex. 144 at MWLIIRO 16270; Ex. 115, at IIRO 149637. In 1988, IIRO's Jeddah headquarters issued a certificate on joint letterhead, describing IIRO as "an affiliate of the Muslim World League," that confirmed Mohammed Jamal Khalifa as IIRO's Regional Director for Southeast Asia. Ex. 51, at FED-PEC 202846; *see* ICS ¶ 50. On August 19, 2001, three weeks before the attacks, IIRO headquarters funded the Fatima al Zahraa Hospital in Jalalabad, Afghanistan, an asset of IIRO and MWL, with a $34,000 check drawn on Al Rajhi Banking & Investment Corp. through Chase Manhattan Bank in New York and made payable to the "Muslim World Leage [sic] Office, Pakistan." Ex. 128, at IIRO 109118-19; *see* ICS ¶ 17. And the Al Qaeda planning document discussed below, which proposed that "League offices" be used as launching points for attacks, is itself written on joint MWL/IIRO letterhead. ICS ¶¶ 1, 179, 498; Ex. 61 at FED-PEC 212276.

The same 1988 document, issued by Naseef as MWL Secretary General and IIRO Chairman together with IIRO Director General Farid Qurashi, authorized Khalifa "to sign any agreement between the governments of South-East Asia Countries and the Muslim World League and the International Islamic Relief Organization." Ex. 51 at FED-PEC 202847; MCS ¶¶ 81, 111. Abdulhadi Daguit, a longtime IIRO employee in the Philippines, testified that MWL and

IIRO operated a joint office there, in the same building, from 1993 through 2001. Ex. 29 at 38; MCS ¶ 81.

The U.S. government consistently treated MWL as IIRO's parent. In April 1999 the CIA reported that MWL "is funded exclusively by the Saudi Government and has served as an umbrella for other Saudi-based NGOs," and that MWL, "which receives a majority of its funding from the Saudi Government and is frequently used by Riyadh as a mouthpiece, acts as the IIRO's parent organization." Ex. 13 at CIA_ 213, 221; *see* ICS ¶¶ 6, 499. The FBI likewise concluded that "MWL was the organization under which the International Islamic Relief Organization (IIRO) and other such as World Assembly of Muslim Youth (WAMY) operated at an international level." Ex. 32 at 3541. Al Fadl agreed that the Rabita (MWL), under which IIRO operated, was "the mother of all NGOs." Ex. 162 at PEC-KSA 2143; ICS ¶¶ 116, 127, 408.

**(3) IIRO's Headquarters Controlled Its Branch Offices**

IIRO's Secretary General told U.S. diplomats in September 2006 that "all 28 country branches report directly to the Jeddah office" and that IIRO headquarters "controls all budgets, programs, and personnel in countries of operation." ICS ¶ 31. IIRO's own directives confirm the point. A March 15, 1999 circular from the Secretary General to all external office managers provides that "[t]he Secretary General is the direct reference of the managers of external offices" and that "[t]he Secretariat General is the only entity authorized to issue appointment, movement, delegation, dismissal and annual vacation decisions for the employees of the Office and its projects and programs." Ex. 86 at IIRO 1219, 1221; *see* ICS ¶ 31. Branch offices were required to report every donation received to the Secretariat General and await its directives, and to submit periodic reports on the office's finances and assets, its projects, and the performance of its employees. Ex. 86 at IIRO 1219-20; *see* ICS ¶ 31.

The branches operated accordingly. IIRO's Philippine office reported to Jeddah every three months, and the funding approved for its programs depended on those reports. Ex. 29 at 48-50. Headquarters' control extended to the smallest details of IIRO's operations inside Afghanistan. For example, Basha personally approved a 1,300-riyal fuel purchase for the generator at IIRO's Jalalabad hospital, specified the funding source, and demanded the original payment documents. Ex. 129 at IIRO 105986.

### B. MWL and IIRO Were Embedded in the Network From Which Al Qaeda Was Formed

#### (1) MWL, IIRO, and the Services Bureau in Peshawar

A 1981 MWL conference held jointly with the Ministers of Auqaf and Islamic Affairs adopted resolutions, memorialized by MWL, appealing to Muslim countries "to establish training camps for Mujahideen" and to support "Mujahideen" in Palestine, Afghanistan, Western Somalia, Moro, and elsewhere "through every possible and legitimate means." Ex. 194 at 62-63. MWL's Fiqh Council, overseen by MWL's Secretary General, endorsed "armed jihad" and the funding of mujahideen through charitable channels. Ex. 35 ¶ 49; Exs. 202-03. And Grand Mufti Abdul Aziz bin Baz, writing as Chairman of MWL's councils, called on Muslims to support the Bosnian Muslims "with men, money, arms, and supplication," a call an MWL spokesman publicly endorsed. Ex. 198; Ex. 199 at 19; Ex. 200 at 27.

Bin Laden and Abdullah Azzam jointly created the "Bureau of Services" (Maktab al Khidamat, or "MAK"), "which channeled recruits into Afghanistan." *See* ICS ¶¶ 109, 122, 127, 484, 497, 517; Ex. 1 at 56. In December 1995 the CIA reported that MAK received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization," as well as from Bin Laden. ICS ¶¶ 6, 175, 481-82, 504, 549-50. Azzam, Bin Laden's mentor, had been "first sponsored by the Muslim World League to open and head a branch office in Peshawar,

Pakistan, in order to aid arriving Arab-Afghan volunteer fighters," and MWL's Peshawar office was later "taken over for a time by Wael Hamza Jalaidan (a.k.a. Abu Al-Hasan Al-Madani), an old friend of Usama Bin Laden and Abdallah Azzam, and one of the original founders of Al-Qaida." Ex. 38, Testimony of Matthew Epstein with Evan Kohlmann, at FED-PEC 4299-4300. Jelaidan began working for MWL in 1989, and contemporaneously with Al Qaeda's formation he was appointed director of the MWL/IIRO offices in Peshawar. ICS ¶¶ 1, 179; Ex. 136 at 2.

That appointment, made consistent with Naseef's agreement with Bin Laden discussed below, gave Al Qaeda a direct channel for coordinating its activities with MWL and IIRO and moving resources from MWL and IIRO to Al Qaeda. ICS ¶ 1; *see infra* Section III.B.4.

Historical records detailing Al Qaeda's formation and development, seized in a raid of Benevolence International Foundation ("BIF"), another Al Qaeda front headed by Bin Laden ally Enaam Arnaout, show that MAK "worked with a number of other charitable/relief organizations, especially with Wael Julaidan ('Abu Hassan al Madani') of the International Islamic Relief Organization . . . , which was under the umbrella of al Rabita al Alami al Islamiya, also known as the Muslim World League." ICS ¶¶ 1, 109, 122. The same proffer recounts that Arnaout, while administering military camps in Afghanistan, "worked directly with Usama Bin Laden, Wael Julaidan, Abu Rida al Suri (Mohamed Loay Bayazid), Abu Hajer al Iraqi (Mamdouh Salim), Hekmatyar and other mujahideen military leaders." Ex. 183 at PEC-KSA 2032.

MWL's own publications promoted violent jihad. They called on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah," taught that "participating in Jihad is worship in itself," and repeatedly called for men, money, and arms for fighters in Bosnia, Kashmir, and elsewhere. MCS ¶¶ 31, 41, 317, 320; Ex. 35 ¶¶ 36, 42; Exs. 194-203, 212. Although MWL points to disclaimers in its Journal, the Journal's Editorial Board

"reserves the right to edit, summarize, or reject any contribution." MCS ¶¶ 322, 325. The CIA assessed that Islamic fundamentalist clerics dominated MWL's leadership positions, and that Naseef's successor as Secretary General, Ahmed Mohammed Ali, left MWL "over continuous disagreements with Islamic fundamentalist clerics." Ex. 19 at CIA_000746, 784; MCS ¶ 33.

MWL has publicly acknowledged the charities' role in arming the Afghan jihad. In August 1992, its newspaper Al Alam Al Islami reported that, "[t]hrough the Saudi Red Crescent, the Islamic Relief Organization, and the Muslim World League, the government and people of Saudi Arabia provided in-kind and financial support to the Afghani mujahideen, purchased arms and ammunition, and paid the costs of transporting them even inside Afghanistan." Ex. 197; MCS ¶ 247.

When the Soviet-Afghan conflict ended, Bin Laden and Azzam determined that the network they had built should not be allowed to dissolve and instead became the base for future jihad. Ex. 1 at 56. Following Azzam's assassination on November 24, 1989, Bin Laden assumed control of MAK, which was absorbed into Al Qaeda, and the charities that had funded and supported MAK during the 1980s, including MWL, IIRO, Al Haramain, WAMY, the Rabita Trust, the Saudi Red Crescent Society, and BIF, continued to serve as primary conduits for financial, logistical, operational, and ideological support to Al Qaeda's global jihad. ICS ¶¶ 176, 517; MCS ¶¶ 244, 362, 409. The CIA itself traced Bin Laden's "familiarity with NGOs" to "his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan." Ex. 20 at CIA_000817.

As head of the IIRO office in Peshawar, Jelaidan used the office to create ID cards for Al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers. See ICS ¶ 109.

**(2) Al Qaeda Figures Ran IIRO's Peshawar Office**

Julaidan, an Al Qaeda founder and close associate of Bin Laden, was appointed by MWL leadership to serve as head of the MWL/IIRO offices in Peshawar, contemporaneously with the formation of Al Qaeda, and per Naseef's agreement with Bin Laden that the MWL, and the IIRO, would be used as cover for Al Qaeda's operations and attacks. See ICS 1. Via this appointment, MWL embedded a senior Al Qaeda financial and logistics official in MWL and IIRO, ensuring a direct channel for coordinating MWL/IIRO's collaboration with Bin Laden and Al Qaeda. *See* ICS ¶ 1.

The IIRO-Pakistan office was an al Qaeda hotbed. Thus, Abu Hammam al Saudi, a member of Al Qaeda and very close associate to bin Laden, served as al Qaeda's "Emir of Finance," was in charge of military affairs for Al Qaeda, and further served as the head of the IIRO's office in Peshawar. ICS ¶¶114, 119.

Similarly, Al Qaeda member Abu Unaith al Saudi worked with Hammam in the IIRO-Pakistan office, which was used to purchase weapons for al Qaeda. *See* ICS ¶114.

As previously discussed, Jamal al Fadl ("Al Fadl"), an Al Qaeda member who had taken the oath of fealty to Bin Laden and served as one of his business agents, defected in 1996 and "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda." ICS ¶ 111; Ex. 1 at 62, 109. In November 1996 Al Fadl told the FBI that "the head of the International Islamic Relief Organization (IIRO) in Peshawar is ABU HAMMAM," one of the founders of Bin Laden's Wadi al Aqiq company, who "had a good

relationship with many Non-Governmental Organizations (NGO's), and would provide false IIRO identifications for people to travel." Ex. 160 at PEC-KSA 2120-21; *see* ICS ¶¶ 114, 127.

In 1998 Al Fadl told the FBI that in late 1989 future Al Qaeda finance chief Madani al-Tayyib "was working under ABU HAMAM AL-SAUDI, the individual who ran the ISLAMIC INTERNATIONAL RELIEF ORGANIZATION in Peshawar," and that as the organization took the name al Qaeda, "ABU HAMAM AL-SAUDI continued to be the Emir of finance." Ex. 163, at PEC-KSA 2145-46; *see* ICS ¶¶ 111, 127. Al Fadl also described receiving his orders to go to Sudan at a meeting held "at the Islamic Relief guesthouse" in Peshawar, attended by Al Qaeda military commander Abu Ubaidah al-Banshiri and Abu Hafs al-Masri. Ex. 163 at PEC-KSA 2146; ICS ¶ 123.

Al Fadl separately identified Julaidan as running IIRO's Peshawar branch. He explained that in 1989 "the Al-Qaeda people, the (Abdullah Azam) people," obtained identity cards from the relief office documenting them as teachers or aid workers so that they could "enter the border between Pakistan, Afghanistan easily," that the office supplied letters to Pakistani immigration enabling them to obtain visas, and that "some money from people from Gulf area to Bin La[d]en or to Azam go to this office. And, after that, they give it to Bin Laden or Azam." Ex. 162 at PEC-KSA 2137-39; ICS ¶¶ 116, 408.

The FBI recorded that Al Qaeda members in IIRO's Peshawar office, then headed by Julaidan, were responsible for purchasing weapons, and the CIA reported in January 1999 that Bin Laden "has extensive contact with Afghani and Pakistani offices of the IIRO." Ex. 161 at PEC-KSA 2133; Ex. 20 at CIA_000817; ICS ¶¶ 17, 497.

Dr. Levitt reports that a 1996 CIA document stated that the head of MWL's office in Pakistan supplied MWL documentation and arms to Afghan and Tajik militants. Ex. 37 at 31-32.

### (3) Julaidan Sat on Al Qaeda's Founding Advisory Council While Directing MWL's Pakistan Office

Minutes of the August 1988 meeting "leading to the official formation of al Qaeda," recovered from BIF's files, name "Abu Hasan al Madani" (Wael Julaidan) among the members of the new Advisory Council, a list that begins with "Sheikh Usama." Ex. 183 at FED-PEC 2046-47. A separate founding-era document from the same files, addressing the formation of an advisory council and "a committee to take care of the brothers' problems, and of the financial matters," lists "Brother Wael Jleidan" alongside "Abu Abdallah President" (Bin Laden). Ex. 67 at FED-PEC 215313; ICS ¶ 179. Al Fadl identified the figure listed under the title "Jihad support" on an early Al Qaeda organizational chart as Wael Julaidan, and told the FBI that Julaidan "ran the Pakistan office of the International Islamic Relief Organization." ICS ¶ 114. BIF's files also contained a letter on Saudi Red Crescent letterhead directing that "all weapons we have in MiranShah be inventoried," bearing a note signed by Bin Laden to "Brother Abu Al Hasan" stating that "we have an extreme need for weapons." ICS ¶¶ 13, 179; Ex. 66, at FED-PEC 215309.

Julaidan admitted holding a joint bank account with Osama Bin Laden at Habib Bank, opened in 1985. Ex. 132 ¶ 9.

### (4) Since Its Founding, Al Qaeda Has Used MWL and IIRO

The documents seized in the March 2002 raid on BIF's Sarajevo office, collected in a computer file titled "Tareekh Osama" ("Osama's History"), show that Al Qaeda's founders planned from the outset to use MWL and IIRO. ICS ¶¶ 1, 13. One planning document calls for "[f]orming a committee to receive donations and maintain an account and the spending" and identifies as its sources "the Crescent (most likely, the Saudi Red Crescent), the Rabita (the Muslim World League), Sheikh Abdallah, the Relief Agency (Hayaat Al-Ighata), and Abu

Mazin." Ex. 60 at FED-PEC 212268; *see* ICS ¶¶ 1, 498. "Hayaat Al-Ighata" is IIRO's Arabic name. ICS ¶ 498; *see* Ex. 183 at FED-PEC 2031. The next item on the same list directs "[u]rging the Islamic agencies to bring in all of what they have." Ex. 60 at 212268.

A second document, written on joint MWL/IIRO letterhead, records a meeting among "Abu Abdallah" (Bin Laden), "Dr. Abdallah Naseef," then MWL's Secretary General and head of IIRO's Supreme Council, Sheikh Abdel Majeed Zindani, and Dhiaul Haq, at which it was proposed, as "a secret (agreement)," that "League offices will be opened as (illegible) for the Pakistanis, and the attacks will be launched from them (these offices)." Ex. 61 at 212276; Ex. 145; ICS ¶¶ 1, 47, 179. The document directs that, "in anticipation of the recall of Abu Al-Hasan" [Julaidan], the "brothers' passports are to be kept with the strong organizations" rather than with the Saudi Red Crescent. Ex. 61 at FED-PEC 212277; *see* ICS ¶ 13. And it instructs: "You must pursue finding an umbrella which you can stay under, other than the Crescent . . . and I prefer the name of the League (most likely, the Muslim World League) because Dr. Naseef is one of the brothers." Ex. 61 at FED-PEC 212278; ICS ¶¶ 1, 47.

**(5) The Golden Chain**

The 9/11 Commission found that Bin Laden's Afghan-era financial support network, "known as the 'Golden Chain,'" was "put together mainly by financiers in Saudi Arabia and the Persian Gulf states," that "[d]onations flowed through charities or other nongovernmental organizations (NGOs)," and that Bin Laden and the "Afghan Arabs" "drew largely on funds raised by this network." ICS ¶ 484. The Golden Chain list itself, recovered with the Tareekh Osama files, pairs each donor with the person who solicited the funds, and "Wail" (Julaidan) appears as the solicitor beside several of the listed donors. Ex. 45 at FED-PEC at 134954; Ex. 183 at FED-PEC 2040-41; ICS ¶¶ 124, 522. At least two al Qaeda donors, Ibrahim Afandi and Abdurahman Faqih, sat on IIRO's Board of Directors, and Afandi also attended the March 8,

1999 Executive Committee meeting at which Jelaidan was elevated within IIRO. ICS ¶¶ 36, 324. Plaintiffs' expert Evan Kohlmann, drawing on IIRO's own board minutes, identified at least three Golden Chain names who served on IIRO's governing bodies. Ex. 35, Kohlmann Rpt. (Mar. 2020) at 46-47. A November 2002 CIA report stated that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives," and the CIA separately reported that, as of 2000, Sulaiman al-Rajhi, of the al-Rajhi family that appears on the Golden Chain list, was one of the permanent members of IIRO. ICS ¶¶ 6, 315. Senate testimony in 2003 recounted that former Al Qaeda operatives had explained how Golden Chain financiers "would donate funds earmarked for bin Laden by way of the Muslim World League." Ex. 179 at 154. The Golden Chain also lists Saleh Kamel, an advisor to IIRO's board members on financial investments, and Sulaiman al Rajhi, a member of IIRO's board and permanent committee. Ex. 45 at FED-PEC 134953-55.

**C. Mohammed Jamal Khalifa and IIRO's Philippine Operation**

Contemporaneous with the formation of Al Qaeda, MWL Secretary General Omar Abdullah Naseef approved the appointment of Mohammed Jamal Khalifa, a founding Al Qaeda member and Osama Bin Laden's brother-in-law, to head the joint MWL/IIRO branch office in the Philippines. *See* ICS 1, 43; Ex. 51, FED-PEC 202846-202847 (MWL and IIRO certifying the appointment of Khalifa as Regional Director for the IIRO in South-East Asia and stating that Khalifa "is authorized to sign any agreement between the governments of South-East Asia Countries and the Muslim World League and the International Islamic Relief Organization"). *See also* Ex. 35. March 9, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at ¶¶ 31, 32, 107-121; Ex. 36. March 10, 2020 Expert Report of Jonathan M. Winer ("Winer Report") at 29, 47, 80, 81, 95-99; Ex. 37. March 9, 2020 Expert Report of Dr. Matthew Levitt ("Levitt Report") at 1 1-12, 34, 35, 37, 38.

As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for Al Qaeda's expansion into Southeast Asia, and a source of substantial financial assistance for Al Qaeda affiliated terrorist organizations in the region such as the Abu Sayyaf Group ("ASG"). Moro Islamic Liberation Front ("MILF"), and Jemaah Islamiyah ("JI"). *See* ICS ¶¶ 1, 43, 129, 145, 160.

Investigations conducted by the U.S. government confirm the extensive financial and logistical support provided to those terrorist groups by Khalifa, IIRO-Philippine branch office, and the IIRO Eastern Province office in Saudi Arabia. *See, e.g.*. ICS ¶¶ 43, 129. 145,160; Ex. 10, (CIA assessing that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training); *See* Ex. 50 (Treasury Department stating that IIRO-Eastern Province Executive Director "Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI)."); *id.* ("A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations."); Ex. 182 (Treasury Department indicating that "IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups."); Ex. 71 (State Department report stating that "the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."). *See also* Ex. 35. Kohlmann Report at ¶¶ 111-118; Ex. 36, Winer Report at 95-99; Ex. 37, Levitt Report at 38.

During his tenure as the IIRO Regional Director, Khalifa maintained close connections with Al Qaeda. ICS ¶¶ 1 and 43. and personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama Bin Laden/Al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See, e.g.,* ICS ¶¶ 2, 43 *See* Ex. 154 (1996 CIA Report stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13 ("Usama Bin Ladin's brother-in-law; Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 37, Levitt Report at 38.

Just weeks prior to the planned Operation Bojinka attack, Khalifa was detained by U.S. law enforcement officials in San Francisco, California as he was returning to the Philippines. The FBI discovered a trove of information in Khalifa's possession including documents referring to the Operation Bojinka plot, as well as documentation identifying the curriculum for the Dar al Imam al Shafi'e orphanage/school funded and maintained by the IIRO. *See* ICS ¶ 62; Ex. 52 (curriculum). The documents confirmed that students at Dar al Imam al Shafi'e school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons. *Id.* Teachers at Dar al Imam al Shafi'e underwent training at a

terrorist camp named "Abu Haidar," which was used to train members of the Moro Islamic Liberation Front and the IIRO. *See* Ex. 59; *see also* Ex. 35, Kohlmann Report at ¶¶ 108-110; Ex. 37, Levitt Report at 38.

Other individuals employed by the IIRO in the Philippines were associated with al Qaeda, Abu Sayyaf Group, and Moro Islamic Liberation terrorist organizations. Abdulhadi Daguit, a twenty-year employee of the IIRO-Philippines office and advisor to Khalifa, was in close contact with leaders of the Moro Islamic Liberation Front and implicated in an al Qaeda bombing plot to take place in the Philippines in 2004. *See* ICS ¶¶ 43, 72; Exs. 50, 58, 59. Mahmud Abd Al-Jalil Afif, a supporter of the Abu Sayyaf Group, served as an official of the IIRO-Philippines and used the office to funnel money to terrorist groups including the ASG. *See* ICS ¶ 43. Abdul Asmad, an intelligence chief for Abu Sayyaf Group, was the head of IIRO's branch office in Tawi Tawi, Mindanao, which was used to siphon money to Abu Sayyaf Group and Moro Islamic Liberation Front. *Id.*; Ex. 35. Kohlmann Report at ¶ 121; Ex. 36, Winer Report at 95-99; Ex. 37, Levitt Report at 38.

On August 3, 2006, the United States formally designated IIRO-Philippines "for facilitating fundraising for al Qaida and affiliated terrorist groups." See ICS ¶¶ 2, 4; Ex. 50 ("The IIRO-PHL is a source of funding for the al Qaida affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations."). *See* Ex. 35. Kohlmann Report at ¶ 121.

### D. Defendants' Support Continued After Al Qaeda Declared War on the United States

#### (1) Al Qaeda's Declarations of War on Americans, and Its Dependence on the Defendant Charities

As previously noted, Bin Laden's calls for jihad against the United States began long before 1996. In 1988, at the time of Al Qaeda's formation, he affirmed what he described as the personal obligation of all Muslims to wage jihad against the enemies of Islam. In 1990, speaking at his family's mosque in Jeddah, he singled out the United States, declaring that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." In early 1992 Al Qaeda's leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands and singling out U.S. forces; and in 1993 Bin Laden issued a fatwa advocating violence against Americans in Somalia, where U.S. forces were then attacked in the battle of Mogadishu. ICS ¶ 200; MCS ¶ 265; Ex. 151 at PEC-KSA 225-26; Ex. 152 at PEC-KSA 229; Ex. 1 at 59; Ex. 15 at CIA_000349.

Based on these public declarations, a reasonable jury could easily find that these Defendants – who became a critical component of Al Qaeda's financial infrastructure at the end of the Soviet-Afghan conflict in or about 1988 – knew of Bin Laden's intentions toward the United States a number of years before the 1996 and 1998 declarations on which MWL and IIRO now focus.

As the 9/11 Commission put it, "[p]lans to attack the United States were developed with unwavering singlemindedness throughout the 1990s." Ex. 1 at 48.

Then, in August of 1996, Bin Laden issued "A declaration of jihad against the Americans occupying the Land of the Two Holy Sanctuaries;" and in February of 1998 "Al Qaeda publicly declared from Afghanistan the 'World Islamic Front' and called for the killing of Americans." ICS ¶¶ 202, 205 (IIRO's own statements). IIRO does not dispute those facts.

**(2) Contemporaneous U.S. Intelligence Placed IIRO and MWL Inside Bin Laden's Funding Network**

The 9/11 Commission's staff found that Al Qaeda "was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities." ICS ¶ 484. The Commission likewise found that Al Qaeda's budget "funded salaries for jihadists, training camps, airfields, vehicles, arms, and the development of training manuals." Ex. 1 at 171. And it found that "[c]harities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization." ICS ¶ 9.

Before September 11, 2001, U.S. intelligence repeatedly identified IIRO and MWL as channels for Bin Laden's money and personnel. In November 1998 the CIA reported that "Bin Ladin-affiliated Islamic NGOs," naming MAK and "the International Islamic Relief Organization (IIRO)" among others, "are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent," and that Bin Laden and Al Qaeda "probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO," and others. ICS ¶¶ 6, 481.

In January of 1999 the CIA reported that "funding for Arabs in Afghanistan from the IIRO, Lajnat al-Bir, and other unspecified NGOs originates in Saudi Arabia and reportedly is transferred through banks in Peshawar, the accounts . . . are the same as those that have received Usama's money," and that "[a]ll-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network." Ex. 20, at CIA_000817; *see* ICS ¶ 6. The same report stated that "Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents," and that "[t]he MWL apparently has been used as a cover organization for several of Usama's associates." ICS ¶¶ 6, 499. It added that "MWL

officials admit . . . that the lack of strict auditing procedures has made diversions of funds a problem." Ex. 20 at CIA_000823.

MWL's Secretary General had already conceded this point to some degree publicly, but attempted to excuse it as an aberration. Thus, when asked in 1997 about reports that MWL funds were being funneled to extremist groups, al Obaid responded: "This is a closed chapter . . . . It has already been proven that there were people who exploited the situation and misused some funds . . . ." Ex. 214 at PEC-KSA 1800; MCS ¶ 264.

In April 1999 the CIA reported that "several MWL affiliate organizations –including the International Islamic Relief Organization (IIRO) – have provided terrorists with funding and cover employment, documentation, and training." ICS ¶¶ 6, 408, 499. It recorded that "[i]n mid-1997 the MWL attempted to assert control over the IIRO by appointing its secretary general as the chairman of the IIRO's Trustee Council," a step taken in response to "accusations that the Jiddah-based IIRO . . . has supported Islamic terrorists in Afghanistan, Pakistan, the Philippines, and elsewhere." Ex. 13 at CIA_220. And it found that "[d]espite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support," and that "[t]he director of the IIRO office in Baku, Azerbaijan diverted approximately $1.5 million to the Egyptian Islamic Jihad." ICS ¶¶ 408, 504.

In April 2001, five months before the 9/11 attacks, the CIA's Counterterrorist Center reported that "Bin Ladin associates or supporters occupy key positions in a number of these organizations, allowing them to funnel money to Bin Ladin." Ex. 12 at CIA_000201; *See* ICS ¶¶ 230, 490. A CIA report compiled from information as of September 30, 2001 listed IIRO in its table of "Islamic Charities Supporting Al-Qa'ida." ICS ¶¶ 6, 481. The same report concluded that "Islamic nongovernmental organizations also are instrumental in financing and facilitating

funds transfers for al-Qa'ida" and described the MWL-founded Rabita Trust as "Bin Ladin-backed." Ex. 17 at CIA_501, 511.

The suspicion was also public: in February 1999 the Japan Economic Newswire reported that the "IIRO is suspected by Western intelligence agencies to be Bin Laden's conduit to various terrorist organizations in Islamic countries," and following the 1998 embassy bombings the government of Kenya banned IIRO and deregistered its Nairobi office. ICS ¶¶ 1, 31, 48.

These and other governmental reports, including CIA reports describing MWL and IIRO's extensive financial support of Al Qaeda – many of which the 9/11 Commission cited in its endnotes – are collected and summarized at ICS ¶ 6. *See e.g.*, Ex. 155 (U.S. Diplomatic Cable, *Terrorist Finance Post-Vetting of Human Appeal International* ("*HAI*"), Feb. 13, 2007, PEC-KSA 1451-52) ("Usama Bin Laden used the entire IIRO network for his terrorist activities."); Ex. 20 at CIA 000823 ("The MWL apparently has been used as a cover organization for several of Usama's associates").

Other press reports published between 1995 and 2000 in the Philippines, Singapore, Australia, the United Kingdom, and Russia stated that Khalifa and IIRO, "working under the Muslim World League," were funding the Abu Sayyaf Group and the MILF; that IIRO, "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"; and that IIRO had arranged the transportation of fighters to the conflict in Chechnya. ICS ¶¶ 1, 94, 503; Ex. 5.

The FBI likewise concluded that "AQ members were employed within these organizations and utilized funding for terrorism support and used the offices for cover for movement of personnel." Ex. 32 at 3532. The CIA explained that such NGOs "typically are awash in money—the Muslim World League's budget is more than $26 million annually, and the

annual budget of the International Islamic Relief Organization has never dipped below $50 million," and that the logistical support they offer "includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons." Ex. 13 at CIA_000210-211. The CIA had reported as early as 1996 that, "[w]here Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package." Ex. 154 at PEC-KSA 965.

**(3) IIRO Was Principal Funder of Al Qaeda's Training Camps in Afghanistan (Where 9/11 Hijackers Trained) Through 2001**

A 1996 CIA report on Islamic nongovernmental organizations recorded that "[t]he IIRO helps fund six militant training camps in Afghanistan, according to a clandestine source." Ex. 154 at PEC-KSA 972; ICS ¶¶ 1, 2. In December 2003 the UN Monitoring Group reported that "[a] recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001." Ex. 150 at PEC-KSA 122; *see* ICS ¶¶ 1, 474. IIRO's own brief acknowledges a 1999 CIA report stating that IIRO "funds a military camp associated with Usama [Bin Laden]." IM at 8. In April and June 2004, the State Department informed U.S. posts that "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime," the period from 1996 through 2001. Ex. 159 at PEC-KSA 1468; Ex. 158 at PEC-KSA 1465; ICS ¶¶ 1, 43.

Evidence from inside IIRO is to the same effect. Sayed Abu Nasir, an IIRO employee transferred to IIRO's Lahore office in 1994, "was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir," and his duties included visiting the camps, assessing their funding needs, and reporting back. ICS ¶¶ 1, 478. A JTF-Guantanamo assessment states that "[s]ince

1996, the IIRO has been linked with providing financial assistance, funds transfers and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief." ICS ¶¶ 9, 220.

The September 11 hijackers were trained in those camps. *See* ICS ¶¶ 1, 2. The 9/11 Commission found that "[a]t least seven of the Saudi muscle hijackers took this basic training regime at the al Faruq camp near Kandahar," which appears to have been "the preferred location for vetting and training the potential muscle hijackers," and that hijacker-pilot Hani Hanjour was identified "in Al Qaeda's al Faruq camp as a trained pilot" before he was sent to Khalid Sheikh Mohammed for inclusion in the plot. Ex. 1 at 226, 234. Before a Pentagon review board, a Saudi detainee who identified himself as an employee of IIRO insisted that the al Faruq camp was a "charity-funded camp." Ex. 35 at 26 (citing Administrative Review Board proceedings for ISN 516). And hijacker Fayez Ahmed Alshehri told his father, before he left to join the plot, "that he was going to work for the IIRO." Ex. 179 at 32.

Throughout this period IIRO's headquarters funded and directed operations inside Taliban-controlled Afghanistan. IIRO reported spending SR 6,533,185 in Afghanistan in 1999-2000 and SR 5,117,633 in 2000-2001, operating a hospital in Jalalabad, clinics, and an orphanage program sponsoring thousands of children. Ex. 82 at 323; Ex. 83 at IIRO 420; *see* ICS ¶ 17.

IIRO and MWL maintained good relations with the Taliban for years, and a letter from the Taliban administration records that aid distribution in Nangarhar, Kandahar, and Kabul was carried out "in full coordination with" IIRO's director of projects in Afghanistan. Ex. 105, IIRO 096076; *see* ICS ¶ 456. JTF-Guantanamo treated a stay at an NGO office, along the overland routes into Afghanistan that ran through Peshawar, as an indicator of travel to join Al Qaeda or

the Taliban. Ex. 69, at FED-PEC 216823. In December 2000, the Taliban's Deputy Prime Minister also wrote to IIRO's Pakistan office to thank it for the assistance it had long provided. Ex. 105 at IIRO 96076; ICS ¶ 456.

**(4) Julaidan's Continuing Positions at IIRO, MWL, and the Rabita Trust**

In a June 1999 interview with al-Jazeera, Bin Laden publicly acknowledged Julaidan as a comrade from Al Qaeda's founding: "We are all in one boat, as is known to you, including our brother, Wa'el Julaidan." ICS ¶¶ 1, 324, 522. That same year IIRO elevated Julaidan. On March 8, 1999, IIRO's Executive Committee, chaired by MWL's Secretary General, resolved "to nominate Mr. Wael Hamza Julaidan . . . to become members of the urgent aid committee, and that Mr. Wael Julaidan should become the Secretary General," and separately referred "the issue of the fund of Mr. Wael Julaidan" to its funds committee. Ex. 124 at 287008, 287010, 287012; *see* ICS ¶ 324.

MWL, for its part, appointed Julaidan head of the Rabita Trust in 1998. Ex. 136 at 3; ICS ¶ 573. In February 2000 he was appointed to the Rabita Trust's Board of Trustees and served as its Director General. Ex. 68, at FED-PEC 215391. Beginning in 1999, Julaidan also served as Executive Director of the joint IIRO/Saudi Joint Relief Committee office in Kosovo. ICS ¶ 573. In October 2000 the IIRO and that Committee signed a memorandum dividing the Committee's Pristina headquarters building between them, sharing rent and utilities. Ex. 98.

More than a year before the 9/11 attacks, U.S. officials asked U.N. police to place the joint IIRO/SJRC office in Pristina under surveillance, describing Julaidan and SJRC official Adel Muhammad Sadiq Bin Kazem as "associates of Osama bin Laden" and Julaidan as helping Bin Laden "move money and men to and from the Balkans." The U.N. Mission in Kosovo then raided the office and declared that it served as cover for several Al Qaeda operatives, including Julaidan. Ex. 43 at FED-PEC 97364; ICS ¶¶ 1, 24.

**(5) Al-Mujil and IIRO's Eastern Province Office**

Abd al-Hamid Sulaiman Al-Mujil ("Al-Mujil") was the Executive Director of IIRO's Eastern Province branch in Saudi Arabia. ICS ¶ 90. Treasury found that Al-Mujil "has been called the 'million dollar man' for supporting Islamic militant groups," that he "provided donor funds directly to al Qaida," and that he "is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI)." ICS ¶ 90.

Treasury also found that Al-Mujil personally knew Osama Bin Laden, and that he "exercised decision-making authority over a number of IIRO offices," including the Philippine, Indonesian, and Thai branches. *Id.* Announcing the designation of the Philippine and Indonesian branch offices of IIRO and of Al-Mujil, U.S. Treasury Under Secretary stated: "We have long been concerned about these IIRO offices, we are now taking public action to sever this link in the al Qaida network's funding chain." Ex. 50 at FED-PEC 202110.

Treasury further found that in 2004 Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under cover of the hajj and planned to give him cash to carry back to support JI; that Al-Mujil was present in Afghanistan in the late 1990s, knew Bin Laden and Azzam personally, and in the 1990s established a relationship with KSM; that in the late 1990s he provided direct financial assistance to ASG leaders Abdurajak Janjalani and Ustadz Ibrahim Ali through Afif, whom Treasury found was implicated in the 1992 assassination of a priest in Zamboanga City; and that IIRO-Indonesia, supported by the Eastern Province office Al-Mujil controlled, supported JI "by providing assistance with recruitment, transportation, logistics, and safe-havens" and, as of late 2002, allegedly financed training facilities "for use by al Qaida associates." Ex. 50 at FED-PEC 202110-12; Ex. 182 at TREASURY00106-09.

Prince Turki bin Fahd bin Jalawi al Saud, a member of the Saudi royal family who led IIRO's Eastern Province office, was identified by the FBI and CIA as "an important al-Qa'ida

donor." ICS ¶ 91; Ex. 31 at 3419. An IIRO audit found that the Eastern Province office was funding projects through IIRO branch offices abroad, including in the Philippines, Indonesia, Pakistan, Jordan, India, and Sudan, through irregular channels, and was paying cash for projects without vouchers or receipts. ICS ¶¶ 91, 268; Ex. 124 at IIRO 287010. When an external auditor discovered the illicit funding activities and reported them, thus creating a public trail of the activity, Basha claims that he asked Prince Turki to stop; the Prince allegedly refused and later resigned because he "did not wish to implement the recommendations of the auditor," and Basha recalled that "the auditor's report connected all the violations to requests from the Prince." Ex. 27 at 268-73; ICS ¶ 91. Neither MWL nor IIRO produced that report. ICS ¶ 271. Given the authorities of IIRO's Secretary General and financial controls governing all expenditures, the record indicates that the illicit and irregular activities were well known to IIRO leadership as they were occurring and were permitted, at least until the risk of public disclosure and investigations prompted IIRO to close the channel in an effort to protect the organization as a whole.

**(6) Financial Improprieties Pervaded IIRO's Branch Offices**

As noted, the designated Eastern Province office was responsible for IIRO's operations in Pakistan, among others.

Tellingly, an audit of the Pakistan branch dated months before the 9/11 attacks found that US $3,071,659 was "unaccounted for" and had been either unrecorded or "misused or misappropriated locally," and documented forged receipts for orphanage supplies that were never purchased. Ex. 91 at IIRO 26478, 26480; ICS ¶ 335. Basha testified that before 2003 IIRO-Pakistan, which was then responsible for IIRO's activities in Afghanistan, transferred all of its funds to Afghanistan in cash. Ex. 27 at 249-50. These illicit financial activities involving cash transfers into Afghanistan occurred at the very time the United States government has found that

IIRO was funding Al Qaeda's training camps in Afghanistan, and while IIRO Pakistan was under the stewardship of the Eastern Branch and officials of the branch who were dedicated Al Qaeda funders and supporters.

IIRO attempts to deflect the obvious relationship between the illicit financial activities through the Pakistan office and IIRO's support for Al Qaeda by pointing to a sham investigation. In IIRO's telling, an IIRO delegation found "cheating, forgery and misuse of the IIRO's funds," including invoices from fictitious companies, and Basha claimed "that the embezzled funds were stolen by [IIRO Pakistan accountant] Amir Jasim, with the knowledge of [IIRO Pakistan Director] Moayad al Butairi," and that "it was explicit that there was fabrication in invoices, fabrication of documents." Ex. 93 at IIRO 31022-23; Ex. 92 at IIRO 31006-07; Ex. 27 at 237-38; ICS ¶ 335. IIRO further claims that Butairi ordered Jasim to burn IIRO's records. Ex. 116 at IIRO 168291; ICS ¶ 335.

IIRO did not prosecute Butairi or Jasim. IIRO claims that it settled with Jasim. IIRO claims that it recovered funds with the assistance of Butairi, but has never produced any documentation of the recovery it claims. Ex. 27 at 217-21, 224; ICS ¶¶ 335, 345.

Similar financial misconduct occurred in other IIRO offices. In 1998, IIRO's Social Care Director found that IIRO-Philippines could account for only 45 of the 80 orphans on IIRO's rolls at one sponsored orphanage ("Where are the others? Who was receiving their allowances?"), that orphan allowances sent in 1997 had not been distributed, and that IIRO-Eastern Province was funding an Islamic institute in the Philippines without informing headquarters. ICS ¶ 230; Ex. 109 at IIRO 111424-25. A 2004 audit of IIRO-Indonesia found, among other irregularities, a direct and unauthorized transfer of $383,663.76 from IIRO-Eastern Province, yet IIRO never asked the office manager to correct the deficiencies. ICS ¶ 238; Ex. 95 at IIRO 34998-99; Ex. 30

at 350. Bosnian Financial Police found that IIRO-Sarajevo kept none of the books required by law for 1996 through 1998 and had no records of the sources or uses of its funds, and in July 2003 Bosnian police arrested nine Bosnian Serbs for allegedly smuggling weapons to IIRO. ICS ¶¶ 294, 313; Ex. 149 at PECFOIA049930; Ex. 62 at FED-PEC 212645-46. An audit of IIRO-Jordan found the use of personal accounts and checks to pay for IIRO projects and "a procedural defect in the flow of funds" from IIRO's Eastern Province office. ICS ¶ 268; Ex. 185 at IIRO 287560.

Plaintiffs' expert Jonathan Winer concluded that these documented improprieties "reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism." Ex. 36 at 77; ICS ¶¶ 230, 238, 294, 335.

**(7) Raids, Arrests, and Account Seizures During Basha's Tenure**

During Basha's tenure as IIRO Secretary General from 1997 through 2013, IIRO branch offices were raided, IIRO employees were arrested, and IIRO bank accounts were seized. ICS ¶ 31; MCS ¶ 255. IIRO's office in Albania was raided in October 2001, with the Saudi Embassy intervening to retrieve seized IIRO documents, and IIRO's Tirana office was raided again in October 2003. Ex. 100 at IIRO 42373; Ex. 99 at IIRO 42360; Ex. 111 at IIRO 122003. Bahraini authorities closed an IIRO account after IIRO "had opened an account illegally and was using the account to circumvent Saudi restrictions on sending money abroad." Ex. 72 at FED-PEC 220490-91; ICS ¶ 31.

**(8) IIRO and MWL Supported Al Qaeda on Its Other Jihad Fronts, Including Bosnia, Chechnya, Sudan, Somalia, Yemen, and Malaysia**

After the Afghan jihad ended, Bin Laden, then living in Sudan under the protection of its National Islamic Front ("NIF"), sent a delegation of senior Al Qaeda members to Bosnia to

assess the logistical needs for waging jihad there, and Al Qaeda's leadership decided that its members should fight in the Bosnian war, with the primary objective of establishing "a base of operations in Bosnia to support al Qaida operations in Europe and the West." ICS ¶ 332; Ex. 172 ¶¶ 17-19. The leader of that delegation, Abu Abdel Aziz, obtained the endorsement of Saudi Grand Mufti Abdul Aziz bin Baz, who called on Muslims to support the Bosnian jihad with "money, arms and prayers." ICS ¶ 332, Exs. 198-200.

Al Qaeda's Balkan and Chechen operations were aimed at the United States: Al Qaeda member Abdel Rahman al Dosari stated that Al Qaeda sought in Bosnia to "forge relations with relief agencies in Bosnia" and "to establish a base of operations in Europe against al Qaeda's true enemy, the United States"; al Fadl confirmed that Bin Laden wanted a European base "from which they would have easy access to other European countries as well as the western nations"; and the U.N. found that Bin Laden agreed to provide the Islamic International Brigade in Chechnya "substantial military assistance and financial aid, including by making arrangement to send to Chechnya several hundred fighters." Ex. 183 at PEC-KSA 2036; Ex. 153 at PEC-KSA 344; Ex. 204 at 2. The CIA reported in October 2001 that Julaidan "has provided support since the 1990s to Muslims in Bosnia and Chechnya—hotbeds of mujahidin activity." Ex. 17 at CIA_000544.

IIRO's general supervisor, Farid Qurashi, boasted that IIRO "was the first relief organization to enter Bosnia-Herzegovina and the Balkan region," and the Saudi da'wah organizations, including IIRO and MWL's Al Haramain Al Masjed Al Aqsa, provided money, food, shelter, and supplies to Al Qaeda fighters throughout the war, often through Al Qaeda members embedded in those organizations. Ex. 35 at 28; ICS ¶¶ 294, 333. An Al Qaeda member who fought in Bosnia from 1992 to 1995 attested that Al Qaeda's Bosnian operations "were

funded and otherwise supported by purported Islamic charitable organizations." Ex. 172 ¶¶ 34, 37; ICS ¶ 333. The Bosnian Army's own military intelligence service reported that IIRO employees moved "in and out of the humanitarian organization" and communicated with members of the El-Mudzahidin unit, and an American mujahideen recruit recalled that "it was well known that they helped get 'people' into Bosnia." Ex. 35 at 28-29; ICS ¶ 294. Mustafa Ait Idr, a member of the Algerian Armed Islamic Group and a participant in an Al Qaeda-linked plot to attack the U.S. Embassy in Sarajevo, entered the Bosnian war in 1993 under cover of IIRO employment, and JTF-Guantanamo found that "[t]he IIRO was known to support extremist/terrorist groups in the Balkans from 1992 to 1996." Ex. 47 at FED-PEC 197546; ICS ¶ 294.

IIRO's offices in Bosnia, Croatia, and Slovenia were supervised by Abdelaziz Zaher (a/k/a Abu Anas), whom Serbian authorities had expelled from Belgrade in 1993 for ties to organizations aiding armed militant groups, and whose top IIRO lieutenant, Jamal al Jibouri, oversaw a large-scale operation supplying weapons and ammunition to Al Qaeda-affiliated militants in the Balkans. ICS ¶ 294; Ex. 89 at IIRO 13287-92; Ex. 25 at 229, 269-71; Ex. 35 at 29. In 1994, Bosnian police arrested Zaher and two mujahideen following the murder of British aid worker Paul Goodall near Zenica, and the mujahideen's deputy commander then wrote to Bosnian authorities seeking the release of the arrested men, describing Zaher and his co-detainee interchangeably as "mujahideen" and as IIRO employees. Ex. 35 at 30-31; ICS ¶ 294. The CIA reported in 1999 that "IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities." Ex. 13 at CIA_000221; ICS ¶¶ 6, 504.

The CIA reported in January 1999 that "Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya." Ex. 20 at CIA_000818; ICS ¶¶

497, 506. A February 2000 ITAR-TASS report that Russian troops had found Arab and Bosnian passports in Chechnya stated that IIRO had arranged the transportation of Islamic fighters to the Chechen conflict. ICS ¶¶ 1, 94; Ex. 5. Philippine intelligence likewise reported that MWL, "which generates funding for a number of relief programs in Afghanistan, Bosnia, and Chechnya, has been infiltrated by a number of key strategist and financiers of international terrorism." Ex. 59 at FED-PEC 211425; ICS ¶ 43. In May 1999, the Saudi government established the Saudi Joint Relief Committee for Kosovo and Chechnya to coordinate the operations of MWL, IIRO, WAMY, and Al Haramain in those theaters, and Julaidan ran that Committee's joint office with IIRO in Pristina. ICS ¶¶ 315, 573; Ex. 173 at PEC-KSA 3910-13. In 2000, IIRO's office in Makhachkala, in Russia's Dagestan region, was closed and its assets confiscated, a matter Basha took up with the Saudi Ambassador in Moscow. Ex. 121 at IIRO 284675; ICS ¶ 31.

The CIA reported that Sudan's NIF worked "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization," and that the Khartoum-based Islamic Relief Agency, which Al Qaeda had infiltrated, worked closely with IIRO personnel. Ex. 19 at CIA_000741; Ex. 20 at CIA_000824; ICS ¶¶ 6, 549. Sulaiman al Rajhi, a permanent member of IIRO, and his family directed financial support to Bin Laden in Sudan, and IIRO's Eastern Province office sent funds directly to IIRO's office in Sudan without headquarters' authorization. Ex. 8 at CIA_00045; Ex. 27 at 267-68; ICS ¶¶ 91, 315. It was in Sudan that Bin Laden and Al Qaeda's military chief studied the feasibility of hijacking airplanes and using them as weapons. Ex. 1 at 153; ICS ¶ 445. And as early as December 1994, the State Department described Khalifa, the head of IIRO's Philippine operation, as the brother-in-law of "the Sudan-based financier of Islamic extremists." Ex. 166 at PEC-KSA 2265; ICS ¶¶ 43, 145, 152.

From Sudan, Bin Laden sent "Islamic Army members" to Somalia in 1993 "with the NIF's knowledge and encouragement, in order to kill U.S. troops." Ex. 15 at CIA_000349; ICS ¶¶ 200, 419. IIRO maintained an office in Somalia that the Saudi government funded directly: in 1998, Prince Sultan bin Abdul Aziz, the Minister of Defense and Aviation, provided SR 5 million to IIRO's Somalia office, more than half of the funds IIRO earmarked for Somalia that year. Ex. 81 at IIRO 200; ICS ¶ 20.

The CIA reported that "funds destined for al-Ittihad al-Islamiyya (AIAI) in Somalia were funneled through several Saudi NGOs, including MWL," Treasury identified AIAI among the al Qaeda affiliates to which IIRO provided "financial, material and logistical support," and Dr. Levitt reports that AIAI, an E.O. 13224 designee, "derived part of its revenue from the MWL and its subsidiary, the IIRO." Ex. 10 at CIA_000150; Ex. 182 at TREASURY00106; Ex. 37 at 31-32.

Samir al Hasan traveled from Yemen to Afghanistan in 1999 or 2000, trained at the al Farouq camp, the same camp at which at least seven of the 9/11 hijackers trained (Section III.D.3, *supra*), and became a bodyguard in August 2001; he told U.S. authorities that he was in Afghanistan as an IIRO relief worker and that he had received the position from the head of IIRO. Ex. 170 at PEC-KSA 2437; ICS ¶ 210.

The CIA also reported in January 1999 that Bin Laden "employed an Algerian named Abu Zayid who worked at an IIRO office, presumably in Yemen." Ex. 20 at CIA_000818.

Philippine intelligence identified former IIRO-Philippines director Mahmud Afif as the financier of two Malaysian demolition experts who arrived in Zamboanga City in October 1998 for terrorist activities. Ex. 59 at FED-PEC 211429; ICS ¶¶ 48, 527. And the 9/11 Commission found that Al Qaeda helped Jemaah Islamiyah, whose cells were "scattered across Malaysia,

Singapore, Indonesia, and the Philippines," the same group that Treasury found IIRO-Indonesia supported. Ex. 1 at 58; ICS ¶¶ 76, 129, 160.

Any suggestion by Defendants that their support for Al Qaeda in certain of these theaters is too remote or attenuated from the September 11th attacks to matter simply misunderstands the aiding and abetting and conspiracy inquiries and the relevance of such support to them. The fact that these Defendants provided support to Al Qaeda in all of these operational theaters, and in service of Al Qaeda's militant activities in each case, underscores the depth of their partnership and ideological alignment with Al Qaeda and broad dedication to advancing Al Qaeda's violent agenda. The breadth and nature of this assistance is thus directly relevant to assessing (for aiding and abetting) their states of mind, the duration and scope of their assistance, the violent nature of the acts they sought to encourage, the nature of their relationship to the principal (Al Qaeda) and (for conspiracy) the existence of an agreement and the nature of the conspiracy.

**E. The Rabita Trust**

MWL founded the Rabita Trust. Its trust deed names MWL as the Trust's "Founder," provides for a twelve-member board, six nominated by MWL, with MWL's Secretary General as Vice-Chairman, and requires every check to be co-signed by a trustee representing MWL; senior MWL leaders populated its initial Board of Trustees. ICS ¶ 573. . MCS ¶¶ 122, 129-30, 134, 137; Ex. 134 at Jelaidan 017; Ex. 140 at MWL 030817-19. MWL Secretary General al Obaid declared that he served as an officer of the Rabita Trust, a charity partly owned by MWL, and testified that the Trust's regulations required that he be consulted on Julaidan's appointment. Ex. 22 ¶ 5; Ex. 23 at 91-92. The Rabita Trust board list shows Julaidan as Director General-cum-Secretary General and includes MWL Secretary General al Obaid, IIRO Secretary General Adnan Basha, and Prince Turky Bin Fahd Bin Jalawy Al-Saud, head of IIRO's Eastern Province office. Ex. 140, at MWL 30817; ICS ¶ 573.

Naseef spearheaded the creation of the Rabita Trust in 1988, contemporaneous with Al Qaeda's formation and with his agreement with Bin Laden to use MWL and its subsidiary bodies to provide support and cover for Al Qaeda's operations. MCS ¶ 122; ICS ¶ 1. The Trust operated out of MWL's offices in Mecca and Islamabad and out of IIRO's Islamabad office, and its board included, in addition to Naseef, al Obaid, and Basha, SDGT Julaidan; Prince Turki bin Jalawi, the "important al-Qa'ida donor" who led IIRO's Eastern Province office; Mohammed bin Abdullah al Dubayban, a board member of the SDGT Al Haramain Al Masjed Al Aqsa Charity Foundation; and IIRO-Pakistan's Moayad al Butairi. MCS ¶¶ 122, 129, 157; Ex. 133 at Jelaidan 016; Ex. 140 at MWL 30817-19; Ex. 31 at 3419.

Contrary to MWL's claim that the Trust was defunct from 1996 to 2000, al Obaid co-signed, as the Trust's Vice-Chairman, a December 1997 appeal seeking "stupendous financial resources" from Muslim governments, charities, and individuals. MCS ¶¶ 140, 146; MWL Ex. 56 at IIRO 149661. And although al Obaid now declares that the Trust "is an independent organization and not a part of MWL," he previously declared in this litigation that it is "partly owned by the Muslim World League." MCS ¶ 159; Ex. 22 ¶ 5. Regardless, the record indicates that Rabita Trust was created by MWL, that MWL was responsible for installing prominent Al Qaeda financial managers and funders to positions of authority in the organization, and that MWL played a critical role in its fundraising and financing.

As recently as March 2014, Naseef presided over a Pakistan Repatriation Council event in Jeddah at which he urged that the Rabita Trust, shut down after its 2001 designation, be reactivated. ICS ¶ 37.

On October 12, 2001, the United States designated the Rabita Trust for "its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida." ICS ¶¶

1, 91. Within days, IIRO's Pakistan office director wrote to Julaidan about the designation as "the Secretary-General of The Rabita Trust," and sent the same report to the heads of IIRO and MWL. Ex. 114, at IIRO 149628; Ex. 115 at IIRO 149637; ICS ¶ 573. Julaidan swore in 2011 that he had "been the Secretary-General of the Rabita Trust since 1999 till this date," and MWL coordinated efforts to petition the Treasury Department to remove the Rabita Trust from the designation list. ICS ¶ 573.

Following the designation, the Trust coordinated with MWL and IIRO to limit its exposure, including through IIRO Secretary General Basha's orders to close the Trust's Lahore office. Ex. 35 ¶¶ 58-62.

### F. Al Haramain Al Masjed Al Aqsa Charity Foundation

Al Haramain Al Masjed Al Aqsa Charity Foundation ("AHAMAA"), another MWL body, was designated by the United States in May 2004 for "funneling dollars to Al-Qaida." ICS ¶ 1; MCS ¶ 1; Ex. 63 at FED-PEC 213973. MWL's 2002 annual report acknowledged that AHAMAA "started its activities under the banner of the Muslim World League" in 1998, and an MWL organizational chart lists AHAMAA among six sub-entities reporting directly to MWL's Secretary General. Ex. 35 ¶¶ 64, 66; Ex. 139 at MWL 19138. AHAMAA officials Mohammed bin Abdullah al Dubayban and Mohammed bin Abdullah al Taibah sat on IIRO's Board of Directors with Basha in 1999 and 2001. Ex. 35 ¶ 65; Ex. 141; Ex. 144.

Treasury found that Julaidan, as an AHAMAA board member, opened three bank accounts on its behalf between 1997 and 2001 and retained signatory authority over two of its Bosnian accounts. Ex. 63 at FED-PEC 213973. State Department cables identified AHAMAA as one of Bosnia's "Dirty Dozen" charities "currently involved in providing financial support to known terrorist organizations," and reported "control over Al Haramayn al Masjid Al Aqsa by

top Al Qa'ida financier Wa'el Julaidan." Ex. 148 at PECFOIA0004500; Ex. 149 at PECFOIA049928.

### G. Findings and Designations by the United States, the United Nations, and the Department of Defense

On September 6, 2002, the United States and Saudi Arabia jointly designated Julaidan as "an associate of Usama Bin Laden and a supporter of al-Qa'ida terror." Ex. 53 at 203469; *see* ICS ¶¶ 324, 497. OFAC's evidentiary memorandum identified Julaidan "as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief." ICS ¶ 561. It found "reason to believe Wa'el Hamza Julaidan is: 1) acting for or on behalf of Al Qaida," among other grounds, and relied in part on his role "[a]s Executive Director of the Rabita Trust." Ex. 180 at 2, 7.

The same memorandum records that Julaidan, "along with fellow Saudis Usama bin Laden and Abdullah Azzam, head of the Pakistan Muslim Brotherhood, established the basis of the organization in the 1980s, as they helped to recruit volunteers to fight in the Afghan resistance." Ex. 180 at 4; MCS ¶ 404.

On August 3, 2006, Treasury designated IIRO's Philippine and Indonesian branch offices "for facilitating fundraising for al Qaida and affiliated terrorist groups," together with Al-Mujil. ICS ¶¶ 2, 90. The UN 1267 Committee listed the same branches and Al-Mujil, and the branches remained listed in 2009. Ex. 76, at FED-PEC 220516; ICS ¶ 91. Treasury's designation memorandum found that IIRO, "which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL," the Taliban, and Hamas, and that IIRO-Indonesia "financed the establishment of training facilities for use by al Qaida associates." ICS

¶¶ 2, 160. In the talking points it delivered to Saudi Arabia, the United States stated that it was "aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity" and had "been concerned about IIRO for many years now." ICS ¶ 94.

The UN Monitoring Group reported to the Security Council in December 2003 that IIRO funds provided to Sana-Bell, Inc. "were subsequently transferred through various channels to Al-Qaida operatives, and to an Al-Qaida financier, Yassin al-Qadi," and that after September 11 "Pakistan also identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan." Ex. 150 at PEC-KSA 122-23; *see* ICS ¶¶ 2, 31. The Security Council also reported that IIRO, "and some of its constituent organizations, has also been used, knowingly or unknowingly, to assist in financing Al-Qaida." Ex. 150 at PEC-KSA 122.

The Department of Defense classified IIRO as "a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin," which "has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida." ICS ¶¶ 9, 220. JTF-Guantanamo's Matrix of Threat Indicators lists both IIRO and MWL among the "terrorist and terrorist support entities identified as associate forces," defined as organizations "with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals." Ex. 69 at FED-PEC 216829, 216831; *see* ICS ¶¶ 9, 220.

The December 2004 joint FBI-CIA assessment found evidence that "official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States and around the world, some of whom are associated with terrorism-related activity." ICS ¶ 540. It identified

IIRO, WAMY, and MWL among the NGOs the Saudi government sponsors and funds, and found that "[o]verseas, these NGOs have wittingly or unwittingly provided support to terrorism," including by "provid[ing] assistance to fighters traveling to and from jihad areas, employ[ing] individuals directly involved in terrorist acts against the United States and other countries, and provid[ing] lodging and other logistical support to individuals training for or involved in jihad." Ex. 31 at 3430. The FBI later reported that "[m]any of these charities were known to have supported AQ and related groups both financially and operationally throughout the world." Ex. 32 at 3541. A February 2007 State Department cable reported that "Usama bin Ladin used the entire IIRO network for his terrorist activities." ICS ¶¶ 6, 415.

### H. Independent Evidence Corroborating Al Fadl

IIRO catalogues a series of eight so-called "Al Fadl" Accusations that IIRO attributes solely to Al Fadl. IM at 9-10. Yet each is corroborated by evidence that does not depend on him.

The 9/11 Commission itself relied on Al Fadl, whose defection "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda." ICS ¶ 111. The Commission found that "[m]uch of the early reporting on Al Qaeda's financial situation and its structure came from Jamal Ahmed Al Fadl." ICS ¶ 111. The Commission also found that Al Fadl's account was confirmed: "Corroborating evidence came from another walk-in source at a different U.S. embassy. More confirmation was supplied later that year by intelligence and other sources." Ex. 1 at 109.

That IIRO's Peshawar office supplied identity documents to Al Qaeda personnel (accusation (i)) is corroborated: by Serb troops' discovery in 1992 of "humanitarian aid worker identification cards printed for young Saudi Muslim militants by the Peshawar, Pakistan IIRO office," Ex. 38 at FED-PEC 4303; by the CIA's reports that Bin Laden used IIRO's Baku office to obtain travel documents and that IIRO provided terrorists with cover employment and

documentation, ICS ¶¶ 6, 408, 499, 506; and by the founding-era instruction that the brothers' passports be kept with "the strong organizations." *See* Section III.B.4, *supra*.

That IIRO funded training camps in Afghanistan (accusation (ii)) is corroborated by the 1996 CIA report, the UN Monitoring Group, the 2004 State Department cables, and the account of IIRO employee Sayed Abu Nasir. ICS ¶¶ 1, 43, 472-474, 478; *see* Section III.D.3, *supra*.

That IIRO was interwoven with Al Qaeda and provided cover to its operatives (accusation (iii)) is corroborated by the Tareekh Osama documents, the CIA's 1999 assessments, the Department of Defense findings, and Pakistan's post-9/11 expulsion of Al Qaeda supporters working for IIRO-sponsored organizations. ICS ¶¶ 1, 6, 9, 31, 47; *see* Sections III.B.4, III.D.2, III.G, *supra*.

That Bin Laden treated Islamic charities as a primary source of Al Qaeda funding (accusation (iv)) is corroborated by Al Qaeda's own planning document naming "the Rabita (the Muslim World League)" and "the Relief Agency (Hayaat Al-Ighata)" as sources for its donations committee, Ex. 60 at 212268; *see* ICS ¶ 498; by the 9/11 Commission's findings on the Golden Chain and Al Qaeda's reliance on charitable donations, ICS ¶ 484; and by the CIA's listing of IIRO among the "Islamic Charities Supporting Al-Qa'ida." ICS ¶¶ 6, 481.

That IIRO facilities housed Al Qaeda personnel (accusation (v)) is corroborated by the FBI-CIA finding that these NGOs provided "lodging and other logistical support to individuals training for or involved in jihad." Ex. 31 at 3430.

That IIRO personnel appear on the Golden Chain (accusation (vi)) is corroborated by the list itself, on which Julaidan appears as a solicitor and IIRO board members Ibrahim Afandi and Abdurahman Faqih appear as donors. ICS ¶¶ 36, 124, 324. It is further corroborated by the 9/11 Commission's endorsement of the government's treatment of the document in its evidentiary

proffer in the Enaam Arnaout prosecution. See 9/11 Commission Report at 55 and Note 21 to Chapter 2.

And, finally, Julaidan's closeness to Bin Laden and his funding role (accusations (vii) and (viii)) are corroborated by Bin Laden's own 1999 statement, the joint U.S.-Saudi designation, and OFAC's finding that Julaidan was a founder of Al Qaeda and Bin Laden's logistics chief, ICS ¶¶ 324, 522, 561; as well as by the August 1988 founding minutes, Julaidan's joint Habib Bank account with Bin Laden, and the CIA's report that IIRO money for the Arabs in Afghanistan reportedly moved through the same Peshawar accounts that received Bin Laden's money. Ex. 183 at PEC-KSA 2046-47; Ex. 132 ¶ 9; Ex. 20 at CIA 817.

### I. Plaintiffs' Experts

Based on the evidence summarized above and additional evidence of record, Plaintiffs' experts have offered opinion testimony concerning: the relationship between MWL and IIRO; their intimate ties to Al Qaeda; the extent of their support for Al Qaeda; the importance of that support to Al Qaeda's terrorist capabilities and the 9/11 attacks themselves; the rigorous nature of the processes underlying OFAC designations and preparation by the CIA of finished intelligence products; and other matters central to Plaintiffs' claims. With limited exceptions, the Court has confirmed the admissibility of their testimony already, and it forecloses Defendants' bid for summary judgment.

For example, Plaintiffs' experts have offered opinion testimony concerning the following: (1) MWL publications that promoted violent jihad and called on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah;"[8](2) the

[8] *See, e.g.,* Ex. 35, Expert Report of Evan Francois Kohlmann ("Kohlmann Report"), March 10, 2020 at ¶¶ 36-49; Ex. 37, Expert Report of Dr. Matthew Levitt ("Levitt Report"), March 9, 2020 at 28.

Saudi charities' involvement in the financial and logistical infrastructure that sustained the Arab-Afghan fighters ("mujahideen") during the Soviet-Afghan war, in collaboration with Osama Bin Laden's Maktab al Khidmat ("MAK"), and the MWL and IIRO's continued role serving as primary conduits for channeling financial, logistical, operational, and ideological support to Al Qaeda's global jihad for years leading up to the 9/11 attacks;[9] (3) evidence of the involvement of the MWL, IIRO, and WAMY in financing and directing terrorist activities;[10] (4) the importance of the support provided by MWL and IIRO to Al Qaeda's development and the 9/11 attacks;[11] (5) Al Qaeda's strategic use of the MWL, IIRO, and other charities to build strategic, global alliances with ideologically aligned terrorist groups (Abu Sayyaf Group, Moro Islamic

---

[9] *See*, e.g., Ex. 35, Kohlmann Report at ¶¶ 20-26 (describing the history of Al Qaeda's terrorist financing infrastructure during the Soviet-Afghan conflict; the use of Saudi charities under the guise of humanitarian relief work for money and the provision of weapons, guesthouses, and travel papers to the mujahideen and jihadist recruits; the use of the Saudi charities to launder money originating from bank accounts belonging to Osama bin Laden and wealthy supporters in the Gulf; and the critical role the MWL, IIRO, WAMY, and other charities would play in al Qaeda's global financial infrastructure following the end of the Soviet-Afghan war); Ex. 37, Levitt Report at 6-13 (discussing the formation and growth of Al Qaeda and financing received from individuals and charities in Saudi Arabia).

[10] *See*, e.g., Ex. 35, Kohlmann Report at ¶¶ 19-26, 26-70 (MWL), 71-157 (IIRO), 158-206 (WAMY); Ex. 36, Expert Report of Jonathan M. Winer ("Winer Report"), March 10, 2020 at 21-38, 82-100 (IIRO), 100-112 (WAMY), 112-118 (MWL); Ex. 37, Levitt Report at 29-32 (MWL), 32-39 (IIRO).

[11] Ex. 35, Kohlmann Report at ¶ 17 ("The money and other support that was channeled to Al-Qaida through Saudi-based dawah organizations fueled Al-Qaida's development - meaning, the Saudi-based dawah organizations were essential elements in Al-Qaida's engine. Without this fuel, Al-Qaida would not have been a global threat, nor capable of executing sophisticated, elaborate terrorist attacks on a global scale—including the September 11 terrorist attacks on the United States."); ¶ 204 ("It is my professional opinion that the tens of millions of dollars in support provided by these dawah organizations was the fuel for Al-Qaida's engine in the period leading up to the September 11th attacks, and that al-Qaida could not have successfully planned and carried out the attacks without that funding."); Ex. 36, Winer Report at 38-49 (explaining that the Saudi charities were central to Al Qaeda's development of its global strike capacities); Ex. 37, Levitt Report at 1-12, 45 (stating that the charities' financial and logistical support provided to Al Qaeda was critical to the terror organization's development and operational prowess).

Liberation Front, Jemaah Islamiyah, and others), to expand the Al Qaeda footprint and its ability to conduct attacks against the United States and its interests abroad;[12] (6) the involvement of Al Qaeda member Mohammed Jamal Khalifa and the IIRO-Philippines in providing support to Khalid Sheikh Mohammed and Ramzi Yousef in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States ("Operation Bojinka"), the precursor to the 9/11 plot and attacks;[13](7) the IIRO's funding of at least of six Al Qaeda training camps in Afghanistan, including camps from which Al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training;[14] (8) the discovery and implications of severe financial improprieties and irregularities in a number of IIRO offices linked to terrorism—IIRO-Eastern Province, IIRO-Pakistan, IIRO-Philippines, IIRO-Indonesia, IIRO-Sarajevo—indicating conditions that facilitated the misappropriation of millions of dollars from those offices in

---

[12] *See, e.g.,* Ex. 36, Winer Report at 77-81 (describing how Al Qaeda used its relationships with the Saudi charities to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe); Ex. 37, Levitt Report at 10 ("Al Qaeda developed a strategy of expansion through building alliances with likeminded militant groups around the world. This strategy enabled the group to spot new recruits, raise funds, export its ideology, gain military and terrorist experience fighting in other conflict zones, and develop the interpersonal relationships that would prove critical to the development of a truly transnational terrorist organization.").

[13] *See, e.g.,* Ex. 35, Kohlmann Report at ¶ 109; Ex. 36, Winer Report at 27 (describing the "Bojinka Plot" as the "precursor to the 9/11 attacks"), 98 (concluding that "the Bojinka plot would not have been possible without the building of the relationships between al Qaeda and its operatives in the Philippines supported by IIRO"); Ex. 37, Levitt Report at 11-12; Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24.

[14] *See, e.g.,* Ex. 35, Kohlmann Report at 83; Ex. 36, Winer Report at 49-54; Ex. 37, Levitt Report at 36.

support of al Qaeda, Islamic Jihad, and terrorism;[15] and (9) the OFAC designations of IIRO-Philippines, IIRO-Indonesia, IIRO-Eastern Province official Abd al Hamid Sulaiman al Mujil, MWL and IIRO official Wa'el Jelaidan, Rabita Trust (part of the MWL), and Al Haramain Al Masjed Al Aqsa (also part of the MWL), and the purpose and process for developing sanctions packages under E.O. 13224.[16]

## IV. WAMY FACTS

### A. WAMY is a Single, Centrally Directed Organization Whose Senior Leadership Knew that it Funded and Otherwise Supported Al Qaeda.

WAMY was established by Saudi Royal Decree in 1972 and has operated under the Saudi Ministry of Islamic Affairs since 1993. (PWS ¶¶ 1, 5, 10, 29.) It litigates as a single entity, and four Rule 30(b)(6) designees all testified for the organization as a whole. (PWS ¶ 4, 7.) Its leadership was drawn from the most senior ranks of the Saudi government, and the entirety of the organization received substantial and recurrent government funding—facts that reflect WAMY's institutional scale and the sophistication of its leadership. The Saudi government appoints WAMY's President, and the Minister of Islamic Affairs served as WAMY's President for more than twenty years. WAMY's Secretary General Maneh al-Johani simultaneously sat on the government's Shura Council. (PWS ¶¶ 17-22; WCS ¶ 2) From 1995 through 2002, WAMY

[15] *See, e.g.,* Ex. 36, Winer Report at 67-77.

[16] *See, e.g.,* Ex. 36, Winer Report at 122-125 (explaining the purpose of the E.O. 13224 designation program); id. at 125-128 (discussing the development of evidence in support of designation sanctions packages to counter terrorist threats, including the use of finished analytical intelligence (CIA reports), U.S. diplomatic cables, information collected by U.S. law enforcement agencies (FBI), and open-source information (media reporting); id. at 128-131 (implications of the U.S. government refraining from designation under E.O. 13224 and what that means); Ex. 244, Expert Report of Jimmy Gurulé (discussing the significance of economic sanctions under E.O. 13224 in combatting the threat of international terrorism); Ex. 37, Levitt Report at 30.

received direct funding annually from the Kingdom, in addition to royal and ministerial contributions, and was given "protection abroad through Saudi embassies and consulates." (PWS ¶¶ 20, 23, 24 (W Ex. 11, Unuq Decl. ¶ 2 ("The Government of Saudi Arabia funds a large portion of WAMY's budget.")).)

WAMY exercised that same centralized control over its own branches. For example, reviewing WAMY's own documents, the Canada Revenue Agency found "no apparent separation between the activities of WAMY (Saudi Arabia) and WAMY [Canada]," that the Saudi headquarters "maintains substantial control" over the branch's finances, and that it "provides substantially all" of the branch's operational funds. (PWS ¶¶ 12, 15, 35; WCS ¶ 2, 315, 317, 319-21, 358, 370, 531.)

Despite that centralized structure, WAMY failed to prepare its corporate witnesses to account for the organization's funding, control, and relationships. Although WAMY designated four Rule 30(b)(6) corporate witnesses on the very topics the Court held material to Plaintiffs' claims—WAMY's funding by and relationship with the Kingdom, its control of its branches, and its ties to the designated organizations and individuals, *see* ECF No. 4588, at 2, it prepared none of them to testify on those subjects. Its central designee, Secretary General Saleh al Wohaibi, admitted that WAMY conducted no inquiry to determine the extent, the amounts, or the names of the sources of funding it received from the Saudi government or the Saudi Royal Family between 1992 and 2002. W Ex. 9, Wohaibi Tr. 95. Its Kashmir-and-affiliates designee, Abdul Noorwali, testified that he "did not do anything" to determine whether WAMY had dealings with the designated organizations he was produced to address, and had never heard of others. W Ex. 20, Noorwali Tr. 126, 134, 135–136. Its document-preservation designee, Abdulhameed al Mazroo, conceded that WAMY's preservation directive was never reduced to writing, that no

steps were taken between 2002 and 2010 to secure the branch-office records at issue, and that he had "no explanation" for the records missing from WAMY's U.S. office. W Ex. 253, Al Mazroo Tr. 77–79, 121–122. Its designee Ibrahim Abdullah disclaimed knowledge of dealings with al Qaeda recruiter and imam propagator Anwar al-Awlaki, the Global Relief Foundation, and WAMY-Canada's funding. W Ex. 77, Abdullah Tr. 82–91, 108–109, 160–165. Having refused to prepare to answer critical material questions on the noticed subjects, WAMY cannot convert its own ignorance into "undisputed" facts on summary judgment. PWS ¶¶ 71; 122; WCS ¶ 119.

**B. WAMY's "Welfare Arm" LBI, and its Successor BIF, Joined Al Qaeda.**

Soon after its founding in 1987, Lajnat al-Birr al-Islamiyyah (LBI) operated as a subsidiary "under the umbrella" of WAMY and served as WAMY's designated "welfare arm." WAMY Secretary General al-Johani, Rule 30(b)(6) designee Noorwali, and LBI official Adel Batterjee conceived and coordinated the collaboration between WAMY and LBI, with WAMY providing financial and logistical support for LBI's operations. (PWS ¶¶ 40-42, 52, 55, 56, 58; WCS ¶¶ WCS ¶¶ 11, 95, 155, 162, 166, 508, 510.) The U.S. Treasury found that LBI "provided financial and operational support to mujahideen elements in Afghanistan ...including fighters associated with UBL," that "LBI later joined al Qaida," and that LBI and its successor BIF "remained one organization with interchangeable assets under Batterjee's control." (PWS ¶¶ 59, 60, 63; WCS ¶¶ 99, 166, 510.) BIF's Bosnia office held al Qaeda's founding minutes, the bayat oath, and the "Golden Chain" list of al Qaeda financiers. (PWS ¶ 61, 64.)

WAMY absorbed LBI's cash (~97.7M riyals) and staff and continued funding its projects because WAMY "cannot abandon them ...out of concern for the reputation of the Kingdom and WAMY itself." (PWS ¶¶ 54, 62.) WAMY's claimed 1993 clean break from Batterjee is disputed: he remained an authorized signatory on LBI's accounts until at least June 1994, and LBI was later wound down under government stop-work orders. (WCS ¶¶ 169, 174,185, 187.) Batterjee

co-authored, through LBI, The Arab Volunteers in Afghanistan—a history of al Qaeda's origins jointly published in 1991 by BIF and WAMY and "checked and revised" by LBI. (PWS ¶¶ 69, 70; WCS ¶¶ 95, 97, 99.)

The conduct of the operational proxies, LBI and BIF, ran directly to al Qaeda's armed operations: LBI's and BIF's director, Enaam Arnaout, used LBI's cover to provide material support to bin Laden's fighters and, in approximately 1990, purchased AK-47s and mortar rounds for al Qaeda while ostensibly working for LBI; and the "Golden Chain" financing architecture ran through LBI official Batterjee, who—on LBI/WAMY letterhead—solicited investment in the Al Shamal Islamic Bank, in which bin Laden was a shareholder. (PWS ¶¶ 63–65.) The links persisted into North America and continued to draw official action: WAMY's Peshawar office shared the post-office box (P.O. Box 1055) that OFAC lists as a known BIF address; WAMY's Canadian chapter and BIF-Canada shared a common director and a bank account styled "World Assembly of Muslim Youth o/a BIF," and WAMY reported a $50,256 transfer to BIF-USA's Orphan Program; and on November 21, 2002, the United Nations 1267 Committee added the BIF entities to its Consolidated List as entities associated with al Qaeda. (PWS ¶¶ 36, 73, 102.)

### C. WAMY Sent Funds, Personnel, and Other Support ao Al Qaeda Affiliated Jihadist Fighters in Conflict Zones, Using Al Qaeda-Linked Conduits.

**Bosnia (TWRA).** WAMY wired funds to the Third World Relief Agency (TWRA)—an office the 9/11 Commission found Osama bin Laden used to "covertly provide financial and other support for terrorist activities." (PWS ¶¶ 80, 81; WCS ¶¶ 435, 431.) WAMY's own Austria/Eastern-Europe director, Fatih el Hassanein, simultaneously ran TWRA from a shared Vienna office; the German/ICTY audit traced more than $7 million of TWRA funds to al Qaeda financier Wael Julaidan and over $4.5 million to Hassanein, and documented arms purchases

disguised as humanitarian "wheat." (PWS ¶¶ 80, 81; WCS ¶¶ 427, 431, 435, 437-38, 440-443, 435.)

**Bosnia (Taibah).** WAMY channeled funds through Taibah International, whose Sarajevo office the CIA reported "received approximately $140,000 from WAMY-Jeddah ... in May 2001," adding that "WAMY is suspected of supporting terrorists." (PWS ¶¶ 83, 84; WCS ¶¶ 444, 447, 449.) Treasury designated Taibah's Bosnia branch a Specially Designated Global Terrorist in May 2004 "for funneling money to al Qaeda," and Taibah's Falls Church branch was co-founded by Osama bin Laden's nephew. (WCS ¶¶ 444, 448.)

**Kosovo (SJRC).** WAMY sat on the Saudi Joint Relief Committee, whose Kosovo office the U.N. reported was "a cover for al Qaeda operatives" and whose executive director, Julaidan, was a designated al Qaeda financier; the CIA found WAMY's Balkans offices were "spotting and assessing suitable terrorist recruits." (PWS ¶¶ 85, 86; WCS ¶¶ 391, 396-97, 399, 402-406, 409.)

**Chechnya.** Al-Johani publicly solicited funds so the Chechen mujahideen could "buy weapons and gear"; the welfare-arm successor BIF (under relief cover) supplied 2,900 anti-mine boots to fighters and installed an al Qaeda Shura-council member as a BIF officer in Chechnya; and the CIA reported al-Haramain couriered funds to Chechnya on WAMY's behalf, in some cases including weapons. (PWS ¶¶ 87, 88, 91, 92; WCS ¶ 410-411, 413, 420.)

**Kashmir.** Al-Johani invited the "Prince of Lashkar-e-Taiba," a leader of a U.S.-designated Pakistan-based Islamist terrorist organization, to a WAMY camp. It was conduct even WAMY's Rule 30(b)(6) designee conceded was "inappropriate." Al-Johani also wrote the head of Saudi intelligence about the "Prince" of Hizb-ul-Mujahideen, a U.S.-designated Kashmir-focused Islamist terrorist organization. India shuttered WAMY's offices in November 2001 for

financing Lashkar-e-Taiba and Jaish-e-Mohammed, the latter being a U.S.-designated Pakistan-based Islamist terrorist organization. (PWS ¶¶ 94–98, 122; WCS ¶¶ 451, 455, 457, 463-464.)

**Sudan.** LBI/BIF's support for al-Qaeda in Sudan was direct and sustained, with U.S. authorities reporting that, after al-Qaeda relocated there in 1991, LBI/BIF opened an office "specifically to support al Qaeda and the mujahideen," providing logistical assistance to the Sudanese Popular Defense Force (WCS ¶¶ 3, 503, 511). U.S. government sources further explained that al-Qaeda collaborated with Sudan's government, trained PDF units, and procured weapons—including "thousands of Kalashnikov weapons"—while expanding into a global terrorist organization engaged in violence in Bosnia-Herzegovina, Chechnya, and elsewhere (WCS ¶ 3). BIF's own Sudan report confirms that its mission was to support jihad through military and logistical assistance and that it formed a "close union" with the Popular Defense Force (WCS ¶ 3).

### D. WAMY Funded Recruitment and Paramilitary Training and Propagated Violent Jihad.

The CIA assessed that WAMY's "global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups" and that WAMY "sponsored and funded" paramilitary training camps teaching "weapons handling, firing, and explosives." (PWS ¶¶ 103, 104; WCS ¶ 44, 58, 409, 451, 503, 515-517, 564.) WAMY publications taught that Islam "is a religion of Jihad" and urged readers to "make jihad for the sake of Allah." (PWS ¶ 105.) An al Qaeda training manual was recovered in a WAMY/LBI envelope held by a convicted 1993 World Trade Center bomber who had trained at the Khaldan camp and met Ramzi Yousef and Khalid Sheikh Mohammed. (PWS ¶¶ 107, 109; WCS ¶¶ 101–104, 511.) WAMY's publications also spread violent incitement: its Handy Encyclopedia of Contemporary Religions and Sects taught that "[t]he Jews are humanity's enemies" and idolized a bus-hijacker,

and a copy was found in the possession of Ahmad Ajaj, a convicted conspirator in the 1993 World Trade Center bombing. Meanwhile, a WAMY youth-camp publication contained exhortation: "are you miserly with your blood?!" (PWS ¶¶ 107-108.)

### E. WAMY Was on Notice of its Role and Did Not Stop.

Osama bin Laden identified WAMY among the charities that were "primary sources" of al Qaeda financing (per al Qaeda lieutenant Jamal al-Fadl). (PWS ¶¶ 112, 113.) The FBI placed WAMY among charities "known to have supported AQ ...financially and operationally," the U.S. Department of Defense (JTF-GTMO) classified WAMY a "Tier 1 NGO"—defined as an NGO that has "demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests"—listed WAMY among al Qaeda's "associated forces," and assessed two WAMY employees (Adel Hassan Hamad and Mammar Ameur) as al Qaeda facilitators tied to their WAMY work; the CIA likewise reported that WAMY personnel "pursue an extremist agenda" and that WAMY officials "have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." (PWS ¶¶ 30, 75, 118, 119; WCS ¶ 494, 498, 500, 504, 512, 519, 524, 531, 540, 551, 561.) WAMY learned of scrutiny over "BIF links to UBL," yet kept operating and fundraising, and did not adopt centralized financial controls until January 1, 2000 —roughly eighteen months after the August 1998 embassy bombings. (PWS ¶¶ 67, 121, 123.) WAMY's oversight was deliberately deficient: it produced no written reporting policies and never physically audited LBI under Batterjee[17]—the kind of gaps through which, as al

[17] Although WAMY points to audits as proof of oversight, the documents it produced do not withstand scrutiny. The audits WAMY produced all post-date Batterjee's alleged departure; WAMY retained—and apparently conducted—no audit of the LBI activities it funded under Batterjee before 1994. The produced audits and financial summaries, moreover, report only what WAMY's own regional offices represented. As the governing auditing standard confirms, such management representations "do not provide sufficient appropriate audit evidence on their own." (Deposition of Jonathan M. Winer in In re: Terrorist Attacks on

*footnote continued*

Qaeda's own financier explained, diverted funds were "listed in the charities' books as expenses for building mosques or schools." (WCS ¶¶ 130, 167, 238, 240.) WAMY's own officials had tied its mission to armed jihad years earlier—in 1991, Secretary General al-Johani told the World Kashmir Freedom Movement that "Jihad is the only way out"—and the CIA described WAMY's own Chairman, Abdallah al-Muhaidib, as "a supporter of Usama Bin Ladin." (PWS ¶¶ 44, 112.) The official scrutiny did not abate: a December 30, 2009 U.S. State Department cable reported intelligence that WAMY and the other Saudi charities "continue to send money overseas and, at times, fund extremism overseas," and a 2005 report of the Netherlands' intelligence service (AIVD) found that WAMY "maintain[s] close ties with parts of the Saudi establishment." (PWS ¶¶ 120, 121.) This conduct continued after al Qaeda declared war on the United States (1996, 1998) and was designated an FTO (1999), including the May 2001 Taibah transfer. (PWS ¶¶ 84, 111, 112.)

### F. WAMY's Support Reached the 9/11 Enterprise and the Hijackers.

WAMY's recruitment, training, and intermediary financing increased al Qaeda's operating capacity and global strike capability; the CIA found Afghan-trained militants formed a "ready pool of manpower for terrorist operations" and that "two of the 9/11 hijackers followed this pattern." (PWS ¶ 126.) WAMY's U.S. branch—run by Osama bin Laden's nephew Abdullah bin Laden, with an FBI-flagged vice president—brokered (and likely funded) the

September 11, 2001 at 305) The audits say as much on their face: WAMY's auditors repeatedly disclaimed verification of key items—reporting, for example, that tens of millions of rupees in donations "remained unverified," that expenditures inside Afghanistan were "not susceptible to independent audit verification," and that, absent independent confirmation, they had simply "accepted assurance from the Regional Director that all WAMY transactions have been reflected in the records." *See* PWS ¶¶ 37–39; WCS ¶¶ 140–142; W Ex. 193, Winer Tr. 304–306, 313–317; W Ex. 180, Winer Rebuttal Rpt. §§ 2.17.1–.2, 2.38.8, 2.39; Decl. of Mohammedi (ECF No. 11997), Exs. 78–82 (WAMYSA018579–580).

posting of "Al-Qaeda recruiter" Anwar al-Awlaki, ECF No. 11182 at 34, as imam at the Dar al-Hijrah mosque in Falls Church, VA, when he relocated from San Diego shortly after his meetings with hijackers Hazmi and Mihdhar and Saudi agents Bayoumi and Thumairy in Southern California. His cross-country move coincided with the relocation of Hazmi and Mihdhar and other arriving al Qaeda 9/11 hijackers in the Northeast U.S. in the months before the 9/11 attack. Awlaki's employment contract was found in WAMY's own records; WAMY hosted Awlaki at its camps and distributed his sermons. (PWS ¶¶ 43, 45, 48-50; WCS ¶¶ 289, 301, 305, 310, 448, 531.) Awlaki was the spiritual advisor and facilitator to hijackers al-Hazmi and al-Mihdhar (and to Hanjour, who traveled to Dar al-Hijrah); two days before the attacks al-Hazmi and al-Mihdhar left possessions at a WAMY-associated mosque run by a WAMY employee; and December 2001 FBI surveillance of an Awlaki contact traced him to WAMY's U.S. office and the home of its Director. (PWS ¶¶ 127–129; WCS ¶¶ 302-305, 310, 314, 527.) The nexus is more specific still: before 9/11, Awlaki was in contact with al Qaeda procurement agent Ziyad Khaleel—identified at the East Africa embassy-bombings trial as the purchaser of a satellite phone bin Laden used to coordinate those bombings—and with Omar al-Bayoumi, the Saudi government employee the FBI identified as a key facilitator and provider of material support to al-Hazmi and al-Mihdhar. The Maryland mosque where those hijackers left possessions two days before the attacks was the Ayah Islamic Center, operated by WAMY employee Said Rageah. (PWS ¶¶ 129, 130.) In addition to Anwar Awlaki, WAMY officials in the United States had contacts with other individuals closely associated with several of the 9/11 hijackers and other Islamic extremists. (WCS ¶ ¶ 3, 289, 302-305, 310, 314, 513, 527, 531.)

### G. Opinion Testimony of Plaintiffs' Experts Concerning WAMY and al Qaeda

Based on the evidence summarized above and additional evidence of record, Plaintiffs' experts—Jonathan Winer, Evan Kohlmann, and Dr. Matthew Levitt—have offered opinion

testimony, on subjects the Court has deemed admissible, concerning WAMY's relationship with al Qaeda, the nature and extent of WAMY's support for al Qaeda, and other matters central to Plaintiffs' claims. The experts' opinions include the following. After reviewing and summarizing the evidence, Winer opines that WAMY, together with IIRO and MWL, provided significant material support to al Qaeda "without which it would not have achieved its global capabilities," and that WAMY specifically "provided funds to al Qaeda and to associated Islamic terrorist organizations," channeled donations, supplied logistical support and weapons, recruited and moved fighters into conflict zones, and disseminated hate speech and calls to jihad advancing al Qaeda's ideology. (PWS ¶ 125; W Ex. 74, Winer Rpt. ¶¶ 3.11, 3.11.3, 12.14.) Kohlmann addresses al Qaeda's origins and structure and WAMY's own organizational structure and centralized control, and describes WAMY as "another example of the shadowy Saudi dawah/charitable entities that have helped support Al-Qaida." (PWS ¶¶ 115, 125; W Ex. 112, Kohlmann Rpt. 47, ¶ 158; 6, ¶ 17.) Levitt describes WAMY's contribution as "general support …[that] enables an organization to go and do what it does," and ties WAMY to the Saudi state, which per the 9/11 Commission "regulated [WAMY] by the Ministry of Islamic Affairs." (PWS ¶ 114; W Ex. 106, Levitt Tr. at 446:11-22; W Ex. 59, Levitt Rpt. 29)

Winer and Kohlmann both trace WAMY's structural merger with Lajnat al-Birr al-Islamiyah (LBI), the precursor to Benevolence International Foundation (BIF): LBI "merged into WAMY and became a formal part of WAMY" in 1996 (PWS ¶¶ 53, 54, 113; W Ex. 74, Winer Rpt. ¶ 3.11.3; *see id*. ¶ 12.12.1), and LBI and BIF "were headed by the same person, Adel Batterjee" (PWS ¶¶ 58, 60; W Ex. 74, Winer Rpt. ¶ 12.12.1), whom Treasury later designated "one of the world's foremost terrorist financiers" for founding LBI/BIF, which "later joined al Qaida." (PWS ¶¶ 59, 60; W Ex. 74, Winer Rpt. ¶ 12.12.10.) Kohlmann states that OFAC lists

WAMY offices in Saudi Arabia, Pakistan, and Sudan as BIF addresses and that Batterjee "founded BIF as an 'affiliate' branch of WAMY," testifying that "BIF … was an arm of WAMY." (PWS ¶ 73; W Ex. 112, Kohlmann Rpt. 56-57, ¶¶ 187-189; W Ex. 163, Kohlmann Tr. at 532:8-10.) Levitt reports the Canada Revenue Agency's finding that WAMY provided thousands of dollars to U.N.-sanctioned BIF, an entity on the U.N.'s al Qaeda list, and that WAMY Saudi Arabia "maintains substantial control over WAMY's finances [in Canada]" and used that control to carry out its own objectives. (PWS ¶¶ 12, 35, 36, 102, 114; W Ex. 59, Levitt Rpt. 29.) Both Winer and Kohlmann also tie WAMY to the Third World Relief Agency (TWRA), which the 9/11 Commission found bin Laden "used …to covertly provide financial and other support for terrorist activities," documenting a March 25, 1992 transfer of roughly $34,254 from WAMY's Jeddah account to TWRA and the dual role of Fatih Hassanein as director of "WAMY Austria and Eastern Europe" while running TWRA's arms procurement for Bosnian fighters. (PWS ¶¶ 80, 81; W Ex. 112, Kohlmann Rpt. 52, ¶ 174; W Ex. 74, Winer Rpt. 74, ¶10.5.10; 108-109, ¶12.12.13, ¶12.12.14.)

Winer and Kohlmann also describe WAMY's non-financial assistance: sponsorship of paramilitary-themed youth camps (including a July 1996 Okeechobee, Florida camp where a WAMY operations manager lectured on jihad in Bosnia and Chechnya), publications calling campers to "unsheath the swords" on "this Day of Jihad," hate literature branding Jews "humanity's enemies," senior official's (Secretary General al-Johani) public solicitation of money "to buy weapons" for Chechen and Kashmiri fighters, and WAMY-USA's incorporation by bin Laden's nephew Abdullah Bin Laden and its association with 9/11 hijackers' spiritual mentor Anwar al-Awlaki. (PWS ¶¶ 48, 87, 106, 107, 109, 110; W Ex. 112, Kohlmann Rpt. 48, ¶160-61; 50, ¶ 166; 52, ¶ 173; 56, ¶ 186; W Ex. 74, Winer Rpt. 102, ¶ 12.11, 12.11.1.2.)

Kohlmann notes the U.S. government's assessment that "WAMY is a Tier 1 Counterterrorism NGO target …demonstrat[ing] sustained and active support for terrorist organizations," "associated with Usama Bin Ladin and al Qaeda operations." (PWS ¶ 118; W Ex. 112, Kohlmann Rpt. 47, ¶ 159.) As to WAMY's financial controls: Winer states that the Canada Revenue Agency audit found "massive deficiencies"—no general ledger, missing cancelled cheques, no board minutes —and opines that "[f]or charities linked to terrorism, bad books and records become the means of hiding terrorist support" (PWS ¶¶ 34, 36; W Ex. 74, Winer Rpt. 68, ¶ 10.3, 10.3.1, 10.3.1.1 to 10.3.1.7; 71, ¶ 10.4).

Viewed cumulatively and in the light most favorable to Plaintiffs, this record would permit a reasonable jury to find each element of liability.

## V. A REASONABLE JURY COULD RETURN A VERDICT AGAINST MWL AND IIRO; SUMMARY JUDGMENT MUST BE DENIED

Plaintiffs have presented a truly powerful case against both MWL and IIRO demonstrating liability under JASTA both for aiding and abetting and for conspiracy.

Taking the evidence as a whole, the picture is clear. From the time of Al Qaeda's founding through the terror attacks of September 11, 2001 (and beyond) MWL/IIRO and Al Qaeda – under the leadership of many of the same men who served in different high-level positions within Al Qaeda and MWL/IIRO at different times – worked together for the common goal of using terrorism to attack and kill those whom they perceived to be enemies of Islam, including all Americans.

**- Plaintiffs' Factual Case Summarized-**

As detailed in the Statement of Facts in Part III above, and as more thoroughly detailed in Plaintiffs' Rule 56.1 Statements and Counterstatements, Plaintiffs have presented an extensive body of evidence from which a reasonable jury could conclude that Defendants raised money for and covertly funded Al Qaeda with millions of dollars per year, embedded senior Al Qaeda figures in their organizations to facilitate their seamless funding and delivery of resources to Al Qaeda, enabled the movement of Al Qaeda terrorists by providing fake employment and cover documentation, moved men and resources on behalf of Al Qaeda, and opened offices in operational theaters to support Al Qaeda operations. This program of support was systematic, pervasive, and continuous from the time of Al Qaeda's founding in or about 1988 through the time of the September 11 attacks. The evidence of extensive financial support includes both the testimony of Plaintiffs' expert Mr. Winer and a wealth of U.S. government reports to the same effect. (Those government reports are summarized and highlighted among other places at ICS ¶ 6.)

While no exact figure is available because this funding was covert, it has been estimated that it was in multiples of thirty million dollars per year. That money was used to fund Al Qaeda's terrorist activities. And, in the case of MWL/IIRO, it included funding for Khalid Sheikh Mohammed's Bojinka Plot, the precursor to the 9/11 operation that provided the foundation for the 9/11 attacks, as well as the funding for the terror camps in Afghanistan where many of the 9/11 hijackers were trained. Defendants also provided important logistical support to Al Qaeda.

Defendants knew full well that Al Qaeda was a global terrorist organization. Indeed, there can be no dispute that by 1996 and 1998 – when Osama Bin Laden publicly declared that it was part of Al Qaeda's mission to kill Americans all over the world – Defendants knew that their continued monetary support for Al Qaeda was support for terrorist violence against Americans.

And, in point of fact, the record confirms that a reasonable jury could readily conclude that Defendants knew much earlier than 1996 the nature of Al Qaeda and of Al Qaeda's murderous intentions. Bin Laden made clear to his allies and audiences in the Arabic world that he intended to attack the United States and "cut off the head of the snake" from the outset, and the Defendants were themselves close allies of Bin Laden from Al Qaeda's inception.

Defendants' programs of financial and logistical support for Al Qaeda demonstrate the close alliance with Al Qaeda. So too does the fact that many leading Al Qaeda figures also held leadership positions with the Defendants.

So, for example, Wa'el Julaidan was at different times one of Al Qaeda's founders, Bin Laden's logistics chief, a joint owner of a bank account with Bin Laden, Director of MWL's Pakistan Office, Secretary General of IIRO's Urgent Aid Committee, and a Trustee of the Rabita Trust. Julaidan also successfully solicited contributions for Bin Laden from several leading donors (*see* III (B)(5) above). Ex. 45 at FED-PEC at 134954; Ex. 183 at 2040-41; ICS ¶¶ 124, 522.

Or, for another example, Mohammed Jamal Khalifa – Bin Laden's brother-in-law and a founding member of Al Qaeda – was at different times a senior member of Al Qaeda, a Director of MWL's office in Pakistan and in the Philippines, and Director of IIRO's office in the Philippines (where the 1994-95 Bojinka Plot originated). Ex. 13, CIA_000216; Ex. 50, FED-PEC 202111; Ex. 145, BUR-PEC 25755; Ex. 13, CIA_000216; Ex. 154, PEC-KSA000972; ICS ¶¶ 1, 43, 45, 47, 62, 420, 421, 427.

And, for a third example, Abdullah Naseef was part of a seminal planning meeting (that also included Bin Laden, among others) at which (as described in a planning document transcribed on joint MWL/IIRO letterhead) it was proposed that MWL open offices so that

"attacks will be launched from them," and Naseef later served as MWL's Secretary General. ICS ¶¶ 1 and 47; *see also* Ex. 51 at FED-PEC 0202847.

In other words – to borrow a phrase from Bin Laden himself – Al Qaeda, Bin Laden, Julaidan, Khalifa, Naseef, and these Defendant charities (among others) were "all in one boat." ICS ¶¶ 324, 522.

It is this body of credible factual evidence that satisfies all the required elements for both a JASTA aiding and abetting claim and a JASTA conspiracy claim.

### A. Aiding and Abetting

In order to make out a sufficient case for JASTA aiding and abetting liability the Plaintiffs must present evidence that could satisfy a reasonable jury as to three elements: 1) the party whom the defendant aids (here Al Qaeda) must perform a wrongful act that causes an injury; 2) general awareness; and 3) knowing substantial assistance. *Halberstam*, 705 F.2d at 477. (*See* Section I(c) above.)

**- Wrongful Act -**

The first element is not in dispute. There can be no question that Al Qaeda committed a wrongful act of international terrorism on September 11 that injured the Plaintiffs by killing their loved ones and causing billions of dollars in property damage.

**- General Awareness -**

As set forth in I(C) above, Plaintiffs must present evidence from which a reasonable jury could conclude each Defendant was generally aware of its role in illegal activity from which terrorist violence was a foreseeable consequence; but Plaintiffs need not show Defendants were aware of the specific terrorist attack that caused Plaintiffs' injury. *Ashley*, 144 F.4th at 438; *Honickman*, 6 F.4th at 496.

Here, Defendants knew full well that Al Qaeda was a terrorist organization whose chief purpose was to commit violent acts of terrorism. And once Osama Bin Laden publicly declared in 1996, and again in 1998, that it was Al Qaeda's mission to kill Americans all over the world, Defendants knew (if they somehow did not already know) that terrorist violence against Americans in the United States was a readily foreseeable consequence of Defendants' extensive financial and logistical support for Al Qaeda. *See Finan v. Lafarge S.A., supra*, 2025 WL 2504317, at *18-19.

Thus, there can be no serious dispute that Plaintiffs' evidence satisfies the "general awareness" requirement for a JASTA aiding and abetting claim.

**- Knowing Substantial Assistance -**

The third element's twin requirements of knowing and substantial assistance are part of a single inquiry designed to capture conscious and culpable conduct. *Twitter*, 598 U.S. at 504; *Ashley*, 144 F.4th at 438. Once again, these elements work in tandem with one another, such that a lesser showing of one can be offset by a greater showing of the other. *Id.; see Spetner v. Palestine Inv. Bank*, 19-cv-5 (EK)(JAM), 2026 WL 2350124 at *12 (E.D.N.Y. Aug. 13, 2026) ("Knowledge and substantial assistance function on a sliding scale 'a lesser showing of one' demands a greater showing of the other") (citing *Twitter*, 598 U.S. at 491–92.)

The evidence supporting Plaintiffs' claims against MWL and IIRO provides an especially compelling predicate for imposing aiding and abetting liability under that sliding scale framework. Indeed, Plaintiffs' claims against these Defendants stand apart from virtually any other JASTA aiding and abetting case the courts have had occasion to consider in several respects.

**- MWL's and IIRO's Knowledge of Al Qaeda's Acts and Objectives -**

The record here offers overwhelming evidence that both the MWL and IIRO were fully committed to Al Qaeda's jihadist agenda and established comprehensive programs of support to advance Al Qaeda's violent mission. This ideological alignment is evident from the agreement forged between MWL Secretary General Naseef and Osama Bin Laden at the time of Al Qaeda's founding to use the MWL as cover for Al Qaeda's activities. It is further established by the fact that both MWL and IIRO repeatedly installed key Al Qaeda financial managers (including Julaidan and Khalifa) in positions of authority within their own organizations and related entities - a pattern that evidences the Defendants' dedication to ensuring a hand-in-glove relationship with Bin Laden's organization. Defendants' ideological alignment with Al Qaeda is reinforced by the roles assigned to key al Qaeda supporters like Turki bin Jalawi al Saud and Al Qaeda's "million dollar man" Abd al Hamid Al Mujil, who were empowered by the IIRO to oversee IIRO operations in Pakistan, Afghanistan, and Southeast Asia, three areas of critical importance to Al Qaeda. It is additionally bolstered by the sheer scope, duration, and geographic reach of Defendants' support for Al Qaeda, and evidence showing Defendants' direct involvement in Al Qaeda plots and attacks.

This and other evidence indicating that MWL and IIRO acted with an especially culpable state of mind itself provides a compelling foundation for imposition of aiding and abetting liability. *See Ashley*, 144 F.4th at 438 (explaining that ultimate focus of the twin elements of "knowing and substantial" assistance is to determine whether the defendant engaged in "conscious and culpable" wrongdoing, and that a stronger showing of one element can sustain liability on a weaker showing of the other).

The fact that the support provided by the MWL and IIRO was systemic, pervasive, and encompassed assistance directly enabling the September 11th attacks only makes the conclusion all the more clear.

As discussed above, the evidence shows that MWL and IIRO were critical early funders and supporters of Al Qaeda from the moment of its creation, providing the very money and assistance bin Laden needed to get his terrorist start-up off the ground. The scale of their financial support was massive, as reflected by Al Mujil's moniker as the "million dollar man," the CIA's conclusion that IIRO funded six training camps in Afghanistan, and the expert testimony that estimated that Defendants provided multiples of thirty million dollars a year, every year, to Al Qaeda. That means that a reasonable jury could readily infer that Defendants contributed many millions of dollars to Al Qaeda over the years leading up to the September 11 attacks, in addition to the false cover and operational assistance documented above. That is *very* "substantial" assistance by any measure. And, of particular note, the Defendants funded the precursor plot that laid the foundation for the September 11 attacks and the very Afghan training camps at which a number of the 9/11 hijackers trained for their deadly mission, and where Al Qaeda leadership conceived, planned, and directed the operation.

International terrorism is an expensive business. Field level terrorists must be recruited, trained, armed, fed, housed, headquartered, on occasion provided with false identities, and moved all around the globe. Their activities must be supervised and coordinated by a higher level of terrorist leadership. They need safe haven from which to operate, secured here through Al Qaeda's massive financial subsidies of the Taliban. All that costs a great deal of money. These Defendants provided that money to Al Qaeda, knowing full well that Al Qaeda was a terrorist organization dedicated to killing innocents – including innocent Americans. Because

the evidence shows that these Defendants were among Al Qaeda's chief sources of funds, Plaintiffs have more than satisfied the "substantial" assistance requirement of a JASTA aiding and abetting claims.

Similarly, there can be little question that, based on the evidence presented, a reasonable jury could conclude that Defendants' assistance to Al Qaeda was "knowing." Clearly, as a matter of logic and reasonable inference, it is extremely unlikely (indeed, probably impossible) that Defendants repeatedly installed Al Qaeda members in positions of authority in their organizations and others, provided false employment and cover documents to Al Qaeda fighters regularly over two decades, and diverted multiples of thirty million dollars per year to Al Qaeda every year without "knowing" that they were doing so. And that is especially true because Defendants themselves affirmatively argue on this summary judgment motion that they generally exercised good control over their expenditures. (*See* V(a)(3) below.) Nor could the Defendants be mistaken as to the purpose for which Al Qaeda was going to use the money provided by Defendants. Al Qaeda was purely a terrorist organization, and its goals were especially well known to Defendants because many of Defendants' leaders helped to found Al Qaeda and were close to Bin Laden.

Indeed, because Defendants continuously provided Al Qaeda with the money that was Al Qaeda's lifeblood, and also provided Al Qaeda with extensive logistical support – or, as one Al Qaeda planning document memorably put it, because MWL and IIRO served as the launching points for Al Qaeda – Plaintiffs respectfully submit that this is the rare case where Defendants' support was so "pervasive, systemic and culpable that [the Court] can say [D]efendant[s] aided every act" performed by Al Qaeda. *Twitter*, 595 U.S. at 496; *Ashley*, 144 F.4th at 445.

At a minimum, given the clear and concrete nexus between a) Defendants' extensive financial support for Al Qaeda (and in particular Defendants' financial support for the very training camps at which the 9/11 hijackers trained) on the one hand and b) the September 11 attacks on the other, a reasonable jury could and should find that Plaintiffs have more than satisfied the requirement for a JASTA aiding and abetting claim of showing both knowing and substantial assistance.

**- The *Halberstam* Factors-**

*Halberstam* lists six factors that are relevant and should be considered when deciding whether an aider and abettor's assistance is "substantial." They are: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) defendant's presence or absence at the time of the tort; (4) defendant's relation to the principal; (5) defendant's state of mind; and (6) the period of defendant's assistance. *Halberstam* 705 F.2d at 483-84; *Linde*, 882 F.3d at 329.

**Factor 1 – Nature of the act encouraged**. The nature of the action encouraged here could not be more culpable. Defendants understood full well that Al Qaeda was devoted to killing innocent civilians in terrorist attacks all over the world, from the failed Bojinka Plot (developed at IIRO's Philippines office) to the embassy bombings in Africa, to various jihadist efforts all over the globe. ICS ¶¶ 2, 43, 45, 47, 62, 200, 202, 205, 420, 421, 427; MCS ¶ 265; Pls.' 56.1 ¶¶ 142-143; Ex. 13 at CIA 000216; Ex. 15 at CIA 000349; Ex. 37, Levitt Report at 38; Ex. 59; Ex. 151 at PEC-KSA 225-26; Ex. 152 at PEC-KSA 229, Ex. 154.

**Factor 2 – Amount of assistance**. As already noted, the amount of assistance provided by Defendants to Al Qaeda was, to put it very mildly, extensive. It included hundreds of millions of dollars and pervasive logistical support. Ex. 36, Winer Report I ¶¶ 31-35; ICS ¶¶ 6, 90, 484; Ex. 13 at CIA 000210-211 (financial support); ICS ¶¶ 1, 2, 109, 114, 116, 119, 408, 499; Ex. 32

at 3532; Ex. 154 al PEC-KSA 972; Ex. 162 at PEC-KSA 2137-39 (logistical support, including cover employment, false identity documents, weapons purchases, and training camps).

**Factor 3 – Presence at the scene of the tort (the lone exception)**. This factor is largely inapplicable in a case involving a sophisticated cross-border terrorist operation. Its relevance is further diminished by the fact that this is not an indirect-assistance case. *Kaplan*, 999 F.3d at 856-57. Even so, MWL and IIRO's reach extended into the 9/11 hijackers' orbit through their funding of the training camps where they trained for their mission. ICS ¶¶ 1, 2, 43, 474, 478; Ex. 1 at 226, 234; Ex. 35 at 26; Ex. 150 at PEC-KSA 122; Ex. 154 at PEC-KSA 972; Ex. 158 at PEC-KSA 1465; Ex. 159 at PEC-KSA 1468; Ex. 179 at 32; IM at 8; see supra Section III.D.3

**Factor 4 – Relation to the principal**. As to the relationship between the Defendants/aiders and abettors MWL and IIRO and the principal wrongdoer Al Qaeda, that relationship was about as close as close can be.

As noted above, Naseef, Al-Julaidan and Khalifa all played leading roles both within Al-Qaeda and with the Defendants. ICS ¶¶ 1, 43, 47, 114, 129, 145, 160, 179, 324, 561; Ex. 10; Ex. 51 at FED-PEC 202846-47; Ex. 61 at FED-PEC 212276-78; Ex. 124 at IIRO 287012; Ex. 136 at 2-3; Ex. 182; Ex. 183 at FED-PEC 2046-47; *see supra* Sections III.B.2-4, III.C. III.D.4. Similarly, Abdul Hamid Al-Mujil was both Executive Director of IIRO's Eastern Branch in Saudi Arabia and identified by the U.S. Treasury Department as the "million dollar man" who provided donor funds directly to Al-Qaeda. ICS ¶ 90; Ex. 50 at FED-PEC 202110. When OFAC designated Al-Mujil, it found that he personally knew Bin Laden, travelled continually with members of Al Qaeda, and had established a relationship with Al Qaeda planner Khalid Sheikh Mohammed, the architect of the 9/11 attacks. ICS ¶ 90; Ex. 50 at FED-PEC 20211012-Ex. 182 at TREASURY00106-09. Along the same lines Prince Turki bin Fahd bin Jalawi Al Saud led

IIRO's Eastern Province Office and was identified by the FBI and CIA as an important Al Qaeda donor, and two of Al Qaeda's largest "Golden Chain" donors (Afandi and Faqih) also sat on IIRO's Board of Directors. ICS ¶¶ 36, 91, 124, 324; Ex. 31 at 3419; Ex. 45 at FED-PEC 134954.

In short, Al Qaeda's leadership and Defendants' leadership were so intertwined as to be almost interchangeable.

**Factor 5 – State of mind**. Defendants' state of mind is an especially important factor. State of mind must usually be inferred from indirect evidence. But this is the rare case where there is direct evidence of Defendants' culpable state of mind because of the 1988 Al Qaeda planning document where the Defendants' plan to aid and abet Al Qaeda by allowing Al Qaeda to use Defendants' offices to launch attacks was set down in black and white on a document written on MWL/IIRO letterhead. ICS ¶¶ 1, 13, 47, 179, 498; Ex. 61 at FED-PEC 212276-78; Ex. 145; *see supra* Parts III(A)(2) and III(B)(4).

**Factor 6 – Duration of assistance**. The period of assistance was also extensive. It covered about a dozen years, from the time of Al Qaeda's formation in 1988 until the September 11, 2001 attacks. Defendants' conduct over the years leading up to the September 11 attacks - that is continuing to fund and otherwise support Al Qaeda following Al Qaeda's express declarations of jihad against America and following Al Qaeda's 1998 attacks on the U.S. embassies in Africa and the 2000 attack on the U.S.S. Cole - further evidences Defendants' continuous embrace of Al Qaeda's campaign of violent jihad. ICS ¶¶ 1, 43, 202, 205, 324, 442-444, 456; Ex. 43 at FED-PEC 97364; Ex. 105 at IIRO 96076; Ex. 158 at PEC-KSA 1465; Ex. 159 at PEC-KSA 1468; *see supra* Sections III.D.1-4.

So too does Defendants' support for Al Qaeda operations and the related operations of Al Qaeda allied terrorist groups all over the world throughout the 1990s in places like Bosnia, Chechnya, Sudan, Somalia, Yemen and Malaysia (among others) (*See* III (8) above). ICS ¶¶ 48, 200, 210, 294, 332, 333, 506, 527, 549; MCS ¶¶ 31, 41, 317, 320; Ex. 10 at CIA 000150; Ex, 19 at CIA 000741; Ex. 20 at CIA 000818; Ex. 59 at FED-PEC 211429; Ex. 170 at PEC-KSA 2437; Ex. 172 ¶¶ 34, 37; Ex. 182 at TREASURY00106; *see supra* Section III.D.8). Notably, Plaintiffs do not contend that Defendants' support for these jihadist activities in other countries by itself gives rise to liability for the September 11 attacks. But this evidence is relevant and important because it is part of a larger pattern of behavior which demonstrates that Defendants and Al Qaeda shared a common goal of promoting violent jihad, and is illustrative of Defendants' culpable state of mind in the period leading up to the September 11 attacks.

In short, a review of the individual *Halberstam* factors simply reinforces the larger picture - - Defendants were consciously and culpably supportive of Al Qaeda's campaign of terror. On this evidence, a reasonable jury could, and almost surely would, find that all the elements of an aiding and abetting claim are more than satisfied.

**- Defendants' Weak Rebuttal -**

In response to this clearly sufficient aiding and abetting case, Defendants (in somewhat scattershot[18] fashion) throw up a series of defenses to Plaintiffs' case – many of which are based

---

[18] Defendants' arguments regarding Plaintiffs' state law claims are especially scattered, fragmentary, and confused. For example, IIRO argues in a single conclusory sentence in a footnote that all claims made by Plaintiffs who are not U.S. nationals should be dismissed for that reason (IM 32, at n.32). And IIRO also argues in a footnote (IM 33 at n. 34) that this Court has already dismissed the *Federal Insurance* Plaintiffs' state law intentional tort claims as time-barred.

The Court should decline to consider arguments developed in such a cursory way. *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("because the arguments

*footnote continued*

appear only in footnotes, they are not properly raised and the Court is under no obligation to consider them."); *Levy v. Young Adult Inst. Inc.*, 103 F. Supp. 3d 426, 441 (S.D.N.Y. 2015) ("the Court will not evaluate arguments that are so drastically underdeveloped, particularly when they are raised only in a footnote").

Moreover, Defendants are simply wrong on the merits of these undeveloped arguments. As to the statute of limitations issue, IIRO's brief mischaracterizes earlier decisions when it wrongly claims that the district court "dismissed as time barred" the *Federal Insurance* Plaintiffs' intentional tort claims. (IM at n.34, citing *In re Terrorist Attacks on Sept. 11, 2001,* 349 F. Supp. 2d 765 (S.D.N.Y. 2005) and *In re Terrorist Attacks on Sept. 11, 2001,* 740 F. Supp. 2d 494, 514 n.6 (S.D.N.Y. 2010).

As the 2010 Opinion that IIRO cites for that proposition makes very clear, the Court merely held that certain *intentional infliction of emotional distress and assault and battery claims* for assigned personal injury and wrongful death claims were time-barred; but the court did not address the *Federal Insurance* Plaintiffs' principal trespass claims or any other intentional tort claims, at all. *See In re Terrorist Attacks on Sept. 11, 2001,* 740 F.Supp. 2d 494, 514 n.6 (S.D.N.Y. 2010).

Moreover, contrary to IIRO's misstatement, the *Federal Insurance* Plaintiffs filed their initial complaint against IIRO on September 10, 2003, well within the three-year statute of limitations applicable to trespass claims (and two-year statute of limitations for wrongful death claims). Subsequent decisions in this action have confirmed that the complaint asserted timely trespass claims. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 2022 U.S. Dist. LEXIS 172943, *171-172 (S.D.N.Y. Sept. 23, 2022).

As to IIRO's cursory argument concerning non-U.S. national Plaintiffs, those Plaintiffs also assert proper state law claims – including aiding and abetting and conspiracy/concerted action liability theories that have essentially the same elements as the federal JASTA secondary liability claims. *See* footnote 4, *supra*. Those state law claims do not depend on a Plaintiffs' status as U.S. nationals.

For another cursory and confused argument, MWL (MM at 38) and IIRO (IM at 47) also argue that they cannot be held liable for negligence because they do not owe any duty to third parties murdered in the attacks. They are wrong.

Under New York law, a defendant who supports terrorists intent on harming third parties can be liable for negligence to those third parties. *Elmaliach v. Bank of China Ltd*., 971 N.Y.S.2d 504, 517 (1st Dep't 2013) (distinguishing *Terrorist Attacks* I, 349 F.Supp.2d 765, 830 (S.D.N.Y. 2005) in situation where defendant bank "knew or had reason to know that it was providing material support to terrorists, or that the bank was involved in, had knowledge of, or participated in any wrongful conduct."); *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 414 (S.D.N.Y. 2023) (plaintiffs who allege that defendant banks "helped 'set in motion' Jeffrey Epstein's sex-trafficking venture – by providing the cash that fueled it – [] plausibly assert that JP Morgan and Deutsche Bank owed a duty to them.").

Here, the Defendants MWL and IIRO owed a duty to protect third parties because they knowingly supported a terrorist organization (Al Qaeda) bent on attacking those third parties

*footnote continued*

solely on Defendants' *ipse dixit*, some of which are patently meritless, and the rest of which merely present disputed issues of fact requiring resolution at trial.

More specifically, beyond simply asserting (without proof) many, many times in various slightly different formulations that Defendants never helped Al Qaeda and did not share Al Qaeda's goals, Defendants raise four chief "defenses."[19] They can be characterized using shorthand terms as follows:

---

and when they "provid[ed] the cash" that "set in motion" Al Qaeda's terrorist ambitions to attack the United States.

[19] Defendants MWL (MM at 62-64) and IIRO (IM at 63-65) also (seemingly half-heartedly) argue as a lesser defense that Plaintiffs are seeking to hold them liable for certain of their employees' conduct that was outside the scope of those employees' employment. Defendants are wrong.

Whether an employee's actions are within the scope of employment is a fact-intensive issue typically left for a jury. *Garanti Financial Kiralama A.S. v. Aqua Marine & Trading Inc.,* 697 F.3d 59, 71 (2d Cir. 2012); *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 3d 447, 460 (E.D.N.Y. 2007). *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (N.Y. 1979) ("the determination of whether a particular act was within the scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury…. Among the factors to be weighed are: the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated").

Here, there is ample evidence that would entitle a reasonable jury to conclude that Mujil, Butairi, Jasim, Daguit (IIRO mentions Daguit but then presents no argument as to why his acts are outside the scope of employment), Khalifa, and Julaidan's support for Al Qaeda occurred within the scope of their employment with MWL and IIRO. *See, e.g.*, ICS ¶¶ 99-91; Ex. 50 at FED-PEC 202110-12 (Treasury findings that Al-Mujil, IIRO's Eastern Province Executive Director, provided donor funds directly to Al Qaeda, exercised decision-making authority over IIRO's Philippine, Indonesian, and Thai offices, and supported terrorist organizations through those offices); ICS ¶¶ 43, 129, 145, 160; Exs. 10, 50, 71, 182 (evidence that Mohammed Jamal Khalifa used his official position as IIRO's Regional Director for Southeast Asia and IIRO's Philippine office to fund, recruit for, and provide logistical support to Al Qaeda-affiliated organizations); ICS ¶¶ 114, 119, 127; Exs. 160, 161, 163 (evidence that Al Qaeda members holding positions in IIRO's Peshawar office supplied false IIRO identification documents, facilitated travel, and purchased weapons); ICS ¶¶ 1, 179, 324, 497, 522; Exs. 61, 124, 136, 183 (evidence that Wa'el Julaidan held positions within MWL and IIRO while acting as an Al Qaeda founder, fundraiser, and logistics official).

(1) Retroactivity;

(2) No financial records demonstrating money flowing from Defendants to Al Qaeda;

(3) The efficacy of Defendant's audits/controls; and

(4) Agency/Alter Ego.[20]

**(1) Retroactivity**

Defendants attempt to argue in substance that – in view of the proof presented by Plaintiffs showing that Defendants provided substantial support for Al Qaeda and its terrorist program *before* Al Qaeda was first formally designated as a Foreign Terrorist Organization (or "FTO") in 1999 – Plaintiffs' ATA and JASTA claims must fail, because the ATA and JASTA are purportedly criminal statutes that do not apply retroactively. In that connection, Defendants further argue that, because 18 U.S.C. § 2333 "uses the present tense," Defendants cannot be liable for providing support to Al Qaeda prior to its designation as an FTO in 1999. (MM at 34-37; IM at 43-45.)

[20] In addition, MWL and IIRO claim that Plaintiffs seek to hold them liable for acts of their employees after they had left those organizations. (MM 62-64, IM 63-65.) MWL and IIRO are mistaken.

To begin with, regardless of who worked for the Defendants at any particular time, Defendants' support for Al Qaeda was constant over the years - rendering the Defendants liable with*out* regard to the comings and goings of individual employees.

Moreover, Plaintiffs seek to hold MWL/IIRO liable for the acts of their employees while they *were* employed by these entities. *See supra* §§ III.B.2–4, III.C, III.D.4; ICS ¶¶ 1, 43, 114, 179, 324, 497, 522; Exs. 13, 50, 51, 61, 124, 136, 154, 180, 183 (detailing acts of Khalifa and Jelaidan to support al Qaeda while employed by MWL and/or IIRO).

And even where Defendants dispute whether a particular individual continued to hold a formal title at the time of a particular act, the record contains evidence of continuing coordinated relationships from which a jury could infer agency, or participation in a common scheme, or both. *See, e.g*., ICS ¶¶ 324, 522, 573; Exs. 68, 114, 115, 124, 136, 180. In all events, a conspirator need not remain a formal employee of another conspirator for acts undertaken in furtherance of the common scheme to be relevant and attributable under agency and conspiracy principles. *See supra* Part I(G).

This argument betrays significant confusion on the Defendants' part as to how to read § 2333.

As noted, § 2333(a) in substance provides a private right of action to any U.S. national injured in his person or property "by reason of an act of international terrorism."

Section 2333(d)(2) (enacted as part of JASTA) in relevant part in turn provides a private right of action for *secondary* liability where, *inter alia*, the "act of international terrorism was committed … by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act … as of the date on which such act of international terrorism was committed …."

It *should* be a relatively simple matter to match up this statutory language with Plaintiffs' case here, and to see that the statute is easily satisfied. Here, the "act of international terrorism" referred to in both § 2333(a) and § 2333(d)(2) upon which Plaintiffs' claims in this case are based is (obviously enough) the terrorist attack of September 11, 2001. Al Qaeda was first formally designated as an FTO in 1999 – that is, two years prior to the September 11 attack. Thus, § 2333(a) and § 2333(d)(2) are clearly and easily satisfied, because the act of international terrorism in this case (the 9/11 attack) was committed by an FTO (Al Qaeda) that was already designated as an FTO at the time the attack was committed. That is all that § 2333(d)(2) requires, and the concept of retroactivity has nothing to do with the question.

It is difficult to understand why Defendants think otherwise. Apparently, however, it is Defendants' view that pursuant to § 2333(d)(2), in order for secondary liability to attach to an

aider and abettor, the acts of aiding and abetting relied upon by plaintiff must take place *after* the primary wrongdoer (here, Al Qaeda) has been designated as an FTO.[21]

But § 2333(d)(2) obviously says no such thing. And Defendants do not and cannot point to any authority for that strange reading of the statute. Sections 2333(a) and 2333(d)(2) require only that the "act of international terrorism" itself – and not conduct undertaken by an aider and abettor in support of that act of international terrorism – take place at a time when the principal actor was designated as an FTO. That requirement is met here, and Defendants' argument cannot be squared with the statute or with simple logic.

Moreover, some of Defendants' subsidiary contentions on this point are also clearly mistaken. First, the ATA and JASTA are civil remedial statutes, not criminal statutes, and they therefore can and do operate retroactively. *Linde*, 882 F.3d at 320; *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 163 (2d Cir. 2021); *Lelchook v. Societe Generale de Banque au Liban S.A.L.*, 147 F.4th 226, 224 n.17 (2d Cir. 2025) *cert. denied*, 1465 S.Ct. 2602 (2026); *Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567, 580 (S.D.N.Y. 2025).

---

[21] Upon a close reading of Defendants' briefs it appears that Defendants' confusion on this point may be the result of Defendants' mistaken assumption that this is an ATA *direct* liability case. Thus, for example, WAMY prefaces its discussion of this issue by mistakenly asserting that "Plaintiffs seek to impose *primary* liability on WAMY under the Anti-Terrorism Act ("ATA") 18 U.S.C. § 2333(a)." (WM at 65) (emphasis added.)

From that mistaken premise, WAMY goes on to expound at length about what constitutes an "act of international terrorism" and to argue at length that WAMY itself did not violate 18 U.S.C. § 2339. (WM 65-70). (IIRO and MWL advance similar arguments. WM at 43-45, MM at 34-70)

But all these arguments made by the Defendants miss the main point. Plaintiffs are *not* asserting a *direct* liability claim under the ATA. Plaintiffs are asserting a *secondary* liability claim under JASTA. Plaintiffs therefore do not and need not allege that these Defendants themselves committed an act of international terrorism. Rather, Plaintiffs allege that *Al Qaeda* committed an act of international terrorism on September 11 – which is beyond dispute – and that Defendants aided and abetted and conspired with Al Qaeda in that regard.

Equally mistaken is Defendants' assertion that Al Qaeda's 1999 FTO designation somehow forecloses proof by Plaintiffs concerning Defendants' pre-designation conduct. (MM at 36, n.95, and IM at 45, n.92.) Pre-designation evidence *is*, of course, admissible. It goes to proving that Defendants provided knowing and substantial assistance to Al Qaeda as required by JASTA, because that pre-designation evidence provides important and probative background information about Defendants' involvement in the formation, operation, and support infrastructure of Al Qaeda. *See* ECF 9060 at 12 (holding admissible testimony of Plaintiffs' expert Mr. Winer concerning the 1993 World Trade Center bombing and the 1994-95 failed Bojinka Plot – both of which *predate* by five years or more Al Qaeda's 1999 FTO designation: "*This background* may help the jury understand the relationship between various individuals and groups in the lead up to 9/11. And ultimately *it will inform the jury's decision as to whether the Defendants' alleged relationships with terrorists constituted material support. It is relevant and admissible*") (emphasis added); and *see In re Terrorist Attacks (Sudan)*, 2023 WL 5132138 at *5 and *7 (Sudan's support for Al Qaeda in the years 1990 to 1996 – long before Al Qaeda was designated as an FTO – was a substantial factor in Al Qaeda's ability to launch the 9/11 attacks and thus helped establish Plaintiffs' claims against Sudan).

Nothing in the ATA or JASTA requires this Court to disregard such pre-designation conduct. To the contrary, the relationship between an aider and abettor and the primary tortfeasor over time, and the period of the aider and abettor's assistance, are (respectively) the fourth and sixth traditional *Halberstam* factors that go to establishing aiding and abetting liability. *Ashley*, 144 F.4th at 435–46; *Linde*, 882 F.3d at 329; *Halberstam*, 705 F.2d at 483–4.

Similarly, the pre-designation history of the association between Defendants and Al Qaeda and its extended length is admissible proof of Plaintiffs' JASTA conspiracy claims. *See*

*Halberstam*, 705 F.2d at 487: "The long-running nature of the scheme is also crucial to the inference of the agreement."

Accordingly, the history of Defendants' long-standing relationship with Al Qaeda – both before and after Al Qaeda's 1999 FTO designation – is relevant and important evidence in this case.

In sum, Defendants' "retroactivity" argument is wrong in almost every particular. JASTA is a civil statute, not a criminal one. JASTA does apply retroactively. Evidence about Defendants' pre-FTO designation conduct is admissible and highly probative evidence in this case. And, most importantly, § 2333 requires only that Al Qaeda was designated as an FTO at the time the September 11 attacks were committed – which cannot be disputed. Section 2333(d)(2) does *not* require that Al Qaeda have been designated as a terrorist organization at all times during which Defendants provided support to Al Qaeda. There is no such requirement, and Defendants' "retroactivity" argument clearly fails.

**(2) Absence of Internal Financial Records Showing Monies Flowing from Defendants to Al Qaeda**

Defendants proudly trumpet the fact that none of their own internal financial records show money going from Defendants to Al Qaeda. (MM at 7-10; IM at 13-15 and 21-24; WM at 17-25. *See e.g.*, IM at 13: "Not a cent was ever traced from IIRO to Al Qaeda.") That is true, but not dispositive, nor even very important.

Defendants operated as ostensible charities. They are supposed to be engaged solely in legitimate charitable work. For that reason, Defendants' aid for terrorism was *covert,* and not reflected in the Defendants' financial books and records. To expect otherwise would be like expecting the books and accounting records of the fictional Corleone crime family's purported olive oil business to record expenditures for machine guns and getaway cars.

In Section 9 of his initial Report, Plaintiffs' expert Jonathan Winer explains why and how Saudi charities' support for Al Qaeda and for terrorism was deliberately omitted from the charities' books and records. With respect to the Defendants in this case in particular, Winer states: "The conduct of other charities that provided support for terrorism such as IIRO, WAMY and MWL … show a similar pattern. Support for Al Qaeda, other terrorist groups, or even for more routine armament of Islamic fighters in zones of conflict, was not something any of them stated in any publicly disclosed financial records. These activities were covert, not overt. Any public evidence of such support was denied, as such disclosure posed an immediate threat to the support, to the individuals at the charity who were carrying it out, and to the continued existence of the charity itself." Winer Report I, ¶ 9.7.2.

Thus Defendants' financial and other support for Al Qaeda is *by design* not reflected in the Defendants' financial records.

But a reasonable jury could nevertheless conclude that this financial aid was in fact provided by MWL/IIRO and WAMY to Al Qaeda – because that was the assessment of the United States intelligence community (and in particular the view expressed by the 9/11 Commission Staff Monograph On Terrorist Financing, Ex. 1), and is also the opinion of Plaintiffs' expert, based on extensive evidence. In other words, the absence of entries in Defendants' internal records showing money going to Al Qaeda at most raises a disputed issue of fact as to whether Defendants in fact provided Al Qaeda with funding. But that is no basis for summary judgment.

**(3) Defendants' Audits/Controls**

On a related note, Defendants also tout evidence showing that they exercised tight corporate controls over their expenditures. (MM at 7-10; IM at 13-15; WM at 17-25.) This evidence, however, tends to prove the opposite of what Defendants hope to show.

It does appear for the most part that Defendants MWL/IIRO did indeed exercise fairly tight control over where they spent money. As a matter of simple logic, that tight control means that Defendants' steady annual multi-million dollar contributions over the years to Al Qaeda were not an accident, were not unknown to Defendants' leadership, and were not the acts of rogue employees.

Rather, because the Defendants did audits occasionally and normally controlled their expenditures, it can readily be inferred by a reasonable jury that the huge stream of money that steadily flowed from Defendants to Al Qaeda every year for many years took place because that is precisely what Defendants' leadership – which was intertwined at the top with Al Qaeda's – wanted and intended.

In other words, the evidence that Defendants now proudly point to indicating that Defendants sometimes audited their finances and ordinarily exercised good control over their expenditures serves chiefly to *support* Plaintiffs' case that Defendants' substantial financial assistance to Al Qaeda was both knowing and intentional.

Moreover, Defendants' control over their expenditures – while *ordinarily* robust – was not as uniformly effective as Defendants now attempt to portray it. Rather, a handful of internal audits and related documents reflect occasional serious lapses in such controls.[22] And (as

---

[22] Thus, Defendants' own records show that the controls which they now proudly point to did not always work.

An independent chartered accountants' audit of IIRO's Pakistan branch, the office through which IIRO administered its Afghanistan program, found that the head office "had neither established any system or mechanism for financial discipline nor required proper reporting from Pakistan office," and that "no internal or external audit was ever carried out for [the] Pakistan branch and H.O. management never asked local management to provide them [with an] audit report on some fixed interval/periodic basis." ICS ¶ 335.

MWL acknowledged the problem at the time. The CIA reported in 1999 that MWL "does not control the IIRO's budget, however, acknowledging that the lack of auditing procedures has

*footnote continued*

explained in Mr. Winer's expert report) the evidence generated by these occasional audits reflects the very same conditions that made it generally possible for Defendants to covertly divert funds to support terrorism. (Winer Report I, Sec. 10 and ¶ 10.9.7.)

**(4) Agency/Alter Ego**

Defendant MWL argues that it cannot be held liable as the alter ego for either Defendant IIRO or for the Rabita Trust. (MM at 55-63.) This argument has at least four fatal flaws.

First, MWL flatly declares that "Saudi law governs the question of whether IIRO was an alter ego of MWL and requires a finding that it was not." (MM at 55.)

But then MWL says nothing further about what Saudi law provides in this regard; instead MWL properly cites to controlling authorities that correctly hold that in this case alter ego liability (or "veil piercing," as the same doctrine is sometimes referred to) is governed by New York state law. (MM at 55-56 and notes 171 and 172.) Thus, MWL's assertion that Saudi law controls this issue is wrong; and it is New York law that governs this question.

Second, Plaintiffs' case does *not* depend on alter ego liability. There is a wealth of evidence that Defendant MWL, Defendant IIRO, and Defendant WAMY each separately provided knowing and substantial assistance to Al Qaeda giving rise to independent aiding and abetting liability for each Defendant under JASTA. In MWL's case, this assistance included the agreement to allow Al Qaeda to use MWL and IIRO as cover for Al Qaeda's terrorist operations; the installation *by MWL* of senior Al Qaeda financiers in positions of authority within MWL and its related subsidiaries; the funding and support of Al Qaeda through joint MWL/IIRO offices;

---

made accountability a problem," and that "MWL officials admit … that the lack of strict auditing procedures has made diversions of fund a problem." Ex. 13, CIA 00210-236 at 221; Ex. 20, CIA 000807-848 at 823.

and the creation and operation of proxies like Rabita Trust and Al Haramain al Masjid al Aqsa to provide support to Al Qaeda.

Similarly, as to Plaintiffs' JASTA conspiracy claims, even if MWL could somehow prove that MWL itself performed no wrongful acts and that IIRO alone performed all acts committed in furtherance of the conspiracy – which is, of course, not the case – MWL would still be liable without regard to alter ego liability. That is so because under the law (set out in V(B) below) a defendant/conspirator (such as MWL) is subject to liability for all acts in furtherance of the conspiracy, and all acts committed by other conspirators (here, IIRO and Al Qaeda) are imputed to all the conspirators (including MWL). *Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 239–40 (2d Cir. 1999); *United States v. Rahman*, 189 F.3d 88, 124 (2d Cir. 1999); *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990).

Thus, the question of alter ego liability is largely beside the point on this motion for summary judgment – because Plaintiffs' JASTA case against each Defendant will go forward regardless of whether alter ego liability is established.

Third, the issue of alter ego liability and piercing the corporate veil "is a fact-intensive issue that generally must be submitted to the jury." *Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 326 (S.D.N.Y. 2016) (collecting authorities); *Carte Blanche PTE Ltd. v. Diners Club Int'l Inc.*, 758 F. Supp. 908, 914 (S.D.N.Y. 1991). Thus Defendants' effort to resolve the issue of alter ego liability by way of a motion for summary judgment is misplaced.

Fourth, the facts here *do* support alter ego liability for MWL. As a general matter, alter ego liability may be predicated upon a showing of complete control by the dominating corporation that leads to a wrong against a third party or parties. *Wm. Passalacqua Builders Inc.*

*v. Resnick Devs. S. Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *Weihai Lianqiao Int'l. Grp. Co. Ltd. v. A Base IX Co. LLC*, 799 F. Supp. 3d 195, 244 (S.D.N.Y. 2025).

*Passalacqua* provides a non-exhaustive list of ten factors that may bear on alter ego liability as follows:

> "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporation entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other corporations as if it were its own."

933 F.2d at 139.

Here, MWL established IIRO as its "offshoot." MWL approved IIRO's Constitution. MWL and IIRO sometimes shared offices and letterhead. Leading MWL officials simultaneously served in multiple leading roles at IIRO. For example, MWL's Secretary General typically served as the Chairman of IIRO's Board. MWL officials participated in IIRO's most consequential personnel decisions. Of particular importance for present purposes, IIRO reported to MWL's Secretary General on terrorism investigations. And perhaps most important of all, the original 1988 Al Qaeda planning document that outlined the plan for League offices to serve as launching points for attacks was written on joint MWL/IIRO letterhead. (*See* Sec. III(A)(1) and (2) above).

Thus, at least with respect to a supporting Al Qaeda and terrorism – which is the relevant consideration here – the evidence supports the reasonable inference that IIRO was. MWL's alter

ego because MWL used IIRO to facilitate and further MWL's own support for Al Qaeda and Al Qaeda's terrorist agenda.

And even if IIRO and the Rabita Trust are not MWL's alter egos, the same record at minimum creates a triable issue as to whether they acted as MWL's *agents*. MWL created IIRO, approved its Constitution, installed MWL's Secretary General *ex officio* as chairman of IIRO's Board and General Assembly, placed multiple MWL officials on IIRO's Board, participated in IIRO's consequential personnel decisions, and required reporting concerning IIRO's activities and branch-office irregularities. ICS ¶¶ 27, 31, 35, 91, 324, 500; Exs. 23, 26, 27, 82, 83, 86, 124. The Rabita Trust's governing documents likewise name MWL as founder, grant MWL authority to nominate half of its trustees, install MWL's Secretary General as Vice-Chairman, and require an MWL representative to co-sign every check. MCS ¶¶ 122, 129-30, 134, 137; ICS ¶ 573; Exs. 22, 23, 134, 140. On that evidence, the existence and scope of an agency relationship cannot be resolved as a matter of law. *Time Warner City Cable* v. *Adelphi Univ.,* 813 N.Y.S.2d 114, 116 (2d Dep't 2006); *accord Manning* v. *Budget Rent A Car.* 241 N.Y.S.3d 295, 299 (2d Dep't 2025).

**B. Conspiracy**

Conspiracy and aiding and abetting are distinct legal theories, but they are often supported by the same evidence and closely approach one another; and so it is often the case that the same body of evidence satisfies the requirements of both causes of action. *Halberstam*, 705 F.2d at 476–479. Or, to put it more simply, co-conspirators often also aid and abet one another. *See Halberstam*, 705 F.2d at 478 ("[M]any tort defendants have both conspired with and substantially aided each other.") That is true here.

To prove a civil conspiracy, a plaintiff must show the existence of a corrupt agreement, an overt act in furtherance of that agreement causing injury to plaintiff, and membership by each

defendant in the conspiracy. *Kalshi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986). Civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence. *Freeman*, 57 F.4th at 76–77; *Gelboim*, 823 F.3d at 781; *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 240 (2d Cir. 1999). An agreement may be inferred from the relationship of the parties, their overt acts, their concert of action, and the totality of their conduct. *AFL-CIO*, 637 F.3d 1178, 1192 (11th Cir. 2011); *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) (conspiracy may be inferred from a "concert of action"); *United States v. Ganji,* 880 F.3d 760, 768 (5th Cir. 2018) ("concerted action between the conspirators illustrates that an agreement had to exist because the individuals would not have otherwise acted in that particular manner").

Once the existence of a conspiracy has been established, all acts committed within the scope of the conspiracy by any defendant are imputed to all the defendants. *See Cofacredit*, 187 F.3d at 240. In order to prove a conspiracy, it is not required that plaintiff show that defendant personally participated in the performance of the conspiracy; nor must it be shown that defendants knew of every detail of the conspiracy or the identities of all conspirators. *United States v. Rahman*, 189 F.3d 88, 124, 127–28 (2d Cir. 1999); *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990).

The main difference between aiding and abetting and conspiracy is, of course, that a plaintiff must prove the existence of an agreement in order to prove conspiracy, and plaintiff must also prove that the tortious act was committed in pursuit of the aims of conspiracy. *See Freeman*, 57 F.4th at 80-83.

In this case, the same evidence outlined above that supports the inference that Defendants were aware of their role in supporting Al Qaeda's acts of terrorism and provided knowing

substantial assistance to Al Qaeda also supports the inference that there was indeed a tacit or express agreement between and among MWL/IIRO and Al Qaeda to commit acts of terror against Americans. *See Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (existence of agreement and conspiracy to commit terrorist acts to eradicate Jewish state "can be inferred from the comprehensive financial support and training that Iran provides to Hamas … the very [s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist acts'"), quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1999)); *accord Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 21–22 (D.D.C. 2009).

More specifically, the existence of an agreement between Defendants and Al Qaeda is supported by the long history of substantial coordinated financial and logistical assistance provided by Defendants to Al Qaeda – *concerted* action which strongly suggests an *agreement* rather than mere coincidental independent behavior. *United States v. Ganji*, 880 F.3d at 768; *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007); *Halberstam*, 705 F.2d at 487 ("the long running nature of the scheme is also crucial to the inference of agreement – Hamilton's knowledge and aid over five years makes some kind of accord extremely likely – perhaps only a tacit accord, but that is enough").

The existence of an agreement is further supported by the fact that many of the same people served at different times in leadership positions within Al Qaeda and with the Defendants, thus strengthening the inference of a meeting of the minds between and among the conspirators.

Perhaps most importantly, this case is that rare case where the existence of an agreement is further supported by an *express* written agreement: namely, the 1988 Al Qaeda planning document written on joint MWL/IIRO letterhead outlining a "secret agreement" pursuant to

which MWL offices are "to be opened" and "attacks will be launched from them" (ICS ¶¶ 1, 47, 179).

Finally, the same evidence that supports foreseeability in connection with Plaintiffs' aiding and abetting claim also supports the inference that 9/11 attacks were committed in pursuit of the goals of the conspiracy among MWL/IIRO, WAMY, and Al Qaeda. The gravamen of the conspiracy here was the agreement between Defendants and Al Queda that Al Qaeda would commit terrorist violence, and that Defendants would foot the bill and provide some logistical support as well. The fact that Defendants continued to fund and otherwise assist Al Qaeda after Bin Laden publicly declared that it was Al Qaeda's mission to kill Americans makes it evident that the 9/11 attacks were committed in furtherance of the goals of the conspiracy. *See Bodoff*, 424 F. Supp. 2d at 84, and *Belkin*, 667 F. Supp. 2d at 21–22.

* * *

In sum, based on the totality of the evidence presented by the Plaintiffs here, a reasonable jury could (and should) easily conclude that Plaintiffs have satisfied all the requirements both for a JASTA aiding and abetting claim and for a JASTA conspiracy claim against both MWL and IIRO (as well as WAMY).

There can now be little doubt that these three Defendants – operating covertly – were among Al Qaeda's chief sources of funds from the time of Al Qaeda's founding through the September 11 attacks and beyond. A reasonable jury can easily conclude that Defendants contributed hundreds of millions of dollars to Al Qaeda. Defendants understood full well that Al Qaeda's chief purpose was to commit acts of terrorism, and Defendants also knew full well from 1996 onward (if not before) that it was Al Qaeda's goal to kill Americans in terrorist attacks all over the world. Knowing and sharing in the intent to accomplish that goal, these Defendants continued to both fund and provide logistical support to Al Qaeda; and, in particular, these

Defendants funded the very Afghan terror camps at which the 9/11 hijackers trained for their deadly mission.

Thus, there is a direct and dramatic nexus between Defendants' conduct and the slaughter of September 11 – a slaughter for which these Defendants as Al Qaeda's chief financial supporters must be held accountable. MWL's and IIRO's summary judgment motions should therefore be denied.

## VI. A REASONABLE JURY COULD RETURN A VERDICT AGAINST WAMY; SUMMARY JUDGMENT MUST BE DENIED

### A. A Reasonable Jury Could Find WAMY Liable for Aiding And Abetting Al Qaeda Under § 2333(D)(2).

JASTA adopts Halberstam's three-element framework—an FTO's wrongful act causing injury, the defendant's general awareness of its role in an overall illegal activity, and knowing and substantial assistance—with substantiality measured by six factors, and it reaches assistance given "directly or indirectly" through intermediaries. *See supra*, Part I.B–I.D, I.E. Awareness, state of mind, and the significance of assistance are generally jury questions, and the record is reviewed cumulatively, not piecemeal. *See supra*, Parts I.A, I.C, I.D, II.D.

**Element one—an FTO's wrongful act causing injury—is undisputed.** Al Qaeda, designated an FTO in 1999, committed the 9/11 attacks that killed and injured Plaintiffs, satisfying § 2331(1). (PWS ¶ 120, 121.) *See supra*, Part I.C.

**Element two—General awareness.** "Generally aware" means "something less than full, or fully focused, recognition"; Plaintiffs need not prove WAMY knew of the 9/11 plot, only that it was generally aware of its own role in an overall illegal activity from which terrorist violence was a foreseeable consequence, which is a fact-intensive inquiry. *See supra*, Part I.C, I.F.

The record demonstrates WAMY's material support of al Qaida's terrorist acts. WAMY operated the "welfare arm" (LBI), PWS ¶¶ 40, 52, 55, 56, 63; WCS ¶¶ 11, 95, 95, 99, 162, 166, 155, 215, 510,166, 508, that Treasury found "joined al Qaida," (PWS ¶¶ 59, 60; WCS ¶¶ 99, 166, 510) and that shared "interchangeable assets" with BIF (PWS ¶¶ 69, 70; WCS ¶¶ 11, 95, 99, 166, 510, 175, 204, 206, 373, 374, 382), and it co-published a history of al Qaeda's origins. (PWS ¶¶ 75, 118, 119; WCS ¶¶ 97, 99.)

U.S. intelligence and enforcement agencies repeatedly placed WAMY inside the terror-support network. The CIA found that WAMY was a recruitment conduit and funder of paramilitary camps and that its personnel pursued "an extremist agenda") (PWS ¶¶ 30, 103, 104). The FBI found that charities, including WAMY, were "known to have supported AQ." (PWS ¶ 18.) The Department of Defense assessed WAMY to be a "Tier 1" counterterrorism target among "associated forces" of Al Qaeda with "sustained and active support for terrorist organizations willing to attack US persons or interests." (PWS ¶¶ 75, 118, 119; WCS ¶¶ 3, 282, 504, 512, 519, 524.) Indeed, bin Laden himself named WAMY a "primary source" of al Qaeda funding. (PWS ¶¶ 112, 113; WCS ¶¶ 451, 504, 532.)

WAMY learned of "BIF links to UBL" and of its officials' and employees' jihadist ties, yet did not investigate and delayed centralized controls until 2000. (PWS ¶¶ 121–123; WCS ¶¶ 130, 167, 238.) A jury could read that persistence as awareness or willful blindness. Because awareness turns on competing inferences from the facts presented, summary judgment is not warranted. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021); *see Strauss v. Credit Lyonnais, S.A*., 925 F. Supp. 2d 414 (E.D.N.Y. 2013) (denying summary judgment because genuine issues of material fact existed as to defendant's knowledge/scienter).

WAMY's contrary arguments do not defeat this element; at most they raise competing inferences for trial. WAMY misstates the standard when it demands proof that WAMY actually knew its intermediaries were tied to al Qaeda and that each was "so closely intertwined" with al Qaeda's violence. WM at 50. "General awareness" requires only awareness of a role in some illegal activity from which terrorist violence was foreseeable. *See supra*, Part I.C, I.F. The record, summarized above, meets that threshold. Moreover, a number of the intermediaries through which WAMY acted (Taibah, Batterjee/BIF, and al Qaeda financier Julaidan) were designated global terrorists. *See supra*, Parts II.D, IV, VI; *see, e.g.*, PWS ¶¶ 60 (Batterjee), 84 (Taibah), 86 (Julaidan), 102 (BIF); WCS ¶ 401 (Julaidan), 445 (Taibah); WAMY 56.1 ¶ 204 (BIF); WCS ¶¶ 185, 401, 445 (Taibah).

WAMY's effort to recast Anwar al-Awlaki as "moderate" until 2006–2007, WM at 56, is squarely disputed. The FBI opened an investigation of Awlaki in 1999, and Plaintiffs' evidence of Awlaki's relationship with Bayoumi, Thumary, Hazmi and Mihdhar, including participating in training events like the paintball combat sessions in San Diego and his timed move to the Virginia mosque attended by the 9/11 hijackers supports the claim that Awlaki was working for al Qaeda before the 9/11 attacks. (WCS ¶¶ 309–311.)

WAMY's placement of Osama bin Laden's nephew Abdullah bin Laden atop its U.S. branch is not only a matter of the shared surname (WM at 41): the CIA described WAMY's chairman as "a supporter of Usama Bin Ladin" and reported that the bin Laden family "probably contributed to WAMY." (PWS ¶¶ 43–44; WCS ¶ 289, 49-500, 505, 505-506, 579, 598.)

The Second Circuit's bank cases that WAMY relies on (*Honickman*, *Weiss*, *Siegel*) for its "general awareness argument," WM at 57-58, are inapposite, because—unlike a bank that

merely served a customer later found to be connected to terrorism—WAMY created, chaired, funded, and absorbed the very intermediary that "joined al Qaida." *See supra*, Parts I.E, VI.

WAMY cannot have it both ways: it cannot cast itself as a government-supervised charity whose legitimacy outsiders trusted while simultaneously disclaiming awareness that its own senior, government-drawn leadership knowingly funded al Qaeda. Any inference that WAMY's support was concealed runs against those who dealt with WAMY at arm's length. WAMY's own officers knew what the organization was doing.

WAMY's reliance on the absence of a 9/11 Commission finding is equally misplaced. A Commission that made no finding on WAMY made no finding of innocence either. The role of the 9/11 Commission was not to identify and name every Al Qaeda front and supporter, and it would have been impossible for the Commission to have done so given the time and budget constraints under which it operated. Further still, doing so would have compromised ongoing intelligence collection and law enforcement activities and exposed sensitive sources and methods. Most plainly, nothing in the 9/11 Commission Report "adequately and specifically refutes" Plaintiffs' allegations. *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018). The Commission's mandate was to provide a historical account and lessons learned, not to adjudicate any funder's culpability, and the Commission's single exculpatory-sounding "no evidence" phrase, Report at 171, was not exculpatory at all, *see* PWS ¶¶ 114, 115; WCS ¶¶ 493, 485, 494, 521, was confined to the Saudi government as an institution back in 2004, and never ran to WAMY or any other charity.

The Report actually found that charities as a class funded al Qaeda, PWS ¶¶ 61, 114, 115; WCS ¶ 3, 493, 503, 515; Ex. 3 and W Ex. 241, National Commission on Terrorist Attacks Upon the United States: Monograph on Terrorist Financing at 20, 22, 24, 118, 119 (Staff Monograph

passages regarding charity funding); *see also* Ex. 1 and W Ex. 4, 9/11 Commission Report at 171 (acknowledging "the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda").

The fact that WAMY was not designated by OFAC also does not exonerate WAMY. Treasury does not designate every component of a terrorist organization, because doing so would be impossible, and it does not maintain "white lists" of approved entities. Thus, omission from a designation list does not establish that an undesignated entity is unaffiliated with terrorism or that it is approved to receive funds. *United States v. El-Mezain*, 664 F.3d 467, 512-13 (5th Cir. 2011). Consistent with that principle, the Treasury evidence discussed in the Cozen O'Connor FOIA litigation showed only that Treasury had not concluded that WAMY financed terrorism; it did not establish that Treasury had investigated WAMY and cleared it. *Cozen O'Connor v. U.S. Dep't of Treasury*, 570 F. Supp. 2d 749, 789 (E.D. Pa. 2008). Under Kaplan, moreover, a designation "is not necessary to establish knowledge." Thus, the absence of a designation, like the Commission's silence, proves little if anything. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021).

**Element three—Knowing and substantial assistance—the six Halberstam factors.** The knowing and substantial assistance requirements operate "in tandem," on a sliding scale, and require neither operational knowledge nor one-to-one traceability; assistance to an intermediary suffices, and the "act" requirement is not stringent. *See supra*, Part I.C–I.D. Where a concrete nexus is lacking, it is enough that the defendant aided a "broad category of misconduct" through conduct "pervasive, systemic and culpable"—a description that aptly captures WAMY's relationship with al Qaeda. *See supra*, Part I.C. As framed herein, five of the six factors support substantial assistance; only physical presence (Factor 3) is not present here but it is not required.

Disputed facts bearing on the factors, and their weight, are for the factfinder. *Linde v. Arab Bank*, PLC, 882 F.3d 314 (2d Cir. 2018).

**Factor 1—Nature of the act encouraged.** As noted above, *supra*, at Part VI, Al Qaeda's violent mission to attack innocent Americans was well known, including to WAMY. WAMY directed its assistance at al Qaeda's terrorist violence, not neutral commerce. WAMY propagated violent jihad through publications ("a religion of Jihad") and camp programming. (PWS ¶¶ 51, 105-108, 110; WCS ¶¶ 58, 97, 99, 101-104, 451, 511-512, 578, 582.) Indeed, it published a history of al Qaida's formation. (PWS ¶¶ 69, 70; WCS ¶¶ 96-98.) WAMY also funded paramilitary camps teaching "weapons handling, firing, and explosives." (PWS ¶¶ 103, 104; WCS ¶¶ 58, 451.) An al Qaeda training manual surfaced in a WAMY/LBI envelope held by a 1993 WTC bomber. (PWS ¶ 109; WCS ¶¶ 97, 102–103, 451.) In Chechnya and Kashmir, WAMY leadership solicited funds for mujahideen to "buy weapons and gear" and courted designated militant leaders. (PWS ¶¶ 87, 88, 95, 96, 98; WCS ¶¶ 411, 451.) Here again, the nature of the act encouraged—terrorist violence against innocent civilians—is especially opprobrious and weighs heavily in favor of the imposition of liability.

**Factor 2—Amount of assistance.** The money transfers are substantial, and in any event the quantity is immaterial so long as WAMY "did something to aid." *See supra*, Part I.C. The CIA reported that "WAMY has long been alleged to be a financier of Islamic extremists," providing "funding for the Palestinian Islamic Resistance Movement (HAMAS); Egypt's Islamic Jihad and Gama'at al-Islamiyya; and an Islamic movement in Kurdistan." (PWS ¶ 116; *see* WCS § G and ¶ 3 citing W Ex. 113, CIA Report, Taibah: Linking Extremists in the Balkans and the United States [REDACTED], December 12, 2002. CIA-SUB_0031-33 at CIA-SUB_0032.)

Despite WAMY's efforts to conceal its terror-financing activities through deficient bookkeeping, the record includes several specific examples pertaining to WAMY: approximately $140,000 in aid went to Taibah-Sarajevo in May 2001 (plus later Albania transfers); WAMY's wire to the bin Laden conduit TWRA (within a donor network the audit tied to Julaidan and to arms purchases); the absorption of approximately 97.7 million riyals of LBI assets and SAR 8.2 million in continued LBI-project funding; LBI's more than $8 million Afghanistan budget in 1989; and intifada contributions that increased to $2.7 million per month. (PWS ¶¶ 62, 76, 80, 84, 117; WCS ¶¶ 159, 187, 190, 431, 444, 447, 159, 187,190, 449.) WAMY's contention that specific sums cannot be verified cuts against it: the gaps reflect its own deficient records, and its expert conceded that WAMY's alleged humanitarian support and its terror-support activity substantially overlapped. (PWS ¶¶ 37–39; WCS ¶¶ 162, 164, 238, 418, 419, 421, 238, 444, 449.)

These transfers capture only the financial dimension of WAMY's assistance, but the money did not travel alone. WAMY also supplied al Qaeda's network with personnel, recruits, paramilitary training, matériel and operational cover, and ideological indoctrination—forms of aid that compound, rather than replace, the sums above, and each of which independently satisfies the requirement that WAMY provided substantial aid. *See supra*, Parts I.C, II.B, IV.

**Personnel and leadership**. WAMY shared officers and directors with the al Qaeda support apparatus. Its Rule 30(b)(6) designee and Assistant Secretary General sat on the board of its "welfare arm," LBI (PWS ¶¶ 42, 57); the head of WAMY's U.S. office and a member of its board was Abdullah bin Laden, Osama bin Laden's nephew (PWS ¶ 43); and WAMY operated under the Saudi Joint Relief Committee headed by al Qaeda financier Wael Julaidan, whose Kosovo office served as "a cover for al Qaeda operatives" (PWS ¶ 85, 86).

**Recruitment.** The CIA assessed that WAMY's reach "made it an excellent conduit of recruits for many extremist groups," that its Balkans offices were "actively involved in spotting and assessing suitable terrorist recruits," and that WAMY "provides stipends for recruits." (PWS ¶ 103.) The FBI reported that WAMY targets students in the United States to promote its ideology (PWS ¶ 116.), consistent with its use as a recruitment pipeline.

**Paramilitary training**. The CIA assessed that WAMY "has sponsored and funded" paramilitary training camps teaching "weapons handling, firing, and explosives" (PWS ¶ 104), and WAMY funded the Muzaffarabad and Azad Kashmir camp networks continuously through November 2001—after the attacks (PWS ¶¶ 97, 98).

**Matériel and operational cover.** Through LBI and its successor BIF, WAMY's network purchased AK-47s and mortar rounds delivered to mujahideen camps and furnished currency and equipment to fighters in Chechnya (PWS ¶¶ 64, 91), and the CIA reported that WAMY's non-governmental support to such groups "included, in some cases, weapons" (PWS ¶ 92). LBI's director used "the cover of LBI" to provide material support to mujahideen associated with Usama Bin Laden and al Qaeda. (PWS ¶ 63.)

**Ideological indoctrination**. WAMY printed and disseminated publications exhorting violent jihad and ran youth camps to the same end—the Islamic Views and Islamic Camps materials and an encyclopedia recovered from a convicted 1993 World Trade Center bombing conspirator, as well as an al Qaeda training manual found inside a WAMY/LBI envelope. (PWS ¶¶ 106–110.) WAMY co-published, with BIF, a laudatory biography of bin Laden that the 9/11 Commission treated as an authoritative account of al Qaeda's origins. (PWS ¶ 69–70.)

Each category is assistance WAMY "did" for al Qaeda and its affiliates independent of any dollar figure; together with the financial transfers, they establish aid that is substantial many times over. (PWS ¶¶ 42–51, 63, 64, 80–98, 91–92, 103–110.)

**Factor 3—Presence at the tort (the lone exception).** As recognized *supra*, at Part I.C, Factor 3, "presence at the tort," is largely inapplicable in a case involving a sophisticated cross-border terrorist operation. Its relevance is further diminished by the fact that this is not an indirect-assistance case. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021); *see supra*, Part I.C. Even so, WAMY's reach extended into the 9/11 hijackers' orbit through Awlaki and a WAMY-associated mosque. (PWS ¶¶ 48, 127, 129; WCS ¶¶ 301, 527.)

**Factor 4—Relation to the principal.** Far from transacting at arm's length, like a bank, WAMY operated, chaired, funded, and absorbed LBI, the very entity that the Treasury Department found "joined al Qaida" and that was "one organization with interchangeable assets" with BIF. (PWS ¶¶ 55, 56, 59, 60, 62; WCS ¶¶ 162, 165, 175, 185, 510, 510.) WAMY shared leadership and a Vienna office with the bin Laden conduit TWRA; sat on the SJRC whose Kosovo arm was a cover for al Qaeda operatives run by a designated financier; funneled money to the later-designated Taibah; and placed Osama bin Laden's nephew atop its U.S. branch. (PWS ¶¶ 43, 80, 81, 84–86; WCS ¶¶ 289, 305, 391, 409, 431, 435, 437-438, 441, 444, 448, 531; *see also* WCS ¶¶ 293, 318-319 (WAMY-Canada and BIF shared officers and bank account).) This intertwined relationship confirms WAMY's close and coordinated relationship with Al Qaeda, further supporting the imposition of liability.

**Factor 5—State of mind.** Under the facts offered here, a jury could find conscious, culpable participation as opposed to inadvertence. The CIA found WAMY "couriered" donations to ideologically aligned recipients and that its personnel "pursue[d] an extremist agenda"; al-

Johani solicited weapons funding for mujahideen and transmitted a Ministry check "for our mujahideen brothers"; WAMY officials advocated jihad; and WAMY ignored red flags and kept inadequate books that, per al Qaeda's financier, are how diverted funds are hidden. (PWS ¶¶ 30, 34, 36, 88, 90, 112, 123; WCS ¶¶ 130, 391, 411, 413, 420, 504, 564.) WAMY's "humanitarian purpose" defense presents a jury argument, not a ground for summary judgment, because its relief and support activity "substantially overlapped." (WCS ¶¶ 404–405, 449.)

**Factor 6—Duration of assistance.** The assistance spanned roughly fifteen years and persisted past every public marker of al Qaeda's hostility—Afghanistan infrastructure (~1986–2001), TWRA (1992–1995), Kashmir camps (1992–Nov. 2001), and Taibah (through 2002–03), continuing after the 1996/1998 bin Laden fatwas declaring war and the 1999 FTO designation. (PWS ¶¶ 76, 78–81, 84, 97, 98, 111, 120; WCS ¶¶ 431, 435, 444, 451.)

All five of the pertinent factors thus support substantial assistance. At minimum, the evidence and facts on these five factors are genuinely disputed. Weighing this evidence is for the jury. Summary judgment on aiding and abetting must be denied. *Linde v. Arab Bank*, PLC, 882 F.3d 314 (2d Cir. 2018); *see supra*, Part I.C, I.D.

WAMY's remaining objections are matters for trial, not grounds for summary judgment. The CIA, FBI, and Department of Defense each placed WAMY inside al Qaeda's support network. (PWS ¶¶ 30, 116, 118, 119.) WAMY's reliance on the Marks forensic-accounting report fares no better: WAMY adopted no centralized financial controls until January 1, 2000, never physically audited LBI under Batterjee, and its own auditors conceded that expenditures inside Afghanistan were "not susceptible to independent audit verification"—a clean audit opinion on records kept that way supplies, at most, a competing inference, and the gaps are

WAMY's own doing.[23] (PWS ¶¶ 37–39, 123; WCS ¶¶ 167, 238, 418-419, 421, 433, 444, 449.) *Siegel* is inapposite: unlike the defendant there, which had ceased its relationship with the terrorism-linked entity before the attacks, WAMY's support of al Qaeda–linked conduits continued into and past 2001, including the May 2001 Taibah transfer. (PWS ¶¶ 84, 120.)

WAMY's "no financial documents" refrain is itself a disputed fact question, not a basis for judgment. Under the anti-money-laundering and counter-terrorism-financing standards that governments and financial institutions apply, the absence or opacity of financial records is an affirmative red flag that raises the likelihood that funds were diverted. The Court has already determined certain Plaintiffs' experts were qualified to offer opinions based on using accepted methodologies to investigate terror financing. Comras, using methodologies drawn from FATF, the EGMONT Group, the IMF, the Wolfsberg Group, and the FFIEC, noted the absence of routine records was a red flag and opined that it supported the claim that it was evidence of the "likelihood" of terrorism financing. (W Ex. 246, Comras Rpt. 6-8, 32; W Ex. 263, Comras Tr.

---

[23] WAMY's invocation of the Marks report is further undercut by unresolved questions going to its reliability and authorship, all of which are for the jury. Although Marks testified that he personally "drafted the report," Baker Tilly's own invoices reflect substantial time billed by other personnel for "report framework," "report re-work," "report revisions," and "preparation of the report," while Marks retained no written analyses from his team's review of the underlying records, which he said was conveyed to him only verbally. (W Ex. 181, Marks Tr. 80–86 & Ex. 962.) At least one former member of the Baker Tilly engagement team has since come forward with firsthand observations that neither Marks nor anyone at Baker Tilly authored the report, that Marks had limited involvement in the underlying work, and that his testimony materially overstated his role—allegations the Court has authorized to be developed through a deposition now scheduled for October 28, 2026. (ECF Nos. 12346, 12352.) The same witness states that, during Marks's deposition, WAMY's counsel supplied written prompts on an easel pad within Marks's view while questions were pending and that Marks's answers tracked those prompts. (*Id.*) The report likewise presented a clean picture while omitting record evidence adverse to WAMY. (W Ex. 181, Marks Tr. 174, 187, 208, 234, 279.) At minimum, these matters bear on the weight of Marks's opinions and present credibility questions reserved for trial. *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

72-74, 291-292; *see also* ECF No. 11157 at 46-48.) Plaintiffs' expert Winer, whom the Court qualified on "charitable financial controls," opined that a charity's lack of controls suggests links to terrorism. (PWS ¶¶ 36; WCS ¶¶ 377, 453, 463, 552, 553.) The point is probabilistic, not a declaration of WAMY's intent: the expert supplies the likelihood of diversion, and the jury draws any inference of knowledge. WAMY's own expert conceded the decisive point—that one "would not expect to see" explicit terror-support entries in a charity's books—which collapses the inference WAMY asks the Court to draw from clean ledgers; and his "no documents" conclusion rests on a limited, largely delegated review of audits prepared years after the fact and verified only to WAMY management, with Afghanistan expenditures "not susceptible to independent audit verification." (PWS ¶¶ 37–39; WCS ¶¶ 142, 167, 238, 566, 567.) Whether clean books reflect innocence or the expected signature of concealed support is a competing-inference question for the jury.

Finally, to the extent any of the foregoing relies on the Department of Defense's JTF-GTMO "Tier 1"/al Qaeda "associated forces" assessment, that assessment is offered as cumulative corroboration of the CIA, FBI, and documentary record—not as load-bearing proof—so the Court need not resolve any objection to it in order to deny summary judgment.

**This is not a "borderline" case.** Unlike the commercial defendants in the bank and platform cases, WAMY did not merely provide routine services to a customer that turned out to be a terrorist. Rather, the record supports the inference that WAMY was "covertly united in cause and purpose with Al Qaeda" and consciously advanced the shared goal of violent jihad through its own welfare arm and a web of al Qaeda-linked conduits. That makes *Halberstam's* conscious-and-culpable-participation core easier, not harder, to satisfy. *See supra,* Part I.C, I.E.

WAMY's support was a substantial factor in, and a foreseeable cause of, the attacks. JASTA aiding-and-abetting liability turns on the three *Halberstam* elements and the substantial-assistance factors; it imposes no separate, redundant proximate-cause requirement of the kind that governs primary liability under 18 U.S.C. § 2333(a). *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018); *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495 (2d Cir. 2021); *see also Sec. Exch. Comm'n v. Apuzzo*, 689 F.3d 204, 213, n.11 (2d Cir. 2012) (recognition of proximate cause as relevant to substantial assistance "does not establish proximate cause as a distinct element of an aiding and abetting claim"). To the extent proximate causation is a feature of any of Plaintiffs' other claims it is easily satisfied here. Proximate cause requires (1) that WAMY's support was a substantial factor leading to the injury and (2) that the injury was a reasonably foreseeable consequence; because support is fungible, it need only have increased al Qaeda's "operating capacity"—its global strike capability—and the defendant need not have known its support was for the 9/11 attacks specifically. *See supra*, Part I.C, I.F. This proximate-cause inquiry is analytically distinct from aiding-and-abetting substantiality. *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018).

WAMY's recruitment pipeline, training sponsorship, and intermediary financing increased al Qaeda's operating capacity and global strike capability. WAMY's support let al Qaeda recruit, train, and support operatives outside the United States. (PWS ¶¶ 103-126.) The CIA found Afghan-trained militants became a ready pool of manpower for terrorist operations and that two of the 9/11 hijackers followed this pattern. (PWS ¶ 126.)

Foreseeability is independently satisfied: WAMY continued to fund conflict-zone jihad and al Qaeda-linked conduits even after bin Laden's 1996 and 1998 declarations of war on

Americans and after the 1999 FTO designation, including the May 2001 Taibah transfer. (PWS ¶¶ 84, 111, 120; WCS ¶ 444, 449, 451.)

Finally, at the end of the foreseeability chain there is also a direct link to the terrorists: WAMY's sponsored cleric Awlaki facilitated at least two of the 9/11 hijackers inside the United States. (PWS ¶¶ 126, 127, 129, 130; WCS ¶¶ 301, 305, 310-311, 527.) WAMY's demand for proof of a direct payment to the hijackers is not the standard. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021); *see supra*, Part I.C, I.D, I.F.

**B. A Reasonable Jury Could Find JASTA Conspiracy Liability.**

Civil conspiracy requires an agreement (tacit suffices, and may be inferred from the parties' relationship, overt acts, concert of action, and the totality of their conduct) to participate in an unlawful act, and an injury from an overt act in furtherance of the common scheme; the co-conspirators must be "pursuing the same object," but the agreement need not be direct and the defendant need not have met or known the attacker. *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 77-78 (2d Cir. 2023); *see supra*, Part I.G.

The same common-cause evidence that distinguishes this from the borderline cases supplies the "same object" agreement inference. WAMY shared al Qaeda's violent-jihad objective and pursued it in sustained concert through al Qaeda-linked intermediaries (its own welfare arm LBI/BIF, the bin Laden conduit TWRA run by WAMY's own officer, the SJRC Kosovo cover run by a designated financier, and the later-designated Taibah), with the 9/11 attacks as the overt act in furtherance. (PWS ¶¶ 52, 60, 63, 64, 81, 84, 85; WCS ¶¶ 99, 162, 391, 409, 431, 441, 444, 510.) Because a tacit agreement may be inferred from this relationship and concert of action, the conspiracy claim presents a jury question. *Freeman*, 57 F.4th at 77; *see supra*, Part I.G.

WAMY's contrary arguments do not alter this conclusion. *Freeman* is distinguishable: unlike the defendant banks there, which provided routine services and were not alleged to share the terrorists' objectives, the record supports the inference that WAMY shared al Qaeda's violent-jihad objective and pursued it in sustained concert through al Qaeda–linked intermediaries. *See supra*, Part I.E, I.G. WAMY's contention that its books reflect no "red flags" does not defeat the inference of a tacit agreement, which turns on the totality of the parties' relationship and concert of action—not on tracing a particular transfer or a formal designation. *See supra*, Parts I.G, II.D.

Finally, the September 11 attacks were themselves the overt act that carried out the very object of the conspiracy WAMY joined. Attacking the United States was al Qaeda's purpose from its inception. Bin Ladin founded al Qaeda in 1988 as "a base or foundation" to serve "as a potential general headquarters for future jihad." Ex. 1, W Ex. 4, 9/11 Commission Report at 56; *see also* W Ex. 74, Winer Rpt. §§ 4.1–4.2 (al Qaeda "founded by bin Ladin in 1988" and "targeted U.S. interests and citizens for its attacks"). "[F]rom at least 1991 and throughout the ensuing years preceding the September 11th attacks," al Qaeda's "primary goal and mission was to carry out attacks against the United States," with bin Ladin "concentrated . . . on attacking the 'far enemy'—the United States." *Id.* at 59. That objective was pursued with relentless dedication: "[p]lans to attack the United States were developed with unwavering singlemindedness throughout the 1990s." *Id.* at 48. And al Qaeda announced that war to its partners from the beginning and to the wider world in the years that followed—in the al Qaeda leadership's 1992 fatwa singling out U.S. forces, *id.* at 59; in bin Ladin's August 1996 "Declaration of War," W Ex. 59, Levitt Rpt. at 12; and, most explicitly, in the February 1998 "World Islamic Front" fatwa proclaiming that "the murder of any American, anywhere on earth," was "the individual duty for

every Muslim who can do it in any country in which it is possible to do it," Ex. 1, W Ex. 4, 9/11 Commission Report at 47.

Given the centrality of inflicting injury upon the United States as a perceived enemy to al Qaeda's mission, WAMY's knowing support demonstrates more than knowing assistance. It demonstrates tacit agreement with this objective. The inference is strengthened by WAMY's broader advocacy for militant jihad and associations with anti-American extremists.

The September 11 attacks were the culmination of that enterprise. Al Qaeda built a network of fronts and conduits that "covertly provided financial and other support for terrorist activities," including "an office of the Benevolence International Foundation in Sarajevo" and the "Third World Relief Agency (TWRA)," *id.* at 57–58, the very intermediaries through which WAMY's support flowed. (PWS ¶¶ 61, 63, 64, 80, 81; WCS ¶¶ 99, 162, 391, 409, 431, 441, 444, 510.) Relying on that infrastructure, al Qaeda carried out the 1998 East Africa embassy bombings, the 2000 attack on the U.S.S. *Cole*, "and, of course, the September 11th attacks." *Id.* at 68–70, 147–148; *see* W. Ex. 74, Winer Rpt. § 7.2.3 (charitable support "incubated al Qaeda's ability to strike globally, including its ability to attack the United States," culminating "on 9/11"). The attacks were thus not a departure from the conspiracy's object but its fulfillment, and a co-conspirator is answerable for the overt acts committed in furtherance of the common scheme. *See supra*, Part I.G. Because WAMY joined a conspiracy whose defining object was to attack the United States, and the September 11 attacks were the overt act accomplishing that object, a reasonable jury could find WAMY liable for conspiracy.

### C. The New York State-Law Claims Survive With The Federal Claims.

WAMY contends (at 70–71) that Plaintiffs' state-law aiding-and-abetting and conspiracy claims fail. That argument is foreclosed by this Court's own rulings. In parallel terrorism litigation, the Court has recognized that New York aiding-and-abetting and conspiracy claims

share substantially the same elements as the secondary-liability claims available under the ATA and JASTA, applying the *Halberstam* framework as the governing New York standard. *See* ECF No. 12318, at 22–23 (Sept. 21, 2026) (applying *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) as the correct standard under New York law), *adopted*, ECF No. 12331 (Sept. 29, 2026); ECF No. 9666, at 8 (Mar. 26, 2024) (applying the *Halberstam* factors under New York law); *see also Lindsay v. Lockwood*, 625 N.Y.S.2d 393, 397 (S. Ct., Monroe Co. 1994) (citing *Halberstam* for New York's conspiracy-liability standard). Because Plaintiffs' JASTA and ATA claims survive summary judgment, *see supra,* Parts I.G, I.H, VI., their New York aiding-and-abetting and conspiracy claims survive with them.

The New York tort claims, wrongful death, survival, IIED, and trespass, are derivative of concerted-action liability and lie where Plaintiffs show WAMY "supported, aided and abetted, or conspired with" the al Qaeda terrorists, which requires that WAMY "know the wrongful nature of the primary actor's conduct." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005); *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp. 2d 539, 554 (S.D.N.Y. 2005) (quoting *Pittman v. Grayson,* 149 F.3d 111, 122–23 (2d Cir.1998)). The same concert-and-knowledge predicate that defeats summary judgment on the federal claims—supported by the cited facts from Plaintiffs' Rule 56.1 affirmative and counter statements—carries these derivative claims; the attacks are themselves "extreme and outrageous" for IIED. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005). Secondary-liability theories fail only if no underlying tort survives, *see Small v. Lorillard Tobacco Co*., 94 N.Y.2d 43, 57 (1999), which is not the case here. WAMY's argument that Plaintiffs must show WAMY itself entered the land, struck the plaintiffs, or destroyed the property misapprehends the theory: on a concerted-action basis, the intentional-tort elements are supplied by the primary

tortfeasors—al Qaeda and the hijackers—whose conduct is attributed to WAMY as a knowing participant, so the assault, battery, and property-destruction claims rise with the wrongful-death, survival, IIED, and trespass claims. WAMY's contention that the state claims "fail for the same reasons" as the federal claims rises and falls with those federal arguments, which do not support summary judgment.

WAMY's challenge to the specific elements of the state-law claims fares no better. WAMY first contends that Plaintiffs cannot establish wrongful death because the evidence does not show that WAMY committed any act that caused a decedent's death. The record is to the contrary. As summarized above and in Plaintiffs Statements of Fact, for years WAMY provided critical support to al Qaeda and its network—*e.g.*, operating and funding its designated "welfare arm" LBI, provision of direct and intermediary financing, weapons and matériel, personnel and organizational infrastructure, conflict-zone logistical support; and facilitating recruitment, movement of fighters, and military and paramilitary training—continuing even after al Qaeda announced it would target Americans. That sustained support to an organization bent on attacking the United States foreseeably resulted in an attack on Americans—here, September 11.

Ample New York authority confirms that concerted-action liability reaches precisely this conduct, and that a defendant need not personally strike the victim or enter the property to be liable. *See Maurizi v. Callaghan*, No. 20-CV-922JLS(F), 2022 WL 1446500, at *14 (W.D.N.Y. Feb. 25, 2022) (sustaining aiding-and-abetting-battery claim where defendant knew of the primary actor's abuse yet "took no action to stop the abuse"), *report and recommendation adopted*, 2022 WL 1444182 (W.D.N.Y. May 5, 2022); *Wilson v. DiCaprio,* 717 N.Y.S.2d 174, 175 (1st Dep't 2000) (allegations of a "close relationship" and a shout of encouragement sufficient to sustain an aiding-and-abetting-battery claim); *Bensky v. Indyke,* 743 F. Supp. 3d

586, 598 (S.D.N.Y. 2024) (allowing aiding-and-abetting claims against Epstein's closest advisors who facilitated the venture); *Dennis v. Napoli,* 148 A.D.3d 446, 49 N.Y.S.3d 652, 653 (1st Dep't 2017) (concerted-action liability for facilitating a co-defendant's campaign of harassment); *Scollo v. Nunez,* 874 N.Y.S.2d 380 (2d Dep't 2009) (triable issues of fact on a tacit agreement to assault or batter the plaintiffs). As *Halberstam* recognized, the contributing activity "need not be so obviously nefarious as cheering a beating or prodding someone to drive recklessly," and "may also be more distant in time and location and still be substantial enough to create liability." 705 F.2d at 482.

**D. Conclusion.**

Viewed cumulatively and in the light most favorable to Plaintiffs, the record of both Rule 56.1 statements would permit a reasonable jury to find that WAMY was generally aware of its role in al Qaeda-related activity, knowingly provided substantial assistance directly and through intermediaries, conspired in the common scheme, and thereby substantially and foreseeably contributed to the September 11 attacks. WAMY's motion should be denied.

## CONCLUSION

Based on Plaintiffs' Rule 56.1 Statements and Counterstatements, upon the accompanying Exhibits, and upon all papers filed and proceedings had herein, and for all the reasons stated herein, Plaintiffs respectfully request that the Court deny the motions for summary judgment made by Defendants MWL, IIRO, and WAMY, and that the Court grant such other, further, and different relief as is just under the circumstances.

Dated: October 16, 2026

**MOTLEY RICE, LLC**
By: *\/s/ Robert T. Haefele*
Robert T. Haefele, Esq.
Donald A. Migliori, Esq.
Jodi W. Flowers, Esq.
John M. Eubanks, Esq.
Jade Haileselassie, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9000
rhaefele@motleyrice.com
dmigliori@motleyrice.com
jflowers@motleyrice.com
jeubanks@motleyrice.com
jhaileselassie@motleyrice.com

Michael J. Quirk, Esq.
Three Logan Square
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Tel: (267) 267-4740
mquirk@motleyrice.com

Attorneys for *Burnett and Euro Brokers* Plaintiffs

**COZEN O'CONNOR**
By: */s/ Sean Carter*
Sean Carter, Esq.
J. Scott Tarbutton, Esq.
Abby Sher, Esq.
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-7255
scarter1@cozen.com
starbutton@cozen.com
asher@cozen.com
Attorneys *for Federal* Plaintiffs

**ANDERSON KILL P.C.**
By: */s/ Jerry S. Goldman*
Jerry S. Goldman, Esq.
Hon. Ethan Greenberg (Ret.)
Bruce E. Strong, Esq.
Alexander A. Greene, Esq.
Amy T. Zelen, Esq.
7 Times Square, 15th Floor
New York, NY 10036
Tel.: (212) 278-1000
jgoldman@andersonkill.com
egreenberg@andersonkill.com
bstrong@andersonkill.com
agreene@andersonkill.com
azelen@andersonkill.com

Attorneys for *O'Neill* Plaintiffs

**KREINDLER & KREINDLER LLP**
By: */s/ Megan Wolfe Benett*
Megan Wolfe Benett, Esq.
Justin T. Green, Esq.
Steven R. Pounian, Esq.
Andrew J. Maloney III, Esq.
Gavin Simpson, Esq.
485 Lexington Ave
New York, NY 10017
Tel: (212) 973-3438
mbenett@kreindler.com
jgreen@kreindler.com
spounian@kreindler.com
amaloney@kreindler.com
gsimpson@kreindler.com

Attorneys for *Ashton* Plaintiffs

**SPEISER KRAUSE P.C.**
By: *_/s/ Jeanne M. O'Grady_*
Jeanne M. O'Grady, Esq.
Frank H. Granito, III,
800 Westchester Ave, Ste. S-608
Rye Brook, NY 10573
Tel: (914) 220-5333
jog@speiserkrause.com
f3g@speiserkrause.com

Attorneys for *Burlingame* Plaintiffs

**BAUMEISTER & SAMUELS, P.C.**
By: *_/s/ Dorothea M. Capone_*
Dorothea M. Capone, Esq.
Michael Baumeister, Esq.
200 Vesey Street, Suite 24170
New York, NY 10281
Tel: (212) 363-1200
tcapone@baumeisterlaw.com
mbaumeister@baumeisterlaw.com

Attorneys for *Bauer* and *Parker* Plaintiffs

**WIGGINS CHILDS PANTAZIS FISHER GOLDFARB PLLC**
By: *_/s/ Timothy Brian Fleming_*
Timothy Brian Fleming, Esq.
2202 18th Street, N.W., #110
Washington, D.C. 20009
Tel.: (202) 467-4489
tfleming@wigginschilds.com

Attorneys for *Ray* and *Maher* Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Motions for Summary Judgment by Defendants International Islamic Relief Organization, Muslim World League and World Assembly of Muslim Youth Under Local Rule 34.1(d) was served by electronic transmission through the Southern District of New York's Case Management Electronic Case Filing ("ACMS") system on October 16, 2026.

Dated: October 16, 2026

By: *<u>/s/ Jerry S. Goldman</u>*

Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, NY 10036
Tel.: (212) 278-1000

*Attorneys for O'Neill* Plaintiffs